# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MALKA RAUL, Derivatively on Behalf of Nominal Defendant GENERAL ELECTRIC COMPANY,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>JOHN L. FLANNERY, SEBASTIEN M. BAZIN, W. GEOFFREY BEATTIE, JOHN J. BRENNAN, FRANCISCO D'SOUZA, MARIJN E. DEKKERS, EDWARD P. GARDEN, PETER B. HENRY, SUSAN J. HOCKFIELD, ANDREA JUNG, RISA LAVIZZO-MOUREY, ROCHELLE B. LAZARUS, STEVEN M. MOLLENKOPF, JAMES J. MULVA, JAMES E. ROHR, MARY L. SCHAPIRO, JAMES S. TISCH, JAMIE MILLER, JEFFREY R. IMMELT, and JEFFREY S. BORNSTEIN<br><br>　　　　　　　Defendants,<br><br>and<br><br>GENERAL ELECTRIC COMPANY,<br><br>　　　　　　　Nominal Defendant. | Civil Action No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Malka Raul (Plaintiff"), by and through her undersigned attorneys, brings this shareholder derivative action for the benefit of Nominal Defendant General Electric Company ("GE" or the "Company"), against certain of the Company's officers and members of the Board of Directors (the "Board") seeking to remedy Defendants' (as defined below) violations of §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duty, abuse of control, unjust enrichment, and gross mismanagement.  Plaintiff makes these allegations upon

personal knowledge and the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by GE and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review of news articles, shareholder communications, and postings on GE's website; (c) review of the pleadings and other documents in the securities class action captioned *Hachem v. General Electric, Inc.*, Case No. 1:17-cv-08457 (S.D.N.Y.) (the "Securities Class Action"); and (d) review of other publicly available information concerning GE and the Defendants.

## NATURE OF THE ACTION

1.       Plaintiff brings this action derivatively for the benefit of Nominal Defendant GE against certain of the Company's current and former executive officers and directors seeking to remedy the Defendants' violations of the Exchange Act for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately December 14, 2016 to the present (the "Relevant Period").[1]

2.       GE is a technology and financial services company operating around the globe, operating several different segments, including Capital, Healthcare, Aviation, Power, Oil & Gas, Renewable Energy, Energy Collections & Lighting, and Transportation.

3.       During the Relevant Period, and for years prior thereto, Defendants falsely reported the finances of its power and insurance segments (the GE insurance segment is a subsidiary of GE Capital).

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately December 14, 2016 to January 24, 2017; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

**False and Misleading Statements and Material Omissions Concerning $15 Billion of Exposure to Long Term Care Insurance Liabilities**

4.      On January 16, 2018 GE shocked investors when it announced that the Company would have to pay $15 billion for reserves to cover its underpayment of reserves for long-term care insurance (which pays for products such as nursing-home care for the elderly) liabilities, with the result that anticipated earnings and dividends were drastically reduced and the Company's stock dropped over 7.5% in the following several trading days following the announcement.

5.      Long term care insurance ("LTC") contracts written in the early 2000's caused hundreds of billions of dollars of losses to the insurers who issued them as a result of policyholders living longer and incurring higher medical costs than insurers had built into their initial assumptions at the time the LTC contracts were written in the early 2000's.  A vast majority of insurance companies (including GE) withdraw from writing new LTC contracts years ago, and it was only because no party desired to accept GE's huge LTC insurance liabilities, that GE's LTC insurance contracts were carved out of the deal spinning off the profitable portions of its insurance segment over a decade earlier.

6.      The January 16, 2018 $6.2 billion charge (resulting from the suddenly announced $15 billion set aside for reserves) did not mysteriously materialize overnight or in a year.  Rather, it resulted from over a decade's worth of the Company's intentional underreporting of potential LTC liabilities.  Concerning the news, CEO Defendant Flannery stated "At a time when we are moving forward as a company, a charge of this magnitude from a legacy insurance portfolio in runoff for more than a decade is deeply disappointing."

7.      The huge unreported liabilities associated with GE's retention of unprofitable LTC insurance contracts had been long known to the many dozens of GE executives, accountants,

actuaries and other employees, who actively participated in altering of LTC actuarial projections and other financial data so as to conceal the extent of the Company's LTC liability from investors.

8.      On January 24, 2018, the Company filed an 8-K with the SEC announcing its fourth quarter results for 2017.  The Company reported EPS of $0.28 on revenue that fell 5% year over year to $31.4 billion.  This was short of analysts' expectations of $0.28 per share on revenue of $33.93 billion.

9.      In addition, during a conference call that same day, the Company noted that SEC regulators were investigating the $6.2 billion insurance loss revealed by the Company on January 16, 2018, and that the SEC was also investigating the Company's accounting practices, specifically looking into "revenue recognition and controls" for the Company's long-term service agreements. In response, the Company noted that it would restate its 2016 and 2017 quarterly numbers to reflect "new accounting standards."

### False and Misleading Statements and Material Omissions Concerning Power Segment and Cash Flow

10.      In addition, throughout the Relevant Period, the Company issued false representations to the market concerning GE Capital's cash flow position, in large part as a result of overstating the strength of its power segment.  For instance, on July 21, 2017, the Company noted that "[w]e have created a very strong position in Power" and that it was expecting "cash flow to continue to improve throughout the year."

11.      On October 20, 2017, GE announced its quarterly results for the third quarter 2017. The Company reported earnings per share ("EPS") of $0.29, falling short of estimates of $0.49 per share.  In addition, the Company also stated that it was lowering 2017 earnings expectations, lowering EPS to $1.05-$1.10 from $1.60-$1.70, as well as deferring the decision to pay

approximately $3 billion of additional GE Capital dividends until a review of the Company's deficiency assumptions was conducted.

12.     That same day, the Company held a conference call with analysts and investors to discuss the above results.  On the call, the Company's current CEO, Defendant Flannery, stated "[w]hile the company has many areas of strength, it's also clear from our current results that we need to make some major changes with urgency and a depth of purpose.  Our results are unacceptable, to say the least."  Defendant Flannery further noted that problems with the Company's Cash Flow from Operating Activities ("CFOA") was down primarily due to "lower than anticipated power volume which was resulted in lower earnings and higher inventory. . . ."

13.     In the October 20, 2017 conference call, Defendants largely blamed the disappointing results on its power segment.  In particular, Defendant Flannery stated that the results were due to "lower than anticipated Power volume which was resulted in lower earnings and higher inventory . . . ."  Following the news, the Company stock fell nearly 7% or $1.51 per share on October 23, 2017.

14.     On November 13, 2017, the Company held an Investor Update and revealed that it would be slashing its annual dividend in half, from $0.96 to $0.48 per share.  This would mark only the second dividend cut by the Company since the Great Depression.  The Company noted that after realizing its industrial business had not grown as previously expected, it would no longer be appropriate to keep the same dividend rate.

15.     Throughout the Relevant Period, Defendants failed to disclose that GE Power was suffering order drops, excess inventories and increased costs, and in part as a result thereof the Company overstated GE's full year 2017 guidance.

16.     The Company and its shareholders have been severely harmed by the false and misleading statements concerning the Company's business, operations, and prospects.  As a result of the above described misconduct, the Company's stock price has continued to drop and has failed to recover.  As of April 11, 2018, the Company's stock was trading near its lowest level in the past six years, closing at $12.98, a stark contrast to the $31.75 the Company's stock was trading at on December 16, 2016, shortly after the beginning of the Relevant Period.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1331 because the claims arise under and pursuant to § 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

18.     The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

19.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.  Also, the Company's principal executive offices are located in this District.

## THE PARTIES

20.     Plaintiff was a shareholder at the time of the wrongdoing complained of herein, has continuously held shares in the Company throughout the Relevant Period, and continues to hold shares in GE currently.

21.     Nominal Defendant GE is a New York corporation with its principal executive offices at 41 Farnsworth Street, Boston, Massachusetts 02210.  The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GE."

22.     Defendant John L. Flannery ("Flannery") has been a member of the Board since and the Company's Chief Executive Officer ("CEO") since August 1, 2017.  Defendant Flannery has been the Chair of the Board since October 2, 2017.  In his role as CEO for fiscal year 2017, Defendant Flannery received $16,005,604 in total compensation.

23.     Defendant Sebastien M. Bazin ("Bazin") has been a member of the Board since 2016.  Defendant Bazin is a member of the Board's Audit Committee.

24.     Defendant W. Geoffrey Beattie ("Beattie") has been a member of the Board since 2009.  Defendant Beattie is a member of the Board's Audit Committee.

25.     Defendant John J. Brennan ("Brennan") has been a member of the Board since 2012.  According to the Company's website, Defendant Brennan is designated the Board's "Lead Director" and Defendant Brennan is the Chair of the Compensation Committee and a member of the Governance Committee.

26.     Defendant Francisco D'Souza ("D'Souza") has been a member of the Board since 2013.  Defendant D'Souza is a member of the Board's Industrial Risk Committee.

27.     Defendant Marijn E. Dekkers ("Dekkers") has been a member of the Board since 2012.  Defendant Dekkers is the Chair of the Board's Industrial Risk Committee and member of the Compensation Committee.

28.     Defendant Edward P. Garden ("Garden") has been a member of the Board since October 2017.

29.     Defendant Peter B. Henry ("Henry") has been a member of the Board since 2016. Defendant Henry is a member of the Board's Audit Committee.

30.     Defendant Susan J. Hockfield ("Hockfield") has been a member of the Board since 2006.   Defendant Hockfield is a member of the Board's Governance and Industrial Risk Committees.

31.     Defendant Andrea Jung ("Jung") has been a member of the Board since 1998. Defendant Jung is a member of the Board's Governance and Compensation Committees.

32.     Defendant Risa Lavizzo-Mourey ("Lavizzo-Mourey") has been a member of the Board since 2017.   Defendant Lavizzo-Mourey is a member of the Board's Governance Committee.

33.     Defendant Rochelle B. Lazarus ("Lazarus") has been a member of the Board since 2000.  Defendant Lazarus is the Chair of the Board's Governance Committee and member of the Compensation Committee.

34.     Defendant Steven M. Mollenkopf ("Mollenkopf") has been a member of the Board since 2016.  Defendant Mollenkopf is a member of the Board's Industrial Risk Committee.

35.     Defendant James J. Mulva ("Mulva") has been a member of the Board since 2008. Defendant Mulva is a member of the Board's Audit and Industrial Risk Committees.

36.     Defendant James E. Rohr ("Rohr") has been a member of the Board since 2013. Defendant Rohr is a member of the Board's Audit and Governance Committees.

37.     Defendant Mary L. Schapiro ("Schapiro") has been a member of the Board since 2013.  Defendant Schapiro is the Chair of the Board's Audit Committee.

38.     Defendant James S. Tisch ("Tisch") has been a member of the Board since 2010. Defendant Tisch is a member of the Board's Governance Committee.

39.     Defendants Flannery, Bazin, Beattie, Brennan, D'Souza, Dekkers, Garden, Henry, Hockfield, Jung, Lavizzo-Mourey, Lazarus, Mollenkopf, Mulva, Rohr, Schapiro and Tisch are collectively referred to herein as the "Director Defendants."

40.     Defendant Jamie Miller ("Miller") has been the Company's CFO since Defendant Bornstein's departure in October 2017.  Defendant Miller has previously been President and CEO of GE Transportation, Vice President, Controller and Chief Accounting Officer; and as GE's Chief Information Officer.

41.     Defendant Jeffrey R. Immelt ("Immelt") was the Chairman of the Board and the Company's CEO from September 2001 through August 1, 2017.

42.     Defendant Jeffrey S. Bornstein ("Bornstein") was the Company's Chief Financial Officer ("CFO") from July 1, 2013 through November 1, 2017.

43.     Defendants Miller, Immelt and Bornstein, along with the Director Defendants, are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

44.     Founded in 1892, GE is a technology and financial services company operating around the globe, offering a wide variety of products and services including aircraft engines, power generation, water processing and household appliances.  The Company operates along several different segments, including Capital, Healthcare, Aviation, Power, Oil & Gas, Renewable Energy, Energy Collections & Lighting, and Transportation.  Two segments which were the primary sources of the false and misleading in particular – GE Capital and GE Power.

45.     GE Capital is GE's financial services unit and provides lending and leasing opportunities to customers in the aviation, energy, and industrial sectors. Recently (and during the

Relevant Period), flow-through dividends from GE Capital provided GE with a substantial amount of its free cash flow used for dividends and to fund buybacks to GE shareholders. GE Capital paid dividends to GE of approximately $28.4 billion between 2015 and 2017.

46.     GE Power, a wholly-owned subsidiary of GE, builds industrial products including power plants, turbines, and generators. GE Power serves power generation, industrial, government and other customers around the world with products and services related to energy production. The Company's products and technologies harness resources, such as oil, gas, coal, diesel, and nuclear to produce electric power and include gas and steam turbines.

47.     GE Power includes a number of divisions that each provides customers different product and services offerings. The Power Services division delivers maintenance, service, and upgrade solutions for the GE products, such as gas turbines. GE contracts with customers to provide servicing and maintenance on those products pursuant to long-term services agreements.

48.     GE Power is the largest segment within the Industrial segment of GE's business and is a significant driver of overall revenue. Indeed, the GE Power segment generated $26.8 billion of GE's overall revenue of $123.7 billion in 2016 and $36.0 billion of GE's overall revenue of $122.1 billion in 2017, representing approximately 30% of GE's total revenue in 2017.

**Defendants Caused the Company to Issue the False and Misleading 2017 Proxy Statement**

49.     On March 8, 2017, the Company filed its proxy statement on Form DEF 14A with the SEC for the 2017 annual meeting of shareholders (the "2017 Proxy"). The 2017 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for reelection.

50.     In the 2017 Proxy, the Company emphasized its supposed past and current efforts to establish and enforce effective controls over financial reporting. The 2017 Proxy stated, in part,

The Board has oversight for risk management at GE with a focus on the most significant risks facing the company, including strategic, operational, financial and legal and compliance risks.

GE uses a broad set of financial metrics to measure its performance, and accurate financial reporting and robust auditing are critical to our success. We have added a number of directors who qualify as audit committee financial experts, and we expect all of our directors to have an understanding of finance and financial reporting processes.

51.    The above statements were false and misleading and omitted material information because the Board has, and continues to, knowingly disregard its oversight responsibility in the area of financial reporting and has ratified GE's past egregious and systemic financial misreporting, as detailed below.

### False and Misleading Statements During the Relevant Period

52.    At the beginning of the Relevant Period, on December 14, 2016, the Company held an annual meeting with investors and analysts to provide forecasts for the upcoming year.  During the conference call, the Company provided the following forecasts for 2017: EPS of $1.60 to $1.70 and GE Capital dividend of $6 billion to $7 billion.  Then-CEO Defendant Immelt represented that the guidance provided was supported by "***very strong pipeline not just in the Power business but across the portfolio . . . .***"

53.    Also on the December 14, 2016 conference call, one analysts from JPMorgan noted that the "$6 billion to $7 billion GE Capital dividends to [GE]" was a "little bit below what [the Company] had initially laid out," and raised his concern about anticipated cash flows and dividends from GE Capital.  Responding, Defendant Bornstein represented that the dividends were sustainable, and that GE Capital was performing well on cash flows, stating: "[w]e pulled dividends [from 2017] into 2016.  ***We are actually several billion dollars ahead of the plan that we gave you, we are not behind plan.***"

54.     On January 20, 2017, the Company hosted a conference call with analysts and

investors to announce and discuss the Company's fourth quarter and annual 2016 financial results.

On the conference call, Defendant Bornstein reiterated the above 2017 EPS forecast, CFOA, and

dividend guidance, in particular highlighting strong growth in GE's power segment:

> ***Our outlook for Power remains consistent with the expectations shared at the
> outlook meeting***, albeit off a lower base.  As we said in December, we expect
> double-digit earnings growth in Power in 2017.

(Emphasis added).

55.     Also on the January 20, 2017 conference call, Defendant Immelt noted that cash

flow would be improved by selling off aging inventory, stating "[w]e expect inventory to go down

$2 billion next year.  And we think ***that's going to give us a ton of momentum as it pertains to***

***CFOA and working capital in 2017.***"

56.     On February 24, 2017, the Company filed its annual report on Form 10-K for the

year ended December 31, 2016 with the SEC (the "2016 10-K"), signed by Defendants Immelt

and Bornstein.  The 2016 10-K stated Company's financial results and position and contained

signed certifications pursuant to the Sarbanes-Oxley Act ("SOX") by Defendants Immelt and

Bornstein specifically certifying the following:

> 1. I have reviewed this report on Form 10-Q of General Electric Company;
>
> 2. ***Based on my knowledge, this report does not contain any untrue statement of
> a material fact or omit to state a material fact necessary to make the statements
> made, in light of the circumstances under which such statements were made, not
> misleading with respect to the period covered by this report***;
>
> 3. Based on my knowledge, the financial statements, and other financial
> information included in this report, fairly present in all material respects the
> financial condition, results of operations and cash flows of the registrant as of, and
> for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing
> and maintaining disclosure controls and procedures (as defined in Exchange Act

Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> a. ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

> b. ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

(Emphasis added).

57.    On March 8, 2017, the Company held a meeting with investors focusing on its Power and Renewable Energy segments.   During the meeting, Defendant Bornstein again

reiterated the strength of the Company's power segment, noting "[w]e feel really good about the power business and what is otherwise a pretty flat market and a really tough set of geographies." Defendant Bornstein also reiterated his confidence in 2017 free cash flow.

58.     On April 21, 2017, the Company held a conference call for analysts and investors to discuss GE's first quarter 2017 results.  During the conference call, Defendant Bornstein noted that the Company would still deliver on its 2017 free cash flow guidance and again touted the Company's power segment:

> In Power, we didn't collect on several delinquent accounts in tough regions around the world, but we expect to collect these throughout the rest of the year, including in the second quarter . . . .  ***Power had a very strong organic growth quarter*** on higher Aero turbines and higher gas turbine shipments . . . .  Our view for the year of mid-single-digit organic growth has not changed.

(Emphasis added).

59.     On June 12, 2017, the Company issued a press release announcing that Defendant Immelt would be stepping down from his position as CEO effective July 31, 2017 and Chairman of the Board effective October 2, 2017.

60.     During Defendant Immelt's tenure as CEO of GE, he oversaw a 30% decline in the Company's stock price, and a loss of nearly $150 billion in market value.[2]  Despite that fact, at his departure, Defendant Immelt was handsomely rewarded. While the Company does not give departing employees severance agreements per se, it does allow executives to receive the majority of their stock and stock option grants in full upon departure, even if the executive would ordinarily need to continue their employment with the Company in order to receive them.  At his departure, Defendant Immelt was eligible to collect more than $39 million, on top of the nearly $82 million in pension benefits pursuant to his employment agreement.  In addition, Defendant Immelt had

---

[2] http://fortune.com/2017/06/12/ge-ceo-jeff-immelt-net-worth/.

more than $75 million in GE stock at the time of his departure from the Company, and along with other retirement benefits, Defendant Immelt stood to receive almost $211 million in total at the time of his departure from the Company.

61.     On July 21, 2017, Defendants caused the Company to issue a press release in which it announced earnings for the second quarter 2017.  The Company stated that it had net earnings of $1.2 billion or $0.13 per share, on total revenues of $29.6 billion.  In addition, the Company provided guidance of $1.60-$1.70 per share.

62.     The July 21, 2017 press release also provided an overview of the Company's major transactions by segment:

**INDUSTRIAL DEAL HIGHLIGHTS**

**POWER:**
9 HA gas turbine orders in 2Q with 33 units in backlog
Won largest Power Services agreement in history - more than $3 billion - to support a large volume of power in Algeria with Sonelgaz, including 68 Advanced Gas Path upgrades (AGPs)
Won $200+ million fast power and digital services contracts to supply power for up to 15% of the population of Angola

**RENEWABLE ENERGY:**
Won contract to supply Invenergy's 300MW wind farm in Texas with 120 GE2.5-116 turbines
First large-scale pilot of Digital Hydro Plant with Fortum in Sweden

**OIL & GAS:**
Combined Baker Hughes and GE Oil & Gas to create BHGE in 3Q; world's first fullstream oil and gas company
Deal for subsea production systems, equipment, and service for Mozambique offshore development project, making us the first subsea supplier in Mozambique and East Africa

**HEALTHCARE:**
Announced 10-year collaboration with Partners Healthcare to develop Artificial Intelligence medical platforms and solutions
Signed agreement with Humber River Hospital in Canada to install a digital Command Center, using predictive analytics to target improved clinical, operational and financial outcomes

Announced deal to install India's first-ever FlexFactory to expand biologics production in Hyderabad, India

**TRANSPORTATION:**
Signed letter of intent with Ministry of Transportation and Egyptian National Railways worth $575 million for locomotives and 15-year agreement for parts and technical support

**ENERGY CONNECTIONS:**
Introduced world's first battery-gas turbine hybrid system with Southern California Edison
India's first-ever LV5 solar inverter solution deployment with 25-year long-term service agreement; largest executed order to date in the country

**AVIATION:**
Announced more than $31 billion-a) in orders and commitments at the Paris Air Show
Signed $3 billion long-term CFM LEAP-1B engine-b) support agreement with VietJet Air
Awarded $1 billion contract from U.S. Army for 2,500 T700 engines

**GLOBAL GROWTH:**
Signed $15 billion of MoUs and agreements for industrial project development and capacity building in Saudi Arabia

**CURRENT, POWERED BY GE:**
Announced second phase of JPMorgan Chase collaboration to reduce their global energy consumption by 15% across 4,500 branches
Signed UK's largest LED deal with Sainsbury's to switch to 100% LED lighting in its stores

**DIGITAL:**
Signed Predix digital solutions agreement with Saudi Ministry of Health to enable digital hospitals
IDC MarketScape recognized GE Digital as a leader in IoT solutions in its IDC MarketScape: IoT Platform 2017 Vendor Assessment

63.     The July 21, 2017 press release also again attempted to assure investors that the

Company's power segment was in fact a strength, with Defendant Immelt stating that "[w]e have

created a very strong position in Power" and that the Company expects "cash flow to continue to

improve throughout the year."

64.     Also on July 21, 2017, the Company held a conference call with investors and analysts to discuss the above results.  On the conference call, the Company reiterated that its power segment was a strength, providing false assurance of GE's cash flow position.  In particular, Defendant Bornstein stated that the Company expected "[p]ower business to deliver a positive CFOA in the year for sure" and that "all the other elements of cash flow will be better in the second half than the first half and will be better substantially versus 2016."

65.     During the conference call, the Company stated that it recently had an "adverse claims experience" in a portion of its long-term care portfolio and that it would "assess the adequacy of our premium reserves."  While this partially revealed a looming issue at GE Capital, it did not provide any context as to the scope of the actual problem.  Following this news, the Company's stock fell nearly 3%, or $0.78 per share, closing at $25.91 on July 21, 2017.

66.     A week later, on July 28, 2017, GE filed its quarterly report on Form 10-Q with the SEC, restating the results disclosed by the July 21, 2017 press release above.  The July 28, 2017 10-Q contained materially misleading statements concerning the Company's business, operations, and prospects and contained signed SOX certifications by Defendants Immelt and Bornstein.

67.     During 2016 and 2017 GE falsely reported the financial condition of its failing insurance sectors – UFLIC and Employers Reassurance Corporation ("ERAC") (the "GE insurance sectors") – which operate as subsidiaries of GE Capital.

68.     As a result of policyholders living longer and incurring higher medical costs than insurers had built into their assumptions for policies written in the late 1980's through the early 2000's (such as those written or reinsured by GE), insurers issuing or reinsuring LTC insurance policies (which pay for products such as nursing-home care for the elderly) have suffered hundreds of billions of dollars of losses.

69.     By the early 2000's, the lion's share of companies in the LTC insurance business, including GE, stopped writing or reinsuring new LTC policies since the policies created huge exposure (due to expanding life expectancies and medical costs) and was inherently unprofitable. Analysts estimate that of those companies still holding and liable for LTC policies written under the incorrect assumptions of the late 1980's and early 2000's, the industry-wide gap between LTC insurance claims and reserves could soon surpass $300 billion.

70.     It was only because no party was willing to accept GE's huge LTC insurance liabilities that GE's LTC insurance policies and reinsurance contracts were carved out of the deal spinning off the profitable portions of its insurance segment over a decade ago.

71.     GE has not sold new LTC insurance policies or reinsured the same for over a decade and its insurance sector primarily handles closed books of long-duration business, i.e. collecting premiums and paying liabilities of long existing policies.  Though GE hid the truth from its investors, in regards to LTC insurance policies the GE insurance sector has long been, in essence, the custodian of toxic assets.

72.     GE was well aware that it shared this industry wide exposure in its LTC business, but none the less, the Company's insurance sectors, including its LTC insurance portfolio, were left essentially unaudited, permitting the Company to understate its required LTC reserves by billions of dollars.  In 2015, the GE Board was explicitly notified that GE's insurance sector had been left unaudited for years.

73.     On July 21, 2017, the Company held a conference call with investors and analysts in which the Company stated that it recently had an "adverse claims experience" in a portion of its long-term care portfolio and that it would "assess the adequacy of our premium reserves."  While this partially revealed a looming issue at GE Capital, it did not provide any context as to the true

source, size or scope of the actual under-reserves. Following this news, the Company's stock fell nearly 3%, or $0.78 per share, closing at $25.91 on July 21, 2017.

74.     On January 16, 2018 GE shocked investors when it announced that the Company would have to pay $15 billion for reserves to cover its underpayment of reserves for likely LTC liabilities, with the result that anticipated earnings and dividends were drastically reduced and the Company's stock dropped over 7.5% in the following several trading days following the announcement.[3]

75.     The January 16, 2018 $6.2 billion charge (resulting from the suddenly announced $15 billion set aside for reserves) did not mysteriously materialize overnight or in a year. Rather, it resulted from over a decade's worth of the Company's intentional underreporting of potential LTC liabilities. Concerning the news, CEO Defendant Flannery stated "At a time when we are moving forward as a company, a charge of this magnitude from a legacy insurance portfolio in runoff for more than a decade is deeply disappointing."

76.     The only fashion in which GE was able to for over a decade underreport its required LTC reserves by billions of dollars, was by not updating assumptions of life expectancy and health care costs, working with stale assumptions, and, making improper projection model changes so as to falsely understate the amount the Company was required to set aside as reserves for likely future liabilities from its LTC insurance business, all in violation of GAAP and statutory insurance regulations.

77.     The huge unreported liabilities associated with GE's retention of unprofitable LTC insurance policies had been long known to the many dozens of GE executives, accountants,

---

[3] GE had been required to make a capital contribution of $964 million in 2012 and $419 million in 2016, which the Company did not include in its financial statements.

actuaries and other employees, who actively participated in altering of LTC actuarial projections and other financial data so as to conceal the extent of the Company's LTC liability from investors.

78.     In light of the nature of the above described misstatements in terms of size (billions of dollars of misstatements), time duration (the Company is restating its 2016 and 2017 earnings), flagrancy (with the Board being informed that the insurance sector was not even conducting audits), and obviousness of fraudulent intent (alterations of fundamental actuarial projections is required in order to understate reserves by billions of dollars), it was apparent to the Director Defendants that the execution of such a massive ongoing massive misstatement of the finances of GE's insurance sector required the knowing involvement of a large number of GE employees ("the GE financial misreporting conspiracy").  The Board became aware that there existed a corporate-wide culture of corruption in the area of financial reporting at GE.

79.     It was clear to the Board that the execution of the GE financial reporting conspiracy over the course of the past decade required the knowing involvement of the following persons (along with many others): Dan Janki, GE's Treasurer, Kevin McCord, GE Capital's Director of Internal Audit, Joseph Pizzuto, GE Capital's former Chief Audit Executive, Ryan Zanin, GE Capital's Chief Risk Officer, Ronald Peters, ERAC's CEO, Clark Ramsey, ERAC's Chief Actuary, David Benz, LTC Managing Actuary, David Benz, and, importantly, KPMP, GM's auditor.

80.     On January 24, 2018, the Company filed an 8-K with the SEC announcing its fourth quarter results for 2017.  The Company reported EPS of $0.28 on revenue that fell 5% year over year to $31.4 billion.  This was short of analysts' expectations of $0.28 per share on revenue of $33.93 billion.

81.     In addition, during a conference call that same day, the Company noted that SEC regulators were investigating the $6.2 billion insurance loss revealed by the Company on January 16, 2018, and that the SEC was also investigating the Company's accounting practices, specifically looking into "revenue recognition and controls" for the Company's long-term service agreements. In response, the Company noted that it would restate its 2016 and 2017 quarterly numbers to reflect "new accounting standards."

82.     The lack of proper audits of GE's insurance business and inaccuracy of financial reporting was brought to the attention of the company's Board of Directors and Audit Committee, and as a result of the lack of controls and misreporting, the Company failed to significantly increase its long term care insurance LTC reserves by any material amount throughout the entire Relevant Period.

83.     The Federal Reserve investigated GE Capital's insurance subsidiaries' controls and found them deficient leading to an ongoing series of reports concerning the serious deficiencies, all of which was provided to the Board of Directors on a quarterly basis during the Relevant Period. Reflective of a corporate wide culture encouraging fixing the books, numerous employees reporting negative information received push back on the reporting thereof in connection with the above process.

84.     Upon information and belief, the Board forced the resignation or retirement of a number of high level executives who led the GE financial misreporting conspiracy, including former CEO Defendant Immelt, "resignation" July 31, 2017; former CFO Defendant Bornstein, "resignation" November 1, 2017; Vice Chairman, President and CEO, GE Global Growth Organization, John Rice, "retirement," December 31, 2017; and, Vice Chairman Business Innovations, Elizabeth Comstock, "retirement," December 31, 2017.

85.     Despite having taken action against several executives for leading the GE financial misreporting conspiracy, the Board has failed to initiate any investigatory, disciplinary, or corrective action against the GE financial reporting personnel who actually executed the massive misreporting in various sectors of the Company.

86.     Despite the Board's awareness that GE's massive financial misreporting was indicative of a corporate-wide culture of corruption in the area of financial reporting, the Board has taken no meaningful steps to: (1) identify offending parties who knowingly participated in the misreporting; (2) create and institute specific policies (to prevent such misconduct in the future) to be enforced by specific persons (or positions) with specific delineated responsibilities and reporting obligations, to oversee risk prevention in the area of financial reporting; and, (3) create a committee to investigate the causes of the massive financial misreporting of 2016 and 2017.

87.     By its above described failure to take reasonable action to identify the offending employees who participated and executed GE's massive financial misreporting conspiracy, and by its above described failure to take reasonable corrective action in response to GE's massive financial misreporting conspiracy, the Director Defendants have in effect ratified that conduct and indicated their willingness to knowingly tolerate it in the future.

88.     The above statements were materially false and misleading when made because Defendants failed to disclose: (1) the Company was overstating profitability on Contract Assets with respect to GE Power's LTSAs, and, that the Company's various operating segments, including its Power segment, were underperforming Company projections, with order drops, excess inventories and increased costs; (2) GE's LTC reserves were being materially understated by billions of dollars as a result the Company overstated GE's full year 2017 guidance; and (3)

that, as a result of the foregoing, Defendants' misstatements about the Company's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

89.     On October 6, 2017, the Company announced that, effective November 1, 2017, Defendant Bornstein would no longer be the Company's CFO.  In connection with his departure, Defendant Bornstein entered into an agreement pursuant to which he will be provided certain compensation arrangements by GE, including:

> 1) Mr. Bornstein will receive up to 12 months of severance pay at his current salary rate as set forth in the 2017 Proxy Statement; (2) Mr. Bornstein will be eligible to receive a 2017 annual cash bonus and a prorated 2016-2018 long-term performance award payment based upon the Company's actual performance, each in accordance with GE's normal processes; (3) Mr. Bornstein's 2017 grants of stock options, restricted stock units and performance share units will be cancelled, along with those stock options and restricted stock units granted prior to 2017 for which vesting is not accelerated (as described below); (4) Mr. Bornstein's outstanding stock options granted prior to 2017 and that would have normally vested during the next two years will vest (to the extent not already vested) in January 2018 and have up to a two-year post-retirement exercise period; (5) Mr. Bornstein's outstanding restricted stock units that were granted prior to 2017 and that would have normally vested during the next two years will vest in January 2018; (6) Mr. Bornstein's outstanding performance share units that were granted before 2017 will remain eligible to vest based on actual Company performance; and (7) Mr. Bornstein will vest at age 60 under the GE Supplementary Pension Plan with benefits based on his approximately 28 years of service as of the retirement date.

Form 8-K, filed with the SEC on October 6, 2017.

90.     On October 20, 2017, Defendants caused the Company to issue a press release announcing its financial results for the third quarter 2017.  The Company reported EPS of $0.29, falling short of estimates of $0.49 per share.  In addition, the Company also stated that it was lowering is previously announced 2017 earnings expectations, lowering EPS to $1.05-$1.10 from $1.60-$1.70

91.     Also on October 20, 2017, Defendants held a conference call to discuss the above results.  On the call, the Company's CEO Defendant Flannery (who had taken over the position

after Defendant Immelt's departure) stated "[w]hile the company has many areas of strength, it's also clear from our current results that we need to make some major changes with urgency and a depth of purpose.  Our results are unacceptable, to say the least."

92.     The Company largely blamed the disappointing results on its power segment, with Defendant Flannery stating that the Company's CFOA was down due to "***lower than anticipated Power volume which was resulted in lower earnings and higher inventory . . . .***"  Defendant Bornstein also stated the following:

> [W]e have recently observed elevated claims experience for a portion of the long-term care at GE Capital's legacy insurance business, which represents $12 billion or roughly 50% of our insurance reserves.
>
> \*       \*       \*
>
> [The Company] began a comprehensive review in the third quarter of premium deficiency assumptions that are used in the annual claims reserve adequacy test. This is a very complex exercise, and the team is making good progress.  We expect to complete this process by the end of the year.

93.     In addition, the Company also announced that it had suspended further dividends from GE Capital.

94.     Following the news, the Company stock fell nearly 7% or $1.51 per share on October 23, 2017, closing at $22.32.

95.     On November 7, 2017, the Washington Post published an article entitled "Who's to Blame for GE's Plight? It Takes a Village: Gadfly," which stated, in pertinent part:

> GE got a pass from too many people for too long because, well, it's GE -- a beacon of American industry and operational excellence that traces its roots to Thomas Edison. That time has ended. Someone has to answer for GE's downward spiral, starting here:
>
> Management: GE's former CEO Jeff Immelt has received the brunt of criticism, and he deserves it. Immelt spent grandly on energy and power deals just as those markets slipped into a decline that's largely responsible for GE's recent earnings struggles and cash shortfall.  But he wasn't a one-man show. Steve Bolze, former

head of GE's power unit and once a top contender to succeed Immelt, didn't respond quickly enough to weakening demand. And former CFO Jeff Bornstein could be just as much a cheerleader as Immelt on overly optimistic forecasts -- and he was the numbers guy. Bornstein took public responsibility, noting on GE's recent earnings call that "the buck stops with me." Given that he was on his way out at the time, it's to his credit that he showed up at all, and it's a lot more than we've heard from Immelt. But this falling-on-the-sword rhetoric will only go so far with investors. Depending on how bad things get, they may seek clawbacks of hefty pay packages.

The Board: GE's fall from grace has exposed a deeper oversight crisis, starting with the company's practice of having an empty private jet tail Immelt. GE was under pressure to cut billions in costs, but the board and Immelt were reportedly unaware of the second plane. At best, this drama is an embarrassing sideshow. ***At worst, it should spark concern about what else the upper ranks of GE didn't question thoroughly.*** For example, why did Beth Comstock, head of GE's Business Innovations unit, receive the same 2016 special retention grant as fellow vice chair and head of GE's crown-jewel aviation unit David Joyce? Why did GE need vice chairs at all? There were 17 external advisors on GE's board. ***In its most recent proxy statement, GE said its larger-than-average board was necessary, given the diversity and complexity of its business. The extra sets of eyes don't seem to have helped much.***

(Emphasis added).

96.     On November 13, 2017, the Company held an Investor Update and revealed that it would be slashing its annual dividend in half, from $0.96 to $0.48 per share.  This would mark only the second dividend cut by the Company since the Great Depression.  The Company noted that after realizing its industrial business had not grown as previously expected, it would no longer be appropriate to keep the same dividend rate.

97.     In addition, the Company lowered it 2018 profit outlook to an adjusted EPS of $1.00 to $1.07, compared to earlier estimates of $2 per share.  The Company further stated that it would reduce its corporate workforce, by 25% (approximately 6,000 jobs).

98.     On this news, the Company's stock price fell over 7% or $1.47 per share, closing at $19.02 on November 13, 2017.

99.     On November 14, 2017, the Company attended a conference sponsored by Goldman Sachs Group Inc., where CFO Jamie Miller (who replaced Defendant Bornstein upon his departure) stated that the Company was undergoing a review of its insurance reserves and that "[w]e had announced earlier that we had deferred the decision on a GE Capital dividend of about $3 billion in the second half of the year. ***At this point in the process, I'd tell you that I expect that charge to be more than that*** . . . ."

100.    Following this news, GE's stock fell nearly 6%, or $1.12 per share, to close at $17.90 per share on November 14, 2017.

101.    On January 16, 2018, the Company filed a Form 8-K with the SEC disclosing that it was taking a $6.2 billion charge in the upcoming quarter from GE Capital and that GE Capital was also setting aside $15 billion to cover the costs of health insurance companies' policies that it re-insures.  Commenting on the news, CEO Defendant Flannery stated "At a time when we are moving forward as a company, a charge of this magnitude from a legacy insurance portfolio in runoff for more than a decade is deeply disappointing."

102.    Upon information and belief, dozens of non-executive employees either knew of or participated in the falsification of earnings and projections at GE Capital and other sectors of GE, including the alteration – in the Company's favor – of GE subsidiary Employers Reassurance Corporation's liability cash flows and loss recognition established by actuaries.  These highly significant alterations were routinely made by Employers Reassurance Corporation executives, without any basis, justification, reasoning or documentation.

103.    On January 23, 2018, Matt Egan published an article on *CNN Money* entitled "GE's 'black box' mystery is freaking Wall Street Out."  The article summarized the recent problems at GE, stating that "In just the past few months, GE has halved its coveted dividend, disclosed a

massive insurance loss, revealed 12,000 layoffs in its power division and signaled it could break itself apart . . . . Fear of the unknown has caused GE shares to tank to a six-year low ahead of Wednesday's earnings report."

104.    The January 23, 2018 article also quoted UBS analyst Steven Winoker, who warned of unknown problems "still lurking in (or off) GE's balance sheet," in particular in the Company's lending unit.  Winoker estimated that the problems could cost "between $4 billion and $6 billion."

105.    On January 24, 2018, the Company filed an 8-K with the SEC announcing its fourth quarter results for 2017.  The Company reported EPS of $0.28 on revenue that fell 5% year over year to $31.4 billion.  This was short of analysts' expectations of $0.28 per share on revenue of $33.93 billion.

106.    In addition, during a conference call that same day, the Company noted that SEC regulators were investigating the $6.2 billion insurance loss revealed by the Company on January 16, 2018, and that the SEC was also investigating the Company's accounting practices, specifically looking into "revenue recognition and controls" for the Company's long-term service agreements. In response, the Company noted that it would restate its 2016 and 2017 quarterly numbers to reflect "new accounting standards."[4]

107.    The announcements raised red flags regarding the internal controls in place at the Company.  For instance, Lynn Turner, former chief accountant at the SEC, noted that the announced problems raise questions concerning GE's controls and bookkeeping, stating "GE seems to be way behind the 8-ball on this.  Others have been boosting reserves and GE hasn't . . .

---

[4] https://www.ge.com/investor-relations/sites/default/files/GE%204Q17%20Earnings%20 Transcript%20012418.pdf

. GE has a reputation for questionable and nontransparent financial reports that play too close to the line when it comes to accounting."

108.    On February 22, 2018 Michelle Fox of CNBC published an article entitled "GE has been 'brushing things under the rug' for decades, Deutsche Bank analyst says."  In the article, Fox reported that John Inch of Deutsche Bank was of the opinion that the Company has been "brushing things under the rug and leveraging aggressive accounting" for several decades.  "One could infer the prior management basically did this to drive the … adjusted EPS up as much as possible to pay themselves as much as possible," Inch said in an interview with CNBC's Power Lunch.

109.    Further, Inch stated, there are "a lot of parties that are culpable here. The information they provided was one-sided. They made it overly complicated to dissect the financials. They compounded the complexity on purpose so people wouldn't look at the details." Inch added, "Now unfortunately they're paying a bit of a price for it."

110.    As a result of the widespread financial misreporting at GE during the 2016 and 2017, GE's LTC reserves were understated by approximately $10 billion in violation of GAAP and by $15 billion in violation of state statutory regulations.

111.    In the days following this news, the Company's stock price has continued to fall, closing at $12.98.

### DAMAGES TO THE COMPANY

112.    GE has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, GE has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

> a.   costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

b.  substantial loss of market capital;

c.  costs already incurred and to be incurred defending the pending securities fraud class action lawsuit pending before this Court captioned *Hachem v. General Electric, Inc.*, Case No. 1:17-cv-08457 (S.D.N.Y.); and

d.  any fines or other liability resulting from the Company's violations of federal law.

113.    In addition, GE's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

114.    The wrongdoing complained of herein has irreparably damaged GE's corporate image and goodwill.  For at least the foreseeable future, GE will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that GE's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

115.    Plaintiff brings this action derivatively in the right and for the benefit of GE to redress injuries suffered, and to be suffered, by GE as a direct result of violations of federal securities laws by the Defendants.  GE is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

116.    The Board of GE, at the time this action was commenced, consisted of Defendants Flannery, Bazin, Beattie, Brennan, D'Souza, Dekkers, Garden, Henry, Hockfield, Jung, Lavizzo-Mourey, Lazarus, Mollenkopf, Mulva, Rohr, Schapiro and Tisch, a total of 17 individuals.

## Demand is Futile as to all Director Defendants

117.   Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the GE Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described conspiracy of false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

118.   Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

119.   Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

120.   In light of the nature of the above described misstatements in terms of size (billions of dollars of misstatements), scope (misstatements relating to several business sectors), and time duration (the Company is restating its 2016 and 2017 earnings), once made public it was apparent to the Director Defendants that the execution of such a massive ongoing misstatement of earnings and prospects required the knowing involvement of a large number of GE employees ("the GE financial misreporting conspiracy").  The Board became aware that there existed a corporate-wide

culture of corruption in the area of financial reporting at GE.

121.   Upon information and belief, the Company has forced the resignation or retirement of a number of high level executives who led the GE financial misreporting conspiracy, including former CEO Defendant Immelt, "resignation" July 31, 2017; former CFO Defendant Bornstein, "resignation" November 1, 2017; Vice Chairman, President and CEO, GE Global Growth Organization, John Rice, "retirement," December 31, 2017; and, Vice Chairman Business Innovations, Elizabeth Comstock, "retirement," December 31, 2017.

122.   Despite having taken action against executives who led the GE financial misreporting conspiracy, upon information and belief, the Board has failed to initiate any meaningful investigatory, disciplinary, or corrective action against the lower level GE financial reporting personnel who executed the massive misreporting in various sectors of the Company.

123.   Despite the Board's awareness that GE's massive financial misreporting was indicative of a corporate-wide culture of corruption in the area of financial reporting, the Board has taken no meaningful steps to: (1) identify offending parties who knowingly participated in the misreporting, including the delegation of the responsibility to investigate the causes of the massive misreporting of 2016 and 2017 earnings; or, (2) create and institute specific policies to be enforced by specific persons (or positions) with specific delineated responsibilities and reporting obligations, to oversee the risk of corrupt employee practices in the area of financial reporting.

124.   By its above described failure to take reasonable action to identify the offending non-executive employees who participated in the execution of GE's massive financial misreporting conspiracy, and by its above described failure to take reasonable corrective action in response to GE's massive financial misreporting conspiracy, the Director Defendants have ratified that past conduct and indicated their willingness to knowingly tolerate it in the future.

125.    By presently knowingly tolerating the GE financial misreporting conspiracy as detailed above, the Director Defendants have indicated their commitment to inaction in this area. By their above described inaction, Defendants have established a reasonable doubt as to their impartiality to consider demand to take action against those responsible for the GE financial misreporting conspiracy.  Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

### Demand is Futile as to Defendant Flannery Because His Principal Professional Occupation is as the Company's Chairman and CEO

126.    Defendant Flannery has been the Company's Chairman and CEO since August 1, 2017 and a director of the Company since October 2, 2017.  In his role as CEO of the Company for the fiscal year 2017, Defendant Flannery received $16,005,604 in total compensation.  The Company does not claim that Defendant Flannery is an independent director and because Defendant Flannery's primary source of income and primary employment is his employment as Chairman and CEO of GE and his professional reputation is inextricably bound to his role at GE. For these reasons, there exists a reasonable doubt as to Defendant Flannery's ability to act independently and impartially in considering demand in this action and demand is futile upon him.

### Demand is Futile as to the Members of the Audit Committee

127.    Demand is futile as to Defendants Schapiro, Bazin, Beattie, Henry, Mulva, and Rohr (collectively, the "Audit Committee Defendants") as the members of the Audit Committee in their knowing failure to fulfill their responsibilities.

128.    The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The Audit Committee Charter notes that the purpose of the Audit Committee "shall be to assist the board in its oversight of the integrity of the financial

statements of the Company, of the Company's compliance with legal and regulatory requirements, of the independence and qualifications of the independent auditor and of the performance of the Company's internal audit function and independent auditors." In addition

129.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

130.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning the true nature of the Company's financial stability, or lack thereof.  In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

## Additional Reason for Demand Futility

131.    GE's officers and directors are protected against personal liability for their acts of mismanagement and violations of federal securities law alleged in herein by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of GE.  Upon information and belief, however, there have been certain changes in the language of directors' and officers' liability insurance policies in the past few years and the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action

brought directly by GE against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of GE, there would be no directors' and officers' insurance protection and thus, they will not bring such a suit. On the other hand, such insurance coverage exists for this action, which is brought derivatively, and will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile, and therefore, excused.

## COUNT I

### Against Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder

132. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133. Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's 2017 Proxy Statements filed violated §14(a) and Rule 14a-9 because they omitted material information regarding the wrongdoing of Defendants as detailed above, and included by reference materially false and misleading financial statements.

134. In the 2017 Proxy, the Company emphasized its supposed past and current efforts to establish and enforce effective controls over financial reporting. The 2017 Proxy stated, in part,

> The Board has oversight for risk management at GE with a focus on the most significant risks facing the company, including strategic, operational, financial and legal and compliance risks.

> GE uses a broad set of financial metrics to measure its performance, and accurate financial reporting and robust auditing are critical to our success. We have added a number of directors who qualify as audit committee financial experts, and we expect all of our directors to have an understanding of finance and financial reporting processes.

135. The above statements were false and misleading and omitted material information because the Board has, and continues to, knowingly disregard its oversight responsibility in the area of financial reporting and has ratified GE's past egregious and systemic financial misreporting.

136. In the exercise of reasonable care, Defendants should have known that the 2017 Proxy Statement contained misleading information and/or omitted material information.

137. The misrepresentations and omissions in the 2017 Proxy Statement were material to Company shareholders in voting on the 2017 Proxy Statement.

138. The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

## COUNT II

### Against the Individual Defendants for Breaches of Fiduciary Duty

139. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140. The Individual Defendants owed and owe GE fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe GE the highest obligation of good faith, loyalty, and due care.

141. The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to GE shareholders materially misleading and inaccurate information through the Company's SEC filings

throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

142.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused GE to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to GE and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

143.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

144.    Plaintiff, on behalf of GE, has no adequate remedy at law.

## COUNT III

### Against all Defendants for Unjust Enrichment

145.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of GE.

147.    The Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to GE.

148.    Plaintiff, as a shareholder and representative of GE, seeks restitution from the Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and breaches of fiduciary duty.

149.    Plaintiff, on behalf of GE, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Abuse of Control

150.    Plaintiff incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.    The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of GE and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

152.    As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

153.    Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

## COUNT V

### Against the Individual Defendants for Gross Mismanagement

154.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155.    The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company.  Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

156.    Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent

manner as prescribed by law as well as in the Company's corporate governance regulations.

157.     By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of GE's affairs and in the use and preservation of GE's assets.

158.     During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused GE to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to GE, thus breaching their duties to the Company.

159.     As a result, the Individual Defendants grossly mismanaged GE and should be liable to the Company for the resulting damages

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of GE and that Plaintiff is an adequate representative of the Company;

B.     Determining and awarding to GE the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.     Directing GE and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect GE and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as

may be necessary to ensure proper Corporate Governance Policies:

> (1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

> (2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D.     Determining and awarding to GE exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.     Awarding GE restitution from Defendants, and each of them;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.     Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 17, 2018

Respectfully submitted,

By: _____
Joshua M. Lifshitz
Email: jml@jlclasslaw.com
Edward W. Miller
Email: edmilleresq@aol.com
**LIFSHITZ & MILLER LLP**
821 Franklin Avenue, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*

**<u>VERIFICATION</u>**

I, Malka Raul Raul hereby declare as follows:

I am shareholder of GE and have continuously so owned the Company's common stock during the relevant period. I declare that I am the plaintiff named in the foregoing Shareholder Derivative Complaint ("Complaint"), and know the content thereof; that the pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe to be true.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on 04/17/2018

Signature