**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GENERAL ELECTRIC COMPANY FEDERAL SHAREHOLDER DERIVATIVE LITIGATION | Case No. 18-CV-03355-JMF<br><br><br>DEMAND FOR JURY TRIAL |

**VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FICUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

**TABLE OF CONTENTS**

**Page(s)**

I.      NATURE AND SUMMARY OF THE ACTION .................................................1

II.     JURISDICTION AND VENUE ........................................................................9

III.    THE PARTIES..............................................................................................10

    A.     Plaintiffs .............................................................................................10

    B.     Nominal Defendant.............................................................................10

    C.     Defendants .........................................................................................11

IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS ......................................30

    A.     Fiduciary Duties.................................................................................30

    B.     Additional Duties of the Audit Committee Defendants.......................31

    C.     Additional Duties of the Finance & Capital Allocation Committee
        Defendants .........................................................................................34

    D.     Additional Duties of the GE Capital Committee Defendants...............35

    E.     Additional Duties of the Risk Committee Defendants .........................36

    F.     Breaches of Duties .............................................................................37

V.      CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION...............38

VI.     FACTUAL BACKGROUND..........................................................................40

VII.    SUBSTANTIVE ALLEGATIONS ................................................................41

    A.     The Board Failed to Maintain Appropriate LTC Reserves in Violation of
        GAAP and SEC Regulations ...............................................................41

        1.     GE Retained and Reinsured the Worst Blocks of Its LTC Business in
            Connection with the Genworth Spin-Off.................................42

        2.     The Board Fails to Increase LTC Reserves Despite Red Flags................46

        3.     The Board's Failure to Adequately Increase LTC Reserves Violates
            GAAP and SEC Regulations .....................................................50

       a.     GAAP Applicable to LTC Insurers.................................................50

       b.     The Board Violated GAAP and SEC Regulations by Failing to Adequately Update Reserves ........................................................52

B.     GE Power Improperly Recognizes Revenue on Its LTSAs ..................................54

C.     The Individual Defendants Made or Allowed GE to Make Improper Statements in Breach of Their Fiduciary Duties .......................................................59

    1.     Improper Statements Concerning GE Capital.............................................59

       a.     Fourth Quarter and Year-End 2014 ...............................................60

       b.     GE Capital's April 10, 2015 Investor Meeting .............................63

       c.     First Quarter 2015 .......................................................................66

       d.     April 22, 2015 Annual Meeting of Shareowners .........................67

       e.     Electrical Products Group Conference on May 20, 2015 .............68

       f.     Sanford C. Bernstein Strategic Decisions Conference on May 27, 2015.......................................................................................69

       g.     Second Quarter 2015....................................................................70

       h.     Third Quarter 2015 ......................................................................70

       i.     December 16, 2015 Annual Outlook Investor Meeting................71

       j.     Fourth Quarter and Year-End 2015 ...............................................72

       k.     Barclays Industrial Select Conference on February 17, 2016........74

       l.     First Quarter 2016 ........................................................................74

       m.     Sanford C. Bernstein Strategic Decisions Conference on June 1, 2016........................................................................................77

       n.     Second Quarter 2016....................................................................79

       o.     Third Quarter 2016 ......................................................................81

       p.     December 2016 Annual Outlook Investor Call ............................83

       q.     Fourth Quarter and Year-End 2016 ...............................................84

       r.     Barclays Industrial Select Conference on February 22, 2017........87

s.     J.P. Morgan Aviation, Transportation & Industrials Conference on March 13, 2017 ........................................................................89

t.     First Quarter 2017 ........................................................................91

u.     Electrical Products Group Conference on May 24, 2017 ............93

2.    Improper Statements Concerning GE Power and Its LTSAs....................94

a.     Fourth Quarter and Year-End 2014 ...............................................94

b.     Fourth Quarter and Year-End 2015 ...............................................95

c.     December 2016 Annual Outlook Investor Meeting.......................96

d.     Fourth Quarter and Year-End 2016 ...............................................97

e.     March 2017 GE Power and Renewable Energy Investor Meeting .......................................................................................98

f.     First Quarter 2017 ........................................................................99

D.    The Individual Defendants Negligently Make Misleading Statements in GE's Proxy Statements ........................................................................................102

1.    The 2016 Proxy........................................................................................102

a.     Misstatements in Support of Reelecting Defendants Beattie, Brennan, D'Souza, Dekkers, Hockfield, Immelt, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, and Tisch................................103

b.     Misstatements in Opposition to Adopting a Policy to Require an Independent Board Chairman ...................................................105

c.     Misstatements in Opposition of Adopting a Policy to Require Cumulative Voting in the Election of Directors .........................107

2.    The 2017 Proxy........................................................................................107

a.     Misstatements in Support of Reelecting Defendants Bazin, Beattie, Brennan, D'Souza, Dekkers, Henry, Hockfield, Immelt, Jung, Lane, Lazarus, McAdam, Mollenkopf, Mulva, Rohr, Schapiro, and Tisch....................................................................108

b.     Misstatements in Support of Vote to Approve an Amendment of the 2007 Long-Term Incentive Plan to Extend the Plan and Increase the Number of Shares Available Under the Plan...........109

          c.      Misstatements in Opposition to Adopting Policies Requiring
                  an Independent Board Chairman and Cumulative Voting ..........111

      E.      The Truth Slowly Emerges .................................................................111

          1.      Second Quarter 2017 .............................................................111

          2.      Third Quarter 2017 ...............................................................116

          3.      November Investor Update and Goldman Sachs Conference.................124

          4.      January 16, 2018 Insurance Update ........................................126

VIII.   DAMAGES TO GE ..............................................................................139

IX.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ....................................141

      A.      Demand Is Excused Because Defendants Bazin, Beattie, Brennan, D'Souza,
              Flannery, Garden, Lavizzo-Mourey, Mulva, and Tisch Face a Substantial
              Likelihood of Liability for Their Misconduct .......................................142

      B.      Demand Is Excused as to Defendant Flannery Because He Lacks
              Independence ...............................................................................145

X.      COUNT I—AGAINST DEFENDANTS BAZIN, BEATTIE, BRENNAN, CASH,
        DEKKERS, D'SOUZA, HENRY, HOCKFIELD, IMMELT, JUNG, LANE,
        LAZARUS, MOLLENKOPF, MULVA, ROHR, SCHAPIRO, SWIERINGA,
        TISCH, AND WARNER FOR VIOLATION OF SECTION 14(A) OF THE
        EXCHANGE ACT ...............................................................................147

XI.     COUNT II—AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF
        FIDUCIARY DUTIES ...........................................................................149

XII.    COUNT III—AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF
        CORPORATE ASSETS .........................................................................151

XIII.   COUNT IV—AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST
        ENRICHMENT ..................................................................................152

XIV.    PRAYER FOR RELIEF ........................................................................152

XV.     JURY DEMAND ................................................................................153

Plaintiffs, by their attorneys, submit this Verified Consolidated Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiffs allege the following on information and belief, except as to the allegations specifically pertaining to plaintiffs which are based on personal knowledge. This complaint is also based on the investigation of plaintiffs' counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiffs on behalf of nominal defendant General Electric Company ("GE" or the "Company") against certain of its officers and directors for violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.  These wrongs resulted in billions of dollars in damages to GE's reputation, goodwill, and standing in the business community.  In addition, these actions have exposed the Company to civil penalties from the SEC, as well as billions of dollars in liability for violations of federal and state law.

2.      GE is a globally diversified technology and financial services company with operations organized across various business segments.  The two segments that are the focus of this matter are: (i) GE Capital Corporation ("GE Capital" or "GECC"), the Company's financial services unit that provides commercial lending and leasing, as well as a wide range of financial services for commercial aviation, energy, and support for GE's industrial business units; and (ii) GE Power, a wholly owned subsidiary of GE, that builds industrial products including power plants, turbines, and generators.  Founded in 1892, the Company is headquartered in Boston,

Massachusetts, and trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GE."

3.     Historically, GE has been known as a "dividend stock," and investors looked to the Company for a consistent stream of quarterly dividends.  Analysts have emphasized the importance of GE's consistent dividends, stockholders have come to rely on these quarterly dividend payments, and GE has repeatedly called its dividend "a top priority."  For the past several years, flow-through dividend payments from the Company's GE Capital subsidiary to GE have provided the Company with a majority of the cash flow used for dividends paid to its stockholders.  Unfortunately, as the Company's recent disclosures reveal, GE was able to maintain sufficient cash flow to sustain its dividend and fund its stock buyback program only through the improper revenue recognition tactics detailed herein.

4.     GE Capital historically underwrote and reinsured billions of dollars in long-term care ("LTC") insurance policies.  Between 2004 and 2006, GE divested much of its legacy LTC policies through the spin-off of Genworth Financial, Inc. ("Genworth").  However, the Company retained $28 billion in insurance policies, including reinsurance on LTC policies.  Under these LTC policies, GE Capital collects premiums to insure costs associated with assisted living and other related expenses not covered by traditional insurance.  U.S. Generally Accepted Accounting Principles ("GAAP") and SEC rules governing corporate disclosures require companies that insure or reinsure LTC policies to collect and review claims experience as well as industry-wide trends in the LTC market in order to allocate sufficient reserves for anticipated claims.  Specifically, to account for these trends in updating cash reserves, LTC insurers are required to regularly review certain factors, including mortality, morbidity, lapse rates, claims experience, and health care costs.

5.      As explained herein, the Individual Defendants (as defined herein) improperly delayed updating the Company's actuarial assumptions for their LTC policies to delay addressing billions of dollars of losses.  They did so despite knowledge of, or at least reckless disregard for obvious red flags, including: (i) mounting industry-wide negative trends in the LTC market, caused by ultralow interest rates, higher life expectancy, and rising medical costs; (ii) substantial and systematic charges taken by other LTC insurers and reinsurers after they adjusted actuarial assumptions to conform to the realities of the market; (iii) GE's own experience during and following the spin-off of Genworth, including the fact that GE was forced to keep the worst performing LTC policies on its books in order to facilitate the spin-off; and (iv) alarming adverse claims experience in the LTC policies the Company was reinsuring, specifically including Genworth's LTC policies.  At a minimum, the Company's failure to adequately update the assumptions and modeling underlying its LTC portfolio and materially increase the Company's LTC reserves violated GAAP and statutory accounting principles.

6.      To make matters worse, during this time GE's fiduciaries routinely concealed the Company's true exposure from its LTC business.  In 2013, after GE Capital was designated as a nonbank Systematically Important Financial Institution ("SIFI"), which would have required increased Federal Reserve Bank scrutiny, including scrutiny of the Company's LTC exposure and its processes for establishing LTC reserves, the Company designed a major restructuring plan to shrink GE Capital by divesting certain of its business units.  The Company's restructuring strategy was successful, and in 2015, GE Capital was de-designated as a SIFI.  Although the Company's fiduciaries touted the benefits of the divestiture, they failed to disclose that after the divestment GE Capital's exposure to its LTC business would be even more pronounced than before.

7.      Because the Individual Defendants made GE's periodic financial reporting opaque, the public was unaware of the massive exposure the LTC policies presented to GE.  For example, from 2015 through 2017, the Individual Defendants made almost no specific disclosures with regard to its exposure from GE Capital's LTC policies.  In fact, until the recent corrective disclosures, rather than separately reporting reserves for LTC, the Company reported them under the "Life Insurance Benefits" section, obscuring the importance of LTC reserves.  As a result, investors and the broader market could not meaningfully assess the true risk these policies presented.

8.      Furthermore, unbeknownst to investors, the Company's ability to sustain its dividend and share buyback program was facing additional pressure from the Company's underperforming GE Power segment.  During this time, the Company concealed weaknesses in its GE Power segment by improperly accelerating the recognition of revenue on its long-term service agreements ("LTSAs") in order to artificially manipulate the Company's quarterly and annual financial results and meet internal revenue projections.  LTSAs are contracts between GE and customers whereby GE agrees to provide servicing and maintenance on its products for a number of years in exchange for periodic payments.  GE Power, the largest segment within GE's industrial businesses and a significant driver of overall revenue, derives much of its earnings from revenue recorded on its LTSAs.  Even as conditions in the power industry deteriorated, GE consistently reported increased revenues in its GE Power segment.  In order to generate positive cumulative catch-up adjustments, and thereby increase reported revenues, the Company improperly relied on historical data to estimate revenue and costs.  Because they failed to take into account known current information or reasonable projections about the realities of the power market, GE's estimates of revenues and costs were not reasonably dependable and did not

adequately account for the risk of nonpayment from customers.  As a result, the Company was overstating revenues, margins, and earnings on its LTSAs in violation of GAAP and SEC regulations governing corporate disclosures.

9.      In addition, the Individual Defendants failed to disclose to investors and the general public the Company's woefully inadequate internal controls over financial reporting with respect to its LTC business and LTSAs.  As detailed herein, GE's Board of Directors (the "Board") remained consciously inactive despite actual and/or constructive knowledge of wrongdoing at GE when it ignored or recklessly disregarded red flags indicating severely deficient internal controls and failed to implement any meaningful changes to identify and immediately end the improper practices.  Based on the nature and scope of the breaches of duty, the members of the Board either knew of, or recklessly turned deaf ears and blind eyes to the misstatements and misconduct occurring around them, thereby ignoring the lack of sufficient internal protocols.

10.     Issues concerning the Company's LTC insurance reserves and LTSAs began to surface through a series of partial public disclosures beginning on July 21, 2017, when the Company held an earnings call advising investors of recent adverse claims experience in its LTC portfolio.  GE stated that as a result, the Company would be required to "assess the adequacy of [its] premium reserves."  Without providing any further detail, the Company, also disclosed that earnings growth caused by LTSA gains was slowing down.

11.     Then, on October 20, 2017, the Company announced its third quarter 2017 financial results, and disclosed to investors that GE had "recently observed elevated claims experience" for a portion of GE Capital's legacy LTC business, which represented $12 billion or approximately 50% of GE Capital's insurance reserves.  The Company disclosed that as a result

of this purportedly "recent" adverse claims experience, it began a "comprehensive review in the third quarter of premium deficiency assumptions that are used in the annual claim reserve adequacy test."  GE further stated that it was suspending dividends from GE Capital "[u]ntil the review has been completed."

12.     The surprises to the market did not end there.  During GE's October 20, 2017 earnings call, details began to emerge about the Company's significant cash flow issues.  As a result of underperformance in the GE Power segment, the Company announced it was slashing its guidance for 2017 industrial cash flow from operating activities ("CFOA"), from an initial range of $12 billion to $14 billion down to $7 billion.  Analysts agreed, these reductions were "drastic" and the CFOA miss was "enormous."  However, the Company muted the effect of this partial revelation by assuring investors "performance in most of the other segments is strong."

13.     Then, on November 13, 2017, less than one month after the Company assured the investing public that GE's overall performance was "strong," the Company shocked the market when it slashed its annual dividend in half, from $0.96 to $0.48 per share.  This was only the second time GE cut its dividend since the Great Depression.  The Company stated that its dividend rate was no longer appropriate because its industrial business did not grow as quickly as anticipated.  Plagued by poor cash flow, defendant John L. Flannery ("Flannery"), the Company's Chief Executive Officer ("CEO"), further explained that GE had been paying out a dividend above its industrial free cash flow for a number of years, and that GE Capital would not be paying a dividend to GE in 2018.  Specifically, defendant Flannery stated that the "dividend was predicated on [GE] growing to a certain level that [it] just did not see happening in terms of industrial cash flow in the next couple of years....  So, the single biggest delta … is obvious, which is what happened in the Power business."  Defendant Jamie S. Miller ("Miller"), the

Company's Chief Financial Officer ("CFO"), further commented on the Company's decision to slash its dividend, explaining that GE is "in the middle of an ongoing reserves review at [its] insurance businesses…. And [it] mentioned [] before that [its] not taking a second half GE Capital dividend of about $3 billion. And as [GE] go[es] through this process, at this point, [it does] expect the charge to be more than that." GE's executives reiterated these shocking revelations at the Goldman Sachs Industrials Conference the following day, on November 14, 2017.

14.    On January 16, 2018, the Company announced that the comprehensive review and reserve testing of its LTC portfolio had concluded, revealing a multibillion-dollar loss in GE's legacy reinsurance business. The Company disclosed that GE would be required to take an after-tax GAAP charge of $6.2 billion for the fourth quarter of 2017 on GE Capital's legacy reinsurance contracts and that GE was required to make statutory reserve contributions of $15 billion over the next seven years. The Company further announced that GE Capital was suspending its dividends to GE for the "foreseeable future." Later that day, during a conference call with investors and analysts, defendant Flannery admitted that the Company "underappreciated the risk in [GE's insurance business] book." The Company further acknowledged that most companies in the LTC industry had experienced significantly greater claims than originally anticipated.

15.    Analysts quickly concluded that GE's fiduciaries knew about problems in its LTC business for some time. As an analyst with Melius Research explained, it's "very hard to believe that mysteriously overnight GE found problems [it] didn't know existed." Likewise, an analyst with Vertical Research Partners opined, "[i]t's hard to imagine a $15 billion problem materialized in the course of the year."

16.     On January 24, 2018, the Company revealed charges to earnings totaling at least $850 million in the fourth quarter of 2017 as a result of cost overruns from the GE Power segment and a write-off for slow-moving and obsolete inventory.  The Company further announced it had adopted stronger internal controls, including "much tighter" underwriting, more attention to pricing, execution, and cost estimating, as well as a reevaluation of the revenues generated by its LTSAs.  The Company's decision to adopt stronger internal controls indicates that the Company had maintained inadequate internal controls over its financial reporting, at least with respect to its LTSAs.  In the wake of the Company's disastrous disclosures, Warren Buffet, the Chairman and CEO of Berkshire Hathaway Inc., made the following comment about GE's accounting practices: "Clearly there were mistakes made, and they made mistakes in long-term care…. The accounting at GE has not been a model at all in recent years."

17.     In addition, in 2016 and 2017, long after the Board was aware of the systemic problems at GE, the Individual Defendants issued materially misleading Proxy Statements urging stockholders to vote to reelect the directors and approve executive compensation packages, among other things.  In seeking stockholder votes in accord with the Board's recommendations, each of the Proxy Statements omitted material information concerning, among other things: (i) GE's failure to periodically test GE Capital's insurance portfolio for impairment; (ii) GE's failure to timely record increases to LTC reserves by billions of dollars in violation of GAAP and statutory insurance regulations; (iii) the Company's improper accounting on LTSAs which artificially inflated the revenue reported in GE's financial statements; and (iv) the Company's inadequate internal controls which facilitated the illegal behavior detailed herein.

18.     The Individual Defendants' actions have devastated GE, as is evident from the 60% stock drop which wiped out over *$183 billion* of the Company's market capitalization in a

little over a year.  Moreover, as a direct result of this unlawful course of conduct, the Company is now the subject of an investigation by the SEC into the Company's "revenue recognition and controls" as well as "the process leading to the insurance reserve increase."  In addition, a class action complaint has been filed in the U.S. District Court for the Southern District of New York against the Company and certain Individual Defendants alleging violations of the federal securities laws in connection with certain false statements concerning the Company's business and operations (the "Securities Class Action"), and at least one class action complaint has been filed under the Employee Retirement Income Security Act ("ERISA") alleging that GE breached its fiduciary duty to retirement plan participants by improperly and imprudently retaining or acquiring GE stock that was artificially inflated as a result of the widespread and well-known improper accounting practices at the Company.

19.     Plaintiffs bring this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## II.     JURISDICTION AND VENUE

20.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

21.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to GE, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.    THE PARTIES

### A.    Plaintiffs

23.     Plaintiff Malka Raul was a shareholder of GE at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current GE stockholder.

24.     Plaintiff Edward Tansey was a stockholder of GE at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current GE stockholder.

25.     Plaintiff Henry Zwang was a stockholder of GE at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current GE stockholder.

### B.    Nominal Defendant

26.     Nominal defendant GE is a New York corporation with principal executive offices located at 41 Farnsworth Street, Boston, Massachusetts.  GE is a global digital industrial company that serves customers in over 180 countries.  The Company's products and services include aircraft engines, power generation, oil and gas production equipment, medical imaging,

financing, and industrial products.   As of February 23, 2018, the Company employed approximately 313,000 people worldwide.

        **C.**     **Defendants**

        27.     Defendant Jeffrey R. Immelt ("Immelt") was GE's Chairman of the Board from September 2001 to October 2017; CEO from September 2001 to July 2017; a director from November 2000 to October 2017; President and Chairman-elect from November 2000 to September 2001; and has held various other roles at GE and its subsidiaries since 1982. Defendant Immelt is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.   Defendant Immelt knowingly, recklessly, or with gross negligence: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.   Defendant Immelt also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 and 2017 Proxy Statements.   GE paid defendant Immelt the following compensation as an executive:

| Year | Salary | Bonus | PSUs & RSUs | Stock Options | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | LTPAs | Change in Pension Value & Nonqualified Deferred Comp. Earnings | All Other Compensation | SEC Total | Adjusted SEC Total |
|------|--------|-------|-------------|---------------|--------------|---------------|----------------------------------------|-------|----------------------------------------------------------------|------------------------|-----------|--------------------|
| 2017 | $2,864,394 | - | - | - | - | - | - | - | $3,373,410 | $1,873,463 | $8,111,267 | $4,982,197 |
| 2016 | $3,800,000 | $4,320,000 | $4,673,098 | $2,142,000 | - | - | - | $1,624,000 | $3,580,288 | $1,185,138 | $21,324,524 | $17,962,122 |
| 2015 | $3,800,000 | $5,400,000 | - | - | $6,238,766 | $2,964,000 | $7,614,000 | - | $6,336,805 | $620,376 | $32,973,947 | $26,831,472 |

28.    Defendant Jeffrey S. Bornstein ("Bornstein") was GE's Vice Chairman from June 2017 to December 2017; CFO from July 2013 to October 2017; and Senior Vice President from 2007 to June 2017.  Defendant Bornstein was also GE Capital's CFO from 2008 to July 2013. Defendant Bornstein is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.    Defendant Bornstein knowingly, recklessly, or with gross negligence:  (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning:   (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct. While in possession of material, nonpublic information concerning GE's true business health, defendant Bornstein sold 168,313 shares of his stock for $4,856,256.47 in proceeds.  GE paid defendant Bornstein the following compensation as an executive:

| Year | Salary | Bonus | PSUs & RSUs | Stock Options | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | LTPAs | Change in Pension Value & Nonqualified Deferred Comp. Earnings | All Other Compensation | SEC Total | Adjusted SEC Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2017 | $1,775,000 | - | $8,140,971 | $692,000 | - | - | - | - | $3,796,480 | $163,272 | $14,567,723 | $10,835,590 |
| 2016 | $1,687,500 | $1,920,000 | $1,532,431 | $750,000 | - | - | - | $739,000 | $2,882,201 | $394,601 | $9,905,733 | $7,081,503 |
| 2015 | $1,600,000 | $2,500,000 | - | - | $2,746,623 | $1,086,800 | $3,351,200 | - | $1,815,193 | $161,000 | $13,260,816 | $11,497,856 |

29.     Defendant Flannery is GE's Chairman of the Board and has been since October 2017 and CEO and a director and has been since August 2017.  Defendant Flannery was also GE's Senior Vice President from October 2014 to August 2017 and Senior Vice President, Corporate Business Development from April 2013 to October 2014.  In addition, defendant Flannery was GE Healthcare's President and CEO from October 2014 to August 2017; GE India's President and CEO from October 2009 to April 2013; and has held various other roles at GE and its subsidiaries, including GE Capital, since 1987.  Defendant Flannery is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Flannery knowingly, recklessly, or with gross negligence: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.   GE paid defendant Flannery the following compensation as an executive:

| Year | Salary | Stock Options | Change in Pension Value & Nonqualified Deferred Comp. Earnings | All Other Compensation | SEC Total | Adjusted SEC Total |
|------|--------|---------------|------|------|------|------|
| 2017 | $1,737,500 | $2,076,000 | $3,255,222 | $1,931,881 | $9,000,603 | $5,800,715 |

30.     Defendant Miller is GE's CFO and has been since November 2017 and Senior Vice President and has been since April 2013.   Defendant Miller was also GE's Chief Information Officer from April 2013 to October 2015 and Vice President, Controller and Chief Accounting Officer from April 2008 to April 2013.   In addition, defendant Miller was GE Transportation's President and CEO from October 2015 to November 2017.   Defendant Miller is named as a defendant in the related Securities Class Action that alleges she violated sections 10(b) and 20(a) of the Exchange Act.   Defendant Miller knowingly, recklessly, or with gross negligence:  (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.   GE paid defendant Miller the following compensation as an executive:

| Year | Salary | PSUs & RSUs | Stock Options | Change in Pension Value & Nonqualified Deferred Comp. Earnings | All Other Compensation | SEC Total | Adjusted SEC Total |
|------|--------|-------------|---------------|------|------|------|------|
| 2017 | $1,335,417 | $1,810,930 | $519,000 | $1,154,778 | $237,736 | $5,057,861 | $3,903,083 |

31.     Defendant Keith S. Sherin ("Sherin") was GE's Vice Chairman from July 2007 to December 2016; CFO from December 1998 to June 2013; and Senior Vice President from December 1998 to July 2007.  Defendant Sherin was also GE Capital's Chairman and CEO from July 2013 to September 2016 and has held various other roles at GE and its subsidiaries since 1981.  Defendant Sherin is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Sherin knowingly, recklessly, or with gross negligence:   (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning:  (a)   the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.   GE paid defendant Sherin the following compensation as an executive:

| Year | Salary | Bonus | PSUs & RSUs | Stock Options | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | LTPAs | Change in Pension Value & Nonqualified Deferred Comp. Earnings | All Other Compensation | SEC Total | Adjusted SEC Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | $2,575,000 | $3,784,000 | $6,965,400 | $2,486,860 | - | - | - | $1,286,800 | $12,890,425 | $362,291 | $30,350,776 | $17,609,982 |
| 2015 | $2,500,000 | $5,232,500 | - | - | $2,991,242 | $1,185,600 | $6,750,550 | - | $6,953,331 | $292,836 | $25,906,059 | $19,087,703 |

32.     Defendant James J. Mulva ("Mulva") is a GE director and has been since April 2008.  Defendant Mulva is also a member of GE's Audit Committee and has been since at least March 2014, and the Chair of the Finance & Capital Allocation Committee and has been since December 2017.  Defendant Mulva knowingly or recklessly: (i) failed to adequately adjust the

Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.  Defendant Mulva also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 and 2017 Proxy Statements.  GE paid defendant Mulva the following compensation as a director:

| Fiscal Year | Stock Awards | Matching Gifts | Other Benefits | Total |
|---|---|---|---|---|
| 2017 | $319,598 | $25,000 | - | $344,598 |
| 2016 | $300,915 | - | $25,000 | $325,915 |
| 2015 | $274,300 | - | $25,000 | $299,300 |

33.     Defendant W. Geoffrey Beattie ("Beattie") is a GE director and has been since June 2009.  Defendant Beattie is also a member of the Company's Audit Committee and has been since at least March 2017.  Defendant Beattie was a member of GE's Risk Committee from at least March 2014 to February 2016, and a member of the GE Capital Committee from February 2016 to at least March 2016.  Defendant Beattie knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in

- 16 -

unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.  Defendant Beattie also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 and 2017 Proxy Statements.  GE paid defendant Beattie the following compensation as a director:

| Fiscal Year | Stock Awards | Matching Gifts | Other Benefits | Total |
|---|---|---|---|---|
| 2017 | $306,017 | $22,811 | - | $328,828 |
| 2016 | $325,059 | - | $21,262 | $346,321 |
| 2015 | $299,237 | - | $25,000 | $324,237 |

34.     Defendant James S. Tisch ("Tisch") is a GE director and has been since June 2010.  Defendant Tisch is also a member of GE's Finance & Capital Allocation Committee and has been since December 2017.  Defendant Tisch was a member of the Company's Risk Committee in at least March 2014.  Defendant Tisch knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.  Defendant Tisch also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 and 2017 Proxy Statements.  GE paid defendant Tisch the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2017 | $285,047 | $285,047 |
| 2016 | $270,630 | $270,630 |
| 2015 | $249,364 | $249,364 |

35.     Defendant Francisco D'Souza ("D'Souza") is a GE director and has been since February 2013.  Defendant D'Souza was also a member of the Company's Audit Committee from at least March 2015 to at least March 2016.   Defendant D'Souza knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.  Defendant D'Souza also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 and 2017 Proxy Statements.  GE paid defendant D'Souza the following compensation as director:

| Fiscal Year | Stock Awards | Other Benefits | Total |
|---|---|---|---|
| 2017 | $290,105 | - | $290,105 |
| 2016 | $300,915 | $19,234 | $320,149 |
| 2015 | $274,300 | $15,138 | $289,438 |

36.     Defendant Mary L. Schapiro ("Schapiro") was a GE director from April 2013 to April 25, 2018.  Defendant Schapiro was also the Chair of the Company's Audit Committee from at least March 2017 to April 25, 2018.   Defendant Schapiro was a member of GE's Risk Committee from at least March 2014 to February 2016, and a member of the GE Capital Committee from February 2016 to at least March 2016.   Defendant Schapiro knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with

GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.   Defendant Schapiro also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 and 2017 Proxy Statements.  GE paid defendant Schapiro the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Matching Gifts | Other Benefits | Total |
|---|---|---|---|---|---|
| 2017 | $24,800 | $281,536 | $4,500 | $961 | $311,797 |
| 2016 | $29,900 | $272,023 | - | $28,075 | $329,998 |
| 2015 | $66,000 | $233,662 | - | $25,000 | $324,662 |

37.     Defendant James E. Rohr ("Rohr") was a GE director from September 2013 to April 25, 2018.  Defendant Rohr was also a member of the Company's Audit Committee from at least March 2017 to April 25, 2018, and a member of the Finance & Capital Allocation Committee from December 2017 to April 25, 2018.  Defendant Rohr was a member of GE's Risk Committee from at least March 2015 to February 2016, and a member of the GE Capital Committee from February 2016 to at least March 2016.   Defendant Rohr knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning:  (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially

overstated value as a result of its wrongful conduct.  Defendant Rohr also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 and 2017 Proxy Statements.  GE paid defendant Rohr the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Matching Gifts | Other Benefits | Total |
|---|---|---|---|---|---|
| 2017 | $135,500 | $200,643 | $25,000 | - | $361,143 |
| 2016 | $138,500 | $210,232 | - | $50,000 | $398,732 |
| 2015 | $130,000 | $194,504 | - | - | $324,504 |

38.     Defendant Sébastien M. Bazin ("Bazin") is a GE director and has been since April 2016.  Defendant Bazin is also a member of the Company's Finance & Capital Allocation Committee and has been since December 2017, and was a member of the Audit Committee in at least March 2017.  Defendant Bazin knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning:  (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.  Defendant Bazin also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2017 Proxy Statement.  GE paid defendant Bazin the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2017 | $309,726 | $309,726 |
| 2016 | $189,254 | $189,254 |

39.     Defendant Peter B. Henry ("Henry") was a GE director from July 2016 to April 25, 2018.  Defendant Henry was also a member of GE's Audit Committee from at least March

2017 to April 25, 2018.  Defendant Henry knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning:  (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.  Defendant Henry also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2017 Proxy Statement.  GE paid defendant Henry the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2017 | $299,755 | $307,755 |
| 2016 | $141,254 | $141,254 |

40.     Defendant John J. Brennan ("Brennan") is GE's Lead Independent Director and has been since April 2014 and a director and has been since July 2012.  Defendant Brennan was also a member of the Company's Risk Committee from at least March 2014 to February 2016, and a member of the GE Capital Committee from February 2016 to at least March 2016.  Defendant Brennan knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning:  (a)  the risks  associated  with  GE Capital's

reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct. Defendant Brennan also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 and 2017 Proxy Statements.  GE paid defendant Brennan the following compensation as a director:

| Fiscal Year | Stock Awards | Matching Gifts[1] | Other Benefits[2] | Total |
|---|---|---|---|---|
| 2017 | $355,374 | $25,000 | - | $380,374 |
| 2016 | $397,272 | - | - | $397,272 |
| 2015 | $374,046 | - | $25,000 | $399,046 |

41.     Defendant Andrea Jung ("Jung") was a GE director from July 1998 to April 25, 2018.  Defendant Jung knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.  Defendant Jung also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 and 2017 Proxy Statements.  GE paid defendant Jung the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Matching Gifts | Other Benefits | Total |
|---|---|---|---|---|---|
| 2017 | $124,000 | $183,610 | $25,000 | - | $332,610 |
| 2016 | $117,000 | $177,575 | - | $28,373 | $322,948 |
| 2015 | $110,000 | $164,580 | - | $25,000 | $299,580 |

42.     Defendant Rochelle B. Lazarus ("Lazarus") was a GE director from December 2000 to April 25, 2018.  Defendant Lazarus knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct. Defendant Lazarus also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 and 2017 Proxy Statements.  GE paid defendant Lazarus the following compensation as a director:

| Fiscal Year | Stock Awards | Matching Gifts[1] | Other Benefits[2] | Total |
|---|---|---|---|---|
| 2017 | $306,017 | $25,000 | - | $331,017 |
| 2016 | $289,495 | - | $25,000 | $314,495 |
| 2015 | $249,364 | - | $27,450 | $276,814 |

43.     Defendant Susan J. Hockfield ("Hockfield") was a GE director from December 2006 to April 25, 2018.  Defendant Hockfield knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a

result of its wrongful conduct. Defendant Hockfield also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 and 2017 Proxy Statements.  GE paid defendant Hockfield the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Matching Gifts | Other Benefits | Total |
|---|---|---|---|---|---|
| 2017 | $118,000 | $174,726 | $14,000 | - | $306,726 |
| 2016 | $109,000 | $165,352 | - | $11,959 | $286,311 |
| 2015 | $100,000 | $149,618 | - | $9,410 | $259,028 |

44.     Defendant Marijn E. Dekkers ("Dekkers") was a GE director from June 2012 to April 25, 2018.  Defendant Dekkers knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.  Defendant Dekkers also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 and 2017 Proxy Statements.  GE paid defendant Dekkers the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Matching Gifts | Other Benefits | Total |
|---|---|---|---|---|---|
| 2017 | - | $306,017 | $25,000 | - | $331,017 |
| 2016 | $55,000 | $239,033 | - | $25,000 | $319,033 |
| 2015 | $110,000 | $164,580 | - | $22,471 | $297,051 |

45.     Defendant Robert W. Lane ("Lane") was a GE director from June 2005 to October 2017.  Defendant Lane was also a member of the Company's Audit Committee from at least March 2014 to at least March 2016.  Defendant Lane knowingly or recklessly:  (i) failed to

adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.  Defendant Lane also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 and 2017 Proxy Statements.  GE paid defendant Lane the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2017 | $90,000 | $133,177 | $1,223,177 |
| 2016 | $123,500 | $187,535 | $311,035 |
| 2015 | $120,000 | $179,542 | $299,542 |

46.     Defendant Robert J. Swieringa ("Swieringa") was a GE director from October 2002 to April 2016.  Defendant Swieringa was also a member of the Company's Audit Committee from at least March 2014 to at least March 2016.  Defendant Swieringa knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.  Defendant Swieringa also negligently

violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its
2016 Proxy Statement.  GE paid defendant Swieringa the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Other Benefits | Total |
|---|---|---|---|---|
| 2016 | $41,250 | $64,024 | $1,025,000 | $1,130,274 |
| 2015 | $99,000 | $175,395 | $24,735 | $299,130 |

47.     Defendant Douglas A. Warner III ("Warner") was a GE director from 1992 to
April 2016.  Defendant Warner was also the Chair of the Company's Audit Committee from at
least March 2014 to at least March 2016.  Defendant Warner knowingly or recklessly: (i) failed
to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate
sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC
regulations; (iii) employed improper revenue recognition practices in connection with GE
Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls;
and (v) made improper statements in the Company's press releases and public filings concerning:
(a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of
dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated
value as a result of its wrongful conduct.  Defendant Warner also negligently violated section
14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 Proxy
Statement.  GE paid defendant Warner the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Other Benefits | Total |
|---|---|---|---|---|
| 2016 | $45,000 | $69,844 | $1,005,841 | $1,120,685 |
| 2015 | $120,000 | $179,542 | $32,729 | $332,271 |

48.     Defendant James I. Cash, Jr. ("Cash") was a GE director from August 1997 to
April 2016.  Defendant Cash knowingly or recklessly: (i) failed to adequately adjust the
Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for

insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.   Defendant Cash also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2016 Proxy Statement.   GE paid defendant Cash the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Other Benefits | Total |
|---|---|---|---|---|
| 2016 | $41,250 | $64,024 | $1,021,752 | $1,127,026 |
| 2015 | $110,000 | $164,580 | $69,357 | $343,937 |

49.     Defendant Lowell C. McAdam ("McAdam") was a GE director from April 2016 to December 2017.  Defendant McAdam knowingly or recklessly:  (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning:  (a)  the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.     GE paid defendant McAdam the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2017 | $281,338 | $281,338 |

| 2016 | $173,625 | $173,625 |

50.     Defendant Steven M. Mollenkopf ("Mollenkopf") was a GE director from November 2016 to April 25, 2018.  Defendant Mollenkopf knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.  Defendant Mollenkopf also negligently violated section 14(a) of the Exchange Act by causing GE to make misleading statements in its 2017 Proxy Statement.  GE paid defendant Mollenkopf the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
| --- | --- | --- |
| 2017 | $278,833 | $278,833 |
| 2016 | $34,288 | $34,288 |

51.     Defendant Risa Lavizzo-Mourey ("Lavizzo-Mourey") is a GE director and has been since April 2017.  Defendant Lavizzo-Mourey knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of

dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.  GE paid defendant Lavizzo-Mourey the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $35,625 | $140,411 | $176,036 |

52.     Defendant Edward P. Garden ("Garden") is a GE director and has been since October 2017.  Defendant Garden is also a member of GE's Finance & Capital Allocation Committee and has been since December 2017.  Defendant Garden knowingly or recklessly: (i) failed to adequately adjust the Company's LTC insurance actuarial assumptions; (ii) failed to allocate sufficient reserves for insurance premium deficiencies in violation of GAAP and SEC regulations; (iii) employed improper revenue recognition practices in connection with GE Power's LTSAs; (iv) failed to appropriately address the Company's inadequate internal controls; and (v) made improper statements in the Company's press releases and public filings concerning: (a) the risks associated with GE Capital's reinsurance business; (b) the accrual of billions of dollars in unreported impairment charges for GE; and (c) the Company's artificially overstated value as a result of its wrongful conduct.  GE paid defendant Garden the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $32,500 | $48,219 | $80,719 |

53.     The defendants identified in ¶¶25-29 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶25, 27, 30-50 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶30-31, 33-37, 43-45 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶30, 32, 35-36, 50 are referred to herein as the "Finance & Capital Allocation Defendants."  The defendants identified in ¶¶31, 34-

35, 38 are referred to herein as the "GE Capital Committee Defendants."   The defendants identified in ¶¶31-32, 34-35, 38 are referred to herein as the "Risk Committee Defendants." Collectively, the defendants identified in ¶¶25-50 are referred to herein as the "Individual Defendants."

## IV.   DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.   Fiduciary Duties

54.   By reason of their positions as officers, directors, and/or fiduciaries of GE and because of their ability to control the business and corporate affairs of GE, the Individual Defendants owed GE and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage GE in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of GE and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to GE and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

55.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of GE, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with GE, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company.

56.   To discharge their duties, the officers and directors of GE were required to exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of GE were required to, among other things:

(a)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)      ensure that the Company complied with its legal obligations and requirements;

(c)      ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management;

(d)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)      remain informed as to how GE conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(f)      truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

## B.      Additional Duties of the Audit Committee Defendants

57.      Under the GE Board's Audit Committee Charter, the Audit Committee Defendants, defendants Bazin, Beattie, D'Souza, Henry, Lane, Mulva, Rohr, Schapiro, Swieringa, and Warner, owe and/or owed specific additional duties to GE.  According to the Audit Committee Charter, among other things, the Audit Committee is responsible for assisting

the Board in overseeing "the Company's and GECC's risk policies and processes relating to financial statements, financial systems, financial reporting processes, compliance and auditing, and allowance for loan and lease losses, as well as the guidelines, policies and processes for monitoring and mitigating such risks."  Further, the Audit Committee is responsible for oversight of "the Company's financial reporting activities, including [the Company's] annual report, and accounting standards and principles, significant changes in such standards or principles or in their application and the key accounting decisions affecting the Company's financial statements, including alternatives to, and the rationale for, the decisions made."  In addition, the Audit Committee is required to:

1.  To meet to review and discuss with management and the independent auditor the annual audited financial statements and quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and any other matters required to be reviewed under applicable legal, regulatory or NYSE requirements.

2.  To discuss with management and the independent auditor, as appropriate, prior to their release to the public, earnings press releases and financial presentations provided to analysts and rating agencies.

3.  To select the independent auditor to examine the Company's accounts, controls and financial statements. The committee shall have the sole authority and responsibility to select, evaluate, compensate and oversee the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (including resolution of disagreements between management and the auditor regarding financial reporting). The independent auditor and each such registered public accounting firm will report directly to the committee. The committee shall have the sole authority to approve all audit engagement fees and terms and the committee, or the chair of the committee, must pre-approve any audit and non-audit service provided to the Company by the Company's independent auditor.

4.  To discuss with management and the independent auditor, as appropriate, any audit problems or difficulties and management's response.

5.      As required by NYSE listing requirements, to discuss with management the Company's risk assessment and risk management practices and the guidelines, policies and processes for risk assessment and risk management.

*   *   *

8.      To review and approve the internal corporate audit staff and GECC internal audit staff functions, including:  (i) purpose, authority and organizational reporting lines; (ii) annual audit plan, budget and staffing; and (iii) concurrence in the appointment, compensation and rotation of the vice president-corporate audit staff.

9.      To review, with the chief financial officer, the vice president-corporate audit staff, the chief GECC audit executive or such others as the committee deems appropriate, the Company's internal system of audit and financial controls and the results of internal audits.

10.     To obtain and review at least annually a formal written report from the independent auditor delineating: the auditing firm's internal quality-control procedures; the auditing firm's independence; and any material issues raised within the preceding five years by the auditing firm's internal quality-control reviews, by peer reviews of the firm, or by any governmental or other inquiry (including inspections by the Public Company Accounting Oversight Board) or investigation relating to any audit conducted by the firm. The committee will also review steps taken by the auditing firm to address any findings in any of the foregoing reviews. Also, in order to assess auditor independence, the committee will review at least annually all relationships between the independent auditor and the Company.

11.     To prepare and publish an annual committee report in the Company's proxy statement.

*   *   *

13.     To review and investigate any matters pertaining to the integrity of management or adherence to standards of business conduct as required in the policies of the Company and GECC. This should include regular reviews of the compliance processes and programs, for each of the Company and GECC, in general and the corporate ombudsman process in particular. In connection with these reviews, the committee will meet, as deemed appropriate, with the general counsel and other Company officers or employees.

14.     To establish and oversee procedures for the receipt, retention and treatment of complaints on accounting, internal accounting controls or auditing matters, as well as for confidential, anonymous submissions by

- 33 -

Company employees of concerns regarding questionable accounting or auditing matters.

15.     The committee shall meet separately at least quarterly with management, the vice president-corporate audit staff, the chief GECC audit executive and the Company's independent auditors.

## C.    Additional Duties of the Finance & Capital Allocation Committee Defendants

58.     Under the Board's Finance & Capital Allocation Committee Charter, the Finance & Capital Allocation Defendants, defendants Bazin, Garden, Mulva, Rohr, and Tisch, owe and/or owed specific additional duties to GE. Specifically, among other things, the Finance & Capital Allocation Committee was tasked with assisting the Board with "oversight of the Company's capital allocation framework, including prioritization, significant decisions and risk considerations related to the Company's financial resources, capital structure and investments and uses of cash." In addition, the Financial & Capital Allocation Committee is required to:

1.     Review the Company's capital structure, liquidity and plans for financing its short- and long-term capital requirements. The committee shall periodically receive and review reporting on the status of the Company's cash flows and other capital generation versus existing targets and plans.

2.     Review proposed changes to dividend policies and programs for the repurchase of capital stock of the Company.

3.     Receive and review regular reports concerning strategic plans and transactions, including significant mergers, acquisitions and divestitures by the Company, including discussion of possible transactions and their financial impact and progress reports on pending and completed transactions.

4.     Review the Company's annual budget for capital expenditures and other organic investments, including discussion of significant proposed capital expenditures, overall research and development spending and other investments in the Company's competitiveness, such as restructuring.

5.     Review significant financing programs to be offered by the Company in support of its business objectives, including secured and unsecured financing, equity investments, letters of credit, guarantees or other forms of financial accommodation. The committee's oversight includes the

oversight of financing offered through GE Capital, as well as the periodic review of the Company's risk appetite for GE Capital and associated financial risk exposures.

6.      Review the Company's overall strategy and capital allocation with respect to its pension liabilities.

**D.      Additional Duties of the GE Capital Committee Defendants**

59.      Pursuant to the Board's GE Capital Committee Charter in effect at the time, the GE Capital Committee Defendants, defendants Beattie, Brennan, Schapiro, and Rohr, owed specific additional duties to GE.  In particular, these defendants were required to "assist the board in its oversight of the Company's risk-management framework, including key strategic and operational risks, as it relates to the Company's financial services businesses."  In addition, the GE Capital Committee Charter provided that the committee's role included "the independent oversight of the Company's wholly owned subsidiary, GE Capital Global Holdings, LLC (GE Capital), including the adequacy and effectiveness of its risk management and credit review functions and the GE Capital Exit plan to reduce the size of the Company's financial services businesses."  The GE Capital Committee Charter further required the GE Capital Committee members:

1.      To review and, as applicable, approve GE Capital's risk governance framework, risk assessment and risk management practices, and the policies and processes for risk assessment and risk management. This shall also include review and approval of significant policies and processes that management uses to manage enterprise, strategic, operational, market, credit and liquidity risks and for capital planning.

2.      To review and, as applicable, approve GE Capital's risk appetite and key policies on the establishment of risk objectives, tolerances and limits, as well as the policies and processes for monitoring and mitigating such risks.

3.      To discuss with management, including GE Capital's chief risk officer and its head of credit review, GE Capital's risk assessment and risk management policies and processes. The committee or its chairman shall

also meet separately with GE Capital's chief risk officer and its head of credit review as the committee deems appropriate.

4.    To receive periodic reports from management on the metrics used to measure, monitor and manage risks related to its financial services business, including management's views on acceptable and appropriate levels of exposures.

5.    To receive reports from internal audit and credit review functions on the results of risk management and credit reviews and assessments.

6.    To review the status of financial services regulatory exams and ongoing reviews relating to GE Capital, as applicable.

7.    To review periodic reports on selected risk topics as the committee deems appropriate.

8.    To review the independence, authority, and effectiveness of the risk management function, including staffing level and staff qualifications.

9.    To approve the appointment and, when and if appropriate, replacement of GE Capital's chief risk officer and its head of credit review, each of whom shall functionally report to the chairman of the committee.

**E.    Additional Duties of the Risk Committee Defendants**

60.    Pursuant to the Board's Risk Committee Charter in effect at the time, the Risk Committee Defendants, defendants Beattie, Brennan, Schapiro, Rohr, and Tisch, owed specific additional duties to GE.  In particular, these defendants were required to provide "oversight of the Company's risk-management framework, including key strategic and operational risks."  The Risk Committee was further tasked with "the independent oversight of the Company's wholly owned subsidiary, General Electric Capital Corporation (GECC), including the adequacy and effectiveness of its risk management and credit review functions."  The Risk Committee Charter further noted, among other things, the Risk Committee's responsibilities included:

1.    To review, and, as applicable, approve the Company's and GECC's risk governance framework, risk assessment and risk management practices, and the guidelines, policies and processes for risk assessment and risk management. For GECC, this shall also include review and approval of significant policies and processes that management uses to manage credit

and investment, market, liquidity, operational, compliance and strategic risks.

2.  To review, and, as applicable, approve the Company's and GECC's risk appetite and key risk policies on the establishment of risk limits, as well as the guidelines, policies and processes for monitoring and mitigating such risks.

3.  To discuss with the Company's chief risk officer, and GECC's chief risk officer and head of credit review, the Company's and GECC's risk assessment and risk management guidelines, policies and processes. The committee shall meet separately at least twice a year with the Company's chief risk officer, and GECC's chief risk officer and head of credit review.

4.  To receive periodic reports from management on the metrics used to measure, monitor and manage risks, including management's views on acceptable and appropriate levels of exposures.

5.  To receive reports from the Company's corporate audit staff and GECC's internal audit function on the results of risk management reviews and assessments.

6.  To review the status of financial services regulatory exams and ongoing reviews relating to the Company and GECC, as applicable.

7.  To review periodic reports on selected risk topics as the committee deems appropriate.

8.  To review the independence, authority, and effectiveness of the risk management function, including staffing level and staff qualifications.

9.  To approve the appointment and, when and if appropriate, replacement of the Company's chief risk officer and GECC chief risk officer, each of whom shall functionally report to the chairman of the committee.

**F.   Breaches of Duties**

61.   Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of GE, the absence of good faith on their part, and a reckless disregard

for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of GE's Board during the time of the misconduct.

62.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its business, operational, and compliance policies, including with respect to the risks associated with GE Capital's reinsurance business.  The Individual Defendants further failed to implement proper internal controls to ensure meaningful adjustments were made to its insurance actuarial assumptions, and to ensure the Company maintained adequate reserves in accordance with GAAP.  These improper practices caused GE to incur substantial damage.

63.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in improper practices that deceived millions of investors, and caused GE to incur substantial damage.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of an investigation by the SEC, the ERISA class action, and the Securities Class Action that allege violations of securities laws.  As a result, GE has expended, and will continue to expend, significant sums of money.

## V.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

64.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

65.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of GE, as to the Company's financial performance; and (ii) and enhance the Individual Defendants' executive and directorial positions at GE and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

66.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

67.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations.

68.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements and mislead the investing public regarding the Company's financial performance. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

69.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VI.     FACTUAL BACKGROUND

70.     GE is a globally diversified technology and financial services company with operations organized across various business segments.  The two segments that are the focus of this matter are: (i) GE Capital, the Company's financial services unit; and (ii) GE Power, a wholly owned subsidiary of GE, that builds industrial products including power plants, turbines, and generators.

71.     GE Capital provides commercial lending and leasing, as well as a range of financial services for commercial aviation, energy, and support for GE's industrial business units. GE Capital accounts for roughly 25% of the Company's revenue.  In the past several years, the Company has derived a substantial amount of its free cash flow used for dividends from GE Capital's flow-through dividends.   In fact, between 2015 and 2017, GE Capital paid approximately $28.4 billion in dividends to its parent GE.  Significant cash dividends from GE Capital materially contributed to GE's ability to fund both a stock buyback program, which helped keep the Company's stock price inflated, and GE's dividend to stockholders.  Given the importance of GE Capital to the Company's cash flows, GE was actively monitoring GE Capital and its risks, including its LTC legacy reinsurance business.

72.     GE Power, is the Company's largest segment within its industrial businesses (encompassing all businesses except finance), earning approximately 30% of the Company's total revenue in 2017.  The GE Power segment serves power generation to customers around the world, and offers diversified products and services related to energy production.  Revenues derived from the GE Power segment are significant to GE.  For example, the Company reported GE Power segment profits of $5.4 billion in 2014, $4.5 billion in 2015, and $5 billion in 2016.  A substantial amount of these earnings were driven by revenue GE recorded on LTSAs within the GE Power segment.

## VII.   SUBSTANTIVE ALLEGATIONS

### A.     The Board Failed to Maintain Appropriate LTC Reserves in Violation of GAAP and SEC Regulations

73.     LTC policies are intended to help defray the cost of home care, assisted living care, nursing home care, and other specialized skilled facility care required when an individual needs assistance with daily living due to an accident, illness, cognitive impairment, or advancing age.  These costs are generally not covered by standard health insurance, Medicare, or Medicaid. Insurance companies began marketing and selling LTC insurance in the 1970s.  Sales of LTC policies peaked in 2002, when 102 insurance companies collectively sold 755,000 policies.  By 2009, most of these companies had exited the LTC market, and in 2016, only a handful of carriers remained who sold fewer than 70,000 policies.

74.     GE Capital historically underwrote and reinsured billions of dollars in LTC policies. It was an early pioneer and a dominant issuer of LTC insurance policies in the 1990s and early 2000s.  In 2001, for example, GE held over 20% market share of new LTC policies issued.   Under these policies, GE Capital collects premiums to insure costs associated with assisted living and other related expenses not covered by traditional insurance.  In order to pay

current and future claims on these policies, GE is required to hold cash in reserves.  As detailed below, GAAP and SEC regulations governing corporate disclosures require insurers to maintain adequate cash reserves and timely book related liabilities for anticipated claims.  The appropriate level of reserves is based on a number of factors including mortality, morbidity, lapse rates, claims experience, and health care costs.  As explained herein, each of these assumptions used for pricing the early LTC policies has had significant unfavorable actual experience in the past decade.  As a result, over the past several years, LTC insurers and reinsurers throughout the industry have revamped their actuarial assumptions and increased their insurance reserves, except for GE.

### 1. GE Retained and Reinsured the Worst Blocks of Its LTC Business in Connection with the Genworth Spin-Off

75.     Between 2004 and 2006, GE divested much of its legacy LTC policies through the spin-off of Genworth.  However, to facilitate the spin-off, GE's then CEO, defendant Immelt, agreed to retain the financial risk for a substantial block of the riskiest LTC policies.  In an April 14, 2015 article titled "GE Stuck With $28 billion Insurance Liability," *TheStreet* reported that "GE hung onto certain insurance businesses, reportedly for fear they would depress Genworth's valuation."  Similarly, a January 15, 2018 *Bloomberg* article noted that the banks underwriting the Genworth spin-off "told GE the share sale could run into obstacles…. Some Genworth businesses were too weak for investors' tastes.  GE would need to backstop them."

76.     The Prospectus for the Genworth stock offering filed with the SEC on June 10, 2004 (the "2004 Genworth Prospectus"), explained the arrangement.  According to the 2004 Genworth Prospectus, through reinsurance transactions, Genworth was ceding certain businesses to GE subsidiary Union Fidelity Life Insurance Company ("UFLIC"), including LTC policies with aggregate reserves of $1.5 billion.  The 2004 Genworth Prospectus stated:

In the Reinsurance Transactions, we [Genworth] will cede to UFLIC [GE subsidiary] the following business:

- All of our liabilities under the in-force structured settlement annuities reflected as policyholder reserves on our U.S. GAAP statement of financial position on December 31, 2003, or reinsured by us under reinsurance agreements in effect prior to January 1, 2004. This business had aggregate reserves of $12.0 billion as of December 31, 2003.

- All of our liabilities under the in-force variable annuity contracts reflected as policyholder reserves on our U.S. GAAP statement of financial position on December 31, 2003, other than our GERA™ product and a limited number of variable annuity products that we no longer offer. UFLIC will also assume any benefit or expense resulting from third party reinsurance that we have on this business. This business had aggregate general account reserves of $2.8 billion as of December 31, 2003.

- ***All of our liabilities under the in-force long-term care insurance policies issued by Travelers prior to January 1, 2004 and reinsured by us. This business had aggregate reserves of $1.5 billion as of December 31, 2003.***

77.     Under these reinsurance transactions, GE agreed to indemnify Genworth for liability on certain of its LTC insurance policies.  According to the 2004 Genworth Prospectus, GE agreed to assume these policies because they failed to meet certain "target return thresholds." Essentially, via UFLIC, Genworth transferred liability for the riskiest LTC blocks back to GE. The 2004 Genworth Prospectus explained:

In connection with the [offering] we entered into a number of arrangements with GE governing our separation from GE and a variety of transition and other matters, including our relationship with GE while GE remains a significant stockholder in our company. These arrangements include several significant reinsurance transactions with Union Fidelity Life Insurance Company, or UFLIC, an indirect, subsidiary of GE. As part of these transactions, we ceded to UFLIC, effective as of January 1, 2004, all of our in-force structured settlement contracts, substantially all of our in-force variable annuity contracts, ***and a block of long-term care insurance policies that we reinsured in 2000 from The Travelers Insurance Company, a subsidiary of Citigroup, Inc., which we refer to in this prospectus as Travelers. In the aggregate, these blocks of business did not meet our target return thresholds, and although we remain liable under these contracts and policies as the ceding insurer, the reinsurance transactions have the effect of transferring the financial results of the reinsured blocks to UFLIC.***

\* \* \*

- 43 -

When we entered into the reinsurance transactions we transferred investment assets to UFLIC in exchange for the reinsurance recoverable asset from UFLIC and consequently we do not earn investment income on the investment assets transferred.

\* \* \*

Under the reinsurance transactions, we receive an expense allowance to reimburse us for costs we incur to service the reinsured blocks. Actual costs and expense allowance amounts will be determined by expense studies to be conducted periodically.... The reinsurance transactions were completed and accounted for at book value.

78.     The Company's divestiture of its insurance business to Genworth also did not include GE's other principal insurance business, GE Insurance Solutions (formerly known as Employers Reinsurance Corp. or "ERC").  This business also had substantial LTC exposure. During GE's November 19, 2003 Investor Meeting, defendant Immelt claimed that it was strategically retaining ERC to maximize stockholder value:

We didn't feel like there was a way to do both that and ERC at the same time. And we really think we're in a turn-around cycle in ERC, so that if we wait some time it's going to be a better business. We're going to generate earnings. And we'll continue to make that business better. And we just kept a couple of runoff blocks that are pretty safe earnings, and that's basically how we picked it.

79.     Despite significant risk exposure in its retained LTC policies, before completing its partial exit from the insurance business, GE failed to give investors any indication that its retained insurance portfolio exposed GE to significant toxic assets.  During the November 19, 2003 Investor Meeting, defendant Immelt assured investors that other than ERC, it was only retaining "a piece of low return, very stable run off block from the [GEFA] portfolio." Defendant Immelt even assured the market that its run-off business was "pric[ed] very diligently" and that it "maintain[ed] strong reserving practices" for its reinsurance business:

You saw us announce the run off of the life rebook. ***We are pricing very diligently, and pricing for risk. We've maintained strong reserving practices, and we look to be in good shape there.*** We really have better market knowledge today than we've ever had before, and a very solid investment portfolio. I haven't

changed my mind in terms of how I look at reinsurance for long term in this business. But I think you ought to count on this business being part of GE for the next couple of years. And we're going to run it with excellence.

During the Company's Annual GE Outlook Analyst Meeting on December 14, 2004, defendant Immelt further stated: "On the go forward basis in the reinsurance side, we've continued to improve operations. And when we look at the book of business we've written in the last few years it's profitable. So we continue to drive that business and make it smaller."

80.     While they repeatedly touted the safety and profitability of its retained reinsurance operations, the Individual Defendants either knew or were reckless in not knowing that these operations exposed GE to significant toxic assets. As an initial matter, in 2004 when the State of New York Insurance Department examined the financial condition of GE Capital Life Assurance Company—one of the entities that ceded a substantial block of LTC insurance to UFLIC in connection with the Genworth spin-off—it found that GE Capital Life Assurance Company's "[LTC] business ha[d] sustained continued losses due to the aging of the block and persistency."[1] Then, in July 2006, GE Capital Life Assurance Company was forced to increase its reserves by almost $200 million after the New York Insurance Department found that it's reserves were based on overly aggressive assumptions:

> During the review, ***concerns were raised regarding the lack of conservatism in certain assumptions with respect to the Company's LTC insurance reserves***. The Company agreed to refine the LTC reserve analysis and to strengthen reserves in a manner acceptable to the Department. ***Toward that end, the Company established additional LTC reserves in the amount of $184 million as of March 31, 2006.***[2]

---

[1] State of N.Y. Ins. Dep't, *Report on the Examination of the GE Capital Life Assurance Co. of N.Y.* (July 31, 2006), http://www.dfs.ny.gov/insurance/exam_rpt/72990c04.pdf.

[2] *Id.*

81.     In 2006, the Company sold off the majority of its other insurance operations to Swiss Reinsurance Company, including: (i) GE Insurance Solutions for $6.8 billion; and (ii) the remaining operations of GE Life for $0.9 billion.   But as with the Genworth spin-off, GE retained the risk for certain blocks of the riskiest LTC policies.   Nevertheless, in its Annual Report on Form 10-K for the fiscal year ended December 31, 2008 filed with the SEC, GE stated that as a result of these transactions, it had "substantially completed" its exit from the insurance industry:

> In 2006, **we substantially completed our planned exit of the insurance businesses** through the sale of the property and casualty insurance and reinsurance businesses and the European life and health operations of GE Insurance Solutions Corporation (GE Insurance Solutions) and the sale of GE Life, our U.K.-based life insurance operation, to Swiss Reinsurance Company.

Defendant Immelt again highlighted the Company's purported exit from the insurance industry in his February 10, 2006 Letter to Stakeholders:  "Exiting insurance is important for GE.  Our poor performance in insurance has dampened a strong performance by the rest of the Company.  I am confident you will now benefit by having a faster-growth, less volatile Company."

82.     As explained further herein, as a result of the Company's statements made during and after the Genworth spin-off, investors and the market were unaware of GE's significant exposure to the LTC industry until the Company revealed on July 21, 2017, that a review of its LTC reserves would be undertaken.

### 2.     The Board Fails to Increase LTC Reserves Despite Red Flags

83.     Since at least the early 2000s, when GE divested much of its legacy LTC policies to Genworth, pricing assumptions in the issuance of the LTC policies have changed dramatically. These changes were caused by factors such as increased costs of healthcare in the United States, lengthened life expectancy models, and lower than expected interest rates.  According to an April 10, 2017 Credit Suisse analyst report titled, "A Deep Dive into Long-Term Care Suggests an

Ongoing Source of Pain for the Industry," "every major assumption factored into pricing LTC policies has turned out to be unfavorable to some degree."  As a result of outdated LTC origination assumptions, insurers throughout the industry have incurred significant losses.  In fact, over the last decade, a number of LTC insurers, including Genworth, have taken repeated charges to boost reserves after severely underestimating how rapidly medical costs would rise, how many people would actually use the benefits, and the length of time policyholders would live, among other miscalculations.  Despite these negative industry-wide trends and red flags, GE's Board failed to make any meaningful adjustments to the Company's actuarial assumptions or increase its LTC reserves.  The Board's failure to materially increase the Company's LTC reserve assumptions violated GAAP and statutory accounting principles.

84.     Discussions about adverse claims experience were pervasive in the LTC industry and were the topic of numerous articles in LTC actuarial and industry publications, professional sessions, and official government reports.  In July 2013, for example, the U.S. Department of Health and Human Services published a study titled "Exiting the Market: Understanding the Factors Behind Carriers' Decision to Leave the Long-Term Care Insurance Market."  This study discussed deteriorating conditions in the LTC market:

- Since the late 1990s, *all of these major determinants of premium and product profitability have been going in the wrong direction: interest rates are significantly lower than what was priced for, voluntary lapse rates are lower than for any other insurance product, morbidity is somewhat worse than expected and mortality is actually improving*.

    *   *   *

- While there has been variability in cumulative industry claims performance over the last decade, recent data suggests that performance is deteriorating. Over the past three years, *new incurred claims are 112% higher than what was expected*.

85.     Further, on February 16, 2015, in response to the frequent earnings charges experienced by LTC providers, Moody's Investors Service summarized the state of the LTC industry:

> LTC is a difficult product to price and has historically given trouble to those life insurance companies offering it. Genworth is the largest LTC provider and is one of a number of insurers whose LTC product has come under pressure. Earlier this month, Unum Group (Baa2 stable), which has no GAAP margins on its LTC business, took a $698 million pre-tax reserve charge related to its reserve on its legacy LTC block, and the charge would have been higher without the assumption of future rate increases. *American Financial Group, Inc. (Baa1 negative) and CNO Financial Group, Inc. (Ba2 positive) each reported deterioration on their LTC margins, and like other insurers, relied on rate increases to offset the decline*.

86.     As a result, many insurers were forced to seek regulatory approval for double-digit premium increases, but even then, the funds fell far short of the amounts needed to pay out benefits.  MetLife Inc., Prudential Financial Inc., and CNA Financial Corp., for example, were all forced to dramatically increase premiums in order to make good on their LTC policies.

87.     Genworth, and thus GE, was not immune to this market reality.  On November 5, 2014, Genworth disclosed that a comprehensive review of its claim-reserve setting assumptions had revealed deficiencies in Genworth's insurance reserves.  Specifically, Genworth updated its assumptions to reflect that "claimants are staying on claim longer and utilizing more of their available benefits in the aggregate than had previously been assumed in the company's reserve calculations."  As a result, Genworth increased its reserves by roughly $531 million.  This charge was significant to Genworth, extinguishing over three years of Genworth's net operating income from its LTC business.   Soon thereafter, on March 2, 2015, Genworth reported that the application of updated assumptions reduced GAAP margins by $5.4 billion and Genworth recorded an additional $730 million charge to its LTC reserves.  Then, in 2016, Genworth was forced to increase its LTC reserves again for essentially the same reasons:

As of September 30, 2016, the liability for policy and contract claims increased $905 million in our long-term care insurance business largely from the **completion of our annual review of assumptions in the third quarter of 2016 which increased reserves by $460 million** and increased reinsurance recoverables by $25 million. The increase was also attributable to aging and growth of the in-force block and higher severity on new claims in the current year.

88.     These Genworth disclosures were red flags to GE.  Not only was Genworth's book of LTC policies comparable to those retained by GE, but the Company had also reinsured a number of these policies in connection with the Genworth spin-off.  As a result, GE's reinsurance exposure to Genworth was massive.  Genworth's financial reports filed with the SEC make clear that GE, through its indirect subsidiary UFLIC, had massive exposure to the LTC policies it reinsured from Genworth.  For example, Genworth's Annual Report on Form 10-K for the fiscal year ended December 31, 2014, filed with the SEC on March 2, 2015, states that "[w]e have several significant reinsurance transactions with [UFLIC], an affiliate of our former parent [GE], which results in a significant concentration of reinsurance risk."  In addition, Genworth's Form 10-K set forth Genworth's exposure to its principal reinsurers in its U.S. life insurance business, revealing that UFLIC had over six times more exposure than Genworth's other reinsurers combined.  Nevertheless, while Genworth was increasing LTC reserves due to elevated claims on its older LTC policies, GE continued to assure the market that it faced no problems, and failed to make any meaningful changes to its own reserves.

89.     The GE Board knew or recklessly disregarded these systemic problems not only at Genworth, but across the entire LTC insurance industry.  During this time, LTC insurers throughout the industry were routinely reporting adverse claims experience.  In February 2012, for example, Unum Group ("Unum"), formerly a major provider of LTC insurance, announced that after analyzing its LTC reserve assumptions, it had concluded a modification of its LTC reserve assumptions was required.  Like Genworth, Unum disclosed the need to implement new

assumptions that reflected the continuing low interest rate environment, as well as increased mortality and morbidity.  As a result, it recorded a $769 million charge to earnings and increased its LTC reserves approximately $180 million.  In addition, in 2013, Unum received approval from its state regulator for a 90% increase in premium rates for its LTC coverage.  However, Unum's problems did not end there.  In Unum's Annual Report on Form 10-K for the fiscal year ended December 31, 2014, filed with the SEC on February 25, 2015, it disclosed that a review of its LTC reserve assumptions again identified a deficiency.  Specifically, Unum stated that it was updating its assumptions to reflect the then-current interest rate environment, as well as increased mortality and increased morbidity.  To increase claim reserves Unum recorded an additional $700 million in charges.

90.     Despite knowledge of, or at least reckless disregard for, the aforementioned obvious red flags, GE failed to reassess its LTC actuarial assumptions and make meaningful adjustments to its insurance reserves.  In fact, from 2013 until January 2018, GE failed to increase its LTC reserves by any material amount.

### 3.     The Board's Failure to Adequately Increase LTC Reserves Violates GAAP and SEC Regulations

#### a.     GAAP Applicable to LTC Insurers

91.     In order to set appropriate cash reserves for anticipated insurance claims, GAAP and SEC rules governing corporate disclosures require companies that insure or reinsure LTC policies to collect and review claims experience as well as industry-wide trends in the LTC market.  Specifically, to account for these trends in updating cash reserves, LTC insurers are required to regularly review certain factors, including: mortality, morbidity, lapse rates, claims experience, and health care costs.  In addition, GE's quarterly and annual reporting with the SEC must include disclosures about its LTC insurance policy-based liabilities.  Specifically, the

Company's reporting must take into account claims paid in the same accounting period, as well as expectations concerning events and circumstances creating liability and the eventual payment of future claims.

92.     GAAP applicable to accounting for LTC obligations is set forth in ASC Topic 944.[3] According to GAAP, LTC insurers must perform premium deficiency testing when actual experience differs from the originally expected experience for each primary assumption. According to paragraph 9.88 of the Audit and Accounting Guide ("AAG"), Life and Health Insurance Entities of the American Institute of CPAs:

> Overall consideration should be given to circumstances indicating that actual experience for a block of business, regardless of the issue year, is significantly different from the originally expected experience for each primary assumption. In circumstances in which actual experience is significantly worse than the originally assumed experience, loss recognition testing is required, using revised assumptions that reflect actual experience and revised estimates of future experience, when appropriate. Significant assumptions generally include mortality, morbidity, persistency, expense levels, and interest rates.

93.     When a deficiency is identified, GAAP requires the liability for future policy benefits to be determined using assumptions revised to consider then-current experience. In addition to an insurer's own experience, GAAP instructs insurers to look at available industry data to develop appropriate LTC reserve assumptions. Paragraph 7.50 of the AAG states:

> For accident and health contracts, assumptions may be based on the life insurance entity's own claims experience, or, if its own experience is unavailable or insufficient, *an appropriate basis for claims cost assumptions is industry experience adjusted for the expected experience for a specific coverage*, and the effect of the entity's underwriting practices. *External trend factors, such as economic conditions and medical developments, should also be considered* as they may create higher rates of morbidity by contract duration than are provided in the statutory or industry experience tables.

---

[3] The SEC has delegated its authority to promulgate GAAP for public companies to the Financial Accounting Standards Board ("FASB"). The FASB's standards are generally contained within the FASB Accounting Standards Codification ("ASC").

         **b.**      **The Board Violated GAAP and SEC Regulations by Failing to Adequately Update Reserves**

94.     The above mentioned rules obliged GE to assess its LTC reserve assumptions taking into consideration its own experience as well as the overall industry's experience. However, despite GE's own experience, including its experience with the Genworth spin-off, and its knowledge of mounting industry-wide negative trends in the LTC market and substantial and systematic charges taken by other LTC insurers between 2012 and 2016, GE failed to perform adequate premium deficiency testing until late 2017.  In consideration of the known adverse claims experience, GE was aware that it needed to perform comprehensive reviews of its LTC reserve-setting assumptions significantly prior to the fourth quarter of 2017.  Had GE updated these assumptions, it would have been forced to materially increase its LTC reserves. Consequently, by waiting until 2018, GE improperly delayed increasing its LTC reserves in violation of ASC 944.

95.     In addition to the Company's obligation to perform deficiency testing and revise actuarial assumptions as necessary, GE also had an obligation to disclose information concerning risks and uncertainties relevant to its accounting.  Specifically, ASC 275-10-50-1 requires LTC insurers to provide information in its financial statements concerning the following topics: (i) the nature of its operations; (ii) the use of estimates in the preparation of financial statements; (iii) certain significant estimates; and (iv) current vulnerability due to certain concentrations. The latter two requirements are particularly relevant to GE's LTC reserves.  Pursuant to these rules, GE was required to disclose the nature of the uncertainties surrounding the estimates GE used in setting LTC reserves.  Notwithstanding these requirements, GE's first disclosure of the risk associated with its LTC reserves was in its Quarterly Report on Form 10-Q for the second

quarter ended June 30, 2017 (the "Q2 2017 Form 10-Q") filed with the SEC on July 28, 2017. The Q2 2017 Form 10-Q stated:

> For us, particular uncertainties that could cause our actual results to be materially different than those expressed in our forward-looking statements include … GE Capital's ability to pay dividends to GE at the planned level, which may be affected by GE Capital's cash flows and earnings, claims and investigations relating to WMC, [GE's mortgage business], ***charges that may be required in connection with GE Capital's run-off insurance operations***, and other factors.

96.     Furthermore, due to the substantial risk and uncertainty associated with LTC reserves, as evidenced in the industry as well as at GE, SEC regulations required GE to provide Management's Discussion & Analysis ("MD&A") disclosures.  SEC Interpretation Release No. 33-6835 provides:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operation is not reasonably likely to occur.

97.     Consequently, GE was obligated to disclose adverse LTC experience unless it concluded that a material effect on liquidity, capital resources, or results of operations was not reasonably likely to occur.  In light of the billions of dollars of LTC coverage that GE reinsured, and its substantial reserve deficiencies, GE's fiduciaries could not have reasonably concluded that its adverse LTC experience wouldn't materially affect the Company's liquidity and capital resources.

## B. GE Power Improperly Recognizes Revenue on Its LTSAs

98.     From at least 2014 until 2017, GE relied on accounting adjustments to improperly accelerate the recognition of revenue in order to meet internal growth and earnings targets. Specifically, the Company used cumulative catch-up adjustments to accelerate profit on its LTSAs on the basis of purported changes in the estimated profitability of its LTSAs.  As a result of these cumulative catch-up adjustments, GE's contract assets—which represent the gap between GE's earnings and cash flow—grew significantly.  In 2016, for example, contract assets increased by $4 billion, $2.2 billion of which is attributable to cumulative catch-up adjustments. In 2017, the Company accelerated an additional $2.1 billion of profit on its LTSAs on the basis of purported cost savings, roughly $1.3 billion of which was recorded in the GE Power segment. These changes accounted for 47% of the total profits reported by the GE Power segment in 2017. Accordingly, these adjustments constituted a substantial percentage of the Company's total earnings from its industrial businesses.

99.     The Company's LTSAs require GE to maintain and service its customers' assets over the term of the contract (typically five to twenty-five years).  Under these agreements, GE recognizes revenue as it performs work based on costs already incurred at the estimated margin rate for the contract.  However, GE's customers were billed, and they generally paid, based on the utilization of assets (e.g., on an hourly basis) or on a milestone basis (e.g., when an overhaul occurred).  As a result, GE frequently recognized revenue and earnings before it actually billed its customers or was entitled to receive cash from its customers.  When GE recognized revenues from its LTSAs before it received cash from the customer, the Company recorded "contract assets" on its balance sheet.  GE's Annual Report on Form 10-K for the fiscal year ended

December 31, 2014 (the "2014 Form 10-K") filed with the SEC on February 27, 2015, explained

how the Company recognized revenue on its LTSAs:

> Revenue recognition on long-term product services agreements requires estimates
> of profits over the multiple-year terms of such agreements, considering factors
> such as the frequency and extent of future monitoring, maintenance and overhaul
> events; the amount of personnel, spare parts and other resources required to
> perform the services; and future billing rate, cost changes and customers'
> utilization of assets. We routinely review estimates under product services
> agreements and regularly revise them to adjust for changes in outlook.

> We also regularly assess customer credit risk inherent in the carrying amounts of
> receivables and contract costs and estimated earnings, including the risk that
> contractual penalties may not be sufficient to offset our accumulated investment
> in the event of customer termination. We gain insight into future utilization and
> cost trends, as well as credit risk, through our knowledge of the installed base of
> equipment and the close interaction with our customers that comes with supplying
> critical services and parts over extended periods.

100. The GE Power segment is the largest holder of contract assets. Specifically, 44%

of GE's contract assets are within the GE Power segment. As a result, the GE Power segment

has a significant impact on GE's reported balance of contract assets. In 2017, for example, total

contract assets increased by $3.7 billion, 52% of which is attributable to GE Power. A key driver

of this growth in GE's contract asset account is cumulative catch-up adjustments made by GE on

the basis of purported cost savings and changes in estimated revenues. GE's Annual Report on

Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K") filed with the

SEC on February 24, 2017, for example, explains that the $4 billion increase in the Company's

contract asset balance over the prior year was "primarily driven by a change in estimated

profitability within [GE's] long-term product service agreements resulting in an adjustment of

[$2.2 billion], as well as an increase in deferred inventory costs." The Company's Quarterly

Report on Form 10-Q for the third quarter ended September 30, 2017 (the "Q3 2017 Form 10-

Q") filed with the SEC on October 30, 2017, further explained the impact of the Company's

cumulative catch-up adjustments:

Revenues in excess of billings increased $2,606 million and $1,328 million for our long-term service agreements and long-term equipment contracts, respectively. The increase in our long-term service agreements is due to a $1,930 million cumulative catch up adjustment driven by lower forecasted costs to complete these contracts as well as increased forecasted revenue and $676 million due to the timing of revenue recognized for work performed relative to billings and collections.

Essentially, through varying GE's estimated profitability on its LTSAs, the Company was able to add billions of dollars to the Company's earnings.  Considering the significant revenues derived from GE Power, these accounting adjustments were vital to GE's consolidated financial results.  Without these accounting adjustments, the Company would have fallen dramatically short of earnings targets.

101.    Under GAAP, the adjustments described above are permissible as long as the costs to complete the contract and the expected revenue from the contract are reasonably estimated.  GE's recent disclosures, however, indicate that GE's accounting associated with contract assets failed to incorporate reasonably dependable estimates.  Specifically during a period of markedly down performance in its Power segment, the Company failed to establish reasonably dependable estimates of expected project revenues and costs to complete its LTSAs.

102.    According to GAAP, the determination of estimated revenue requires "careful consideration."  Specifically, "a contractor's estimating procedures should provide reasonable assurance of a continuing ability to produce reasonably dependable estimates."  ASC 605-35-25-62.  Essentially, this regulation requires companies to routinely review contracts to ensure revenue estimates continue to remain reasonable.  The Company's 2017 Annual Report states that, consistent with this requirement, GE used a combination of historical utilization trends and information about current market trends to formulate revenue estimates.  Therefore, GE's estimates should have taken into consideration whether expected revenue was likely to be lower than revenues in recent period due to declining power generation requirements or other market

factors.   During 2016 and 2017, the power industry was experiencing well-known negative trends.   For instance, in its July 24, 2017 analyst report, J.P. Morgan commented on downward revenue trends in the power industry:   "Of note, in services, they pointed to outage volumes, particularly larger F-class outages, running down close to 10%, driven by lower utilization, lower capacity payments in North America, and extended intervals between outages."

103.    Despite these mounting industry-wide negative trends, GE increased its estimates of revenue and profits on its LTSAs.   During this time analysts expressed concern that these accounting changes were accelerating profit at a time when the GE Power segment was otherwise experiencing widespread demise.   For example, J.P. Morgan stated in its July 24, 2017 report:

> Starting with Power, there is a negative mosaic here that we have been talking about recently, where Power Gen is the next "distributor like" vertical at risk of disruption from the triple threat of renewables, energy efficiency and storage, but we were flat out speechless (not easy for us) to hear the commentary on the deteriorating state of this business which was all new news in terms of messaging from the company … ***even non cash earnings can't drive a positive result***. The Power dynamics are not cyclical, they are potentially secular, getting worse, and we are cutting our numbers here further.

Further, on October 23, 2017, J.P. Morgan published a report calling into question the actual value of GE's contract asset account.   This report focused on the fact that more than 50% of the sales in GE Power had been sold at prices insufficient to achieve profitability:

> Our view is that GE is competing irrationally, giving away content and terms that underprice the risk around these projects, something that management alluded to when discussing the growth in equipment related contract assets that now have more elongated payment terms of 12-24 months. Looking at contract assets ... and receivables sold to GE Capital (~$4B in Power), we see ~$10B in estimated deals that we believe represent business that was too competitively bid. This represents >50% of Power equipment sales.

104.    As with revenue, GAAP also requires companies to identify and estimate contract costs with a reasonable degree of accuracy.   According to GAAP, costs incurred to date on a

contract must be determined "with a relatively high degree of precision" and estimates of costs must be determined using "[s]ystematic and consistent procedures." ASC 605-35-25-33; 605-35-25-44. Further, GAAP requires that estimates of costs to complete a contract be reviewed periodically and revised to reflect existing conditions. Unfortunately, as revealed in recent media reports and the Company's own disclosures, GE severely underestimated costs on its LTSAs.

105. On November 4, 2017, in an interview with *Barron's*, C. Stephen Tusa Jr. ("Tusa"), the J.P. Morgan analyst covering GE, expressed concern that GE's overly optimistic pricing would result in a charge eighteen to twenty-four months down the road. The following exchange took place:

> [*Barron's*]: Is that what you meant when you wrote that GE "is competing irrationally, giving away content and terms that underprice the risk"?
>
> [Tusa]: Correct. What I believe, whereas Mitsubishi Heavy Industries may come in with a gas turbine that's a little more efficient than GE's gas turbine and priced competitively, GE will come to the customer and say, "Hey, we will finance this for you at a very competitive rate, and make an investment in the power plant if you want us to, and throw in all this content." ***And they do that at an all-in price that doesn't necessarily position GE to withstand some of the risk that project may face over the next 18 to 24 months. Ultimately, where that will manifest itself, 18 or 24 months down the road, GE will book this charge that says, "Hey, we underestimated how much this would cost us."*** But ultimately, they've already got the turbine in place. They've already got the market share. And that's kind of the most important thing to them. That's a big reason their cash flow has been so weak relative to their earnings. That's where these things called contract assets, which are about $29 billion on the GE industrial balance sheet, would show up. This contract accounting is based on certain long-term assumptions that may or may not come true from a cash perspective.

106. As predicted, in the fourth quarter of 2017, GE announced an $850 million charge to earnings to correct for project cost overruns in its GE Power segment. On its January 24, 2018 conference call, GE Power's CEO, Russell Stokes ("Stokes"), acknowledged that GE did not

have the internal controls in place to formulate dependable estimates in its GE Power segment, stating:

> There is an element of price that we've acknowledged that we felt up to now, just given that we did not have the level of attention that we should have had on that portion of the business.  We also acknowledge in the past cost overruns around some of the execution that had taken place as well.

Stokes further admitted that the Company's prior estimates were not reasonably dependable, stating:

> …On execution, we continue to just do everything we need to run the business better.  We dove deeply into projects and we're working through cost overruns and adjustments that we needed to take in those projects, as we were nearing the conclusion of a number of legacy contracts, shoring up costs with partners on deals that were underwritten back in the 2013, 2014, 2015 timeframe.

107.    Accordingly, the Company failed to establish reasonably dependable estimates of expected project revenues and contract costs in violation of GAAP.  In addition, these failures have prompted an investigation by the SEC into the Company's revenue recognition practices for LTSAs.

### C.    The Individual Defendants Made or Allowed GE to Make Improper Statements in Breach of Their Fiduciary Duties

108.    As detailed below, between February 2013 and January 2018, the Individual Defendants made or allowed the Company to make improper statements in its public filings concerning: (i) the Company's GE Capital segment; (ii) the Company's GE Power segment; and (iii) the adequacy of the Company's internal controls over financial reporting.

### 1.    Improper Statements Concerning GE Capital

109.    From January 2015 until January 2018, the financial metrics that GE published to investors and the broader market concerning GE and GE Capital's quarterly and annual earnings, CFOA, and segment profits were improper.  Specifically, GE's financial statements omitted or failed to disclose that:  (i) GE was failing to make meaningful adjustments to its insurance

actuarial assumptions; (ii) GE was failing to allocate sufficient reserves for insurance premium deficiencies and other risks associated with GE Capital's legacy reinsurance business; (iii) these risks were accruing billions of dollars in unreported impairment charges for GE; (iv) only by under-reserving for liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program; (v) GE failed to maintain adequate internal controls over its financial reporting with respect to LTC reserves; and (vi) consequently, GE's earnings and cash flows were overstated.  Moreover, all of the certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") contained in the Company's annual and quarterly reports and filed with the SEC between January 2015 and January 2018, were improper for failure to disclose the information detailed above.

### a.      Fourth Quarter and Year-End 2014

110.    On January 23, 2015, GE issued a press release summarizing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2014. For the quarter, the Company reported net income of $5.15 billion, or $0.51 per diluted share, on revenue of $33.42 billion, compared to net income of $3.20 billion, or $0.32 per diluted share, on revenue of $39.35 billion, for the same period in the prior year.

111.    Later that day, GE hosted a conference call in connection with its 2014 results, during which defendant Immelt spoke positively about GE Capital's financial condition, stating:

> We ended the year with substantial liquidity and financial strength. GE Capital ended the year with Tier 1 common ratio of 12.7%, substantially above the regulatory guidelines. We returned about $11 billion to investors in dividends **and buyback**, and we remain on track for $12 billion to $15 billion for free cash flow and dispositions in 2015.

112.    Defendant Bornstein also commented on GE Capital's "solid operating results," stating:

Our liquidity levels were strong, ending the quarter at $76 billion. This includes $13 billion attributable to Synchrony [Financial]....  On the right side of the page, ***asset quality trends continue to be stable***, with significant improvements in our mortgage portfolio....

\* \* \*

***Overall, Keith and the team continue to execute the portfolio strategy and deliver solid operating results.*** …As we look forward to 2015, we expect GE Capital to generate about $0.60 on an [earnings per share ("EPS")] basis, as Jeff discussed last month during the annual outlook meeting. We expect GE Capital to earn approximately $1.5 billion in the first quarter of the year.

113.    Analysts were provided an opportunity to ask questions following the Company's prepared remarks.  J.P. Morgan analyst Tusa asked about the future of GE Capital's dividend. Defendant Immelt highlighted GE Capital's cash to assure investors that the Company's dividend was safe.  The following exchange took place:

[Tusa]: Got you. Then just one last question, just on cash. Jeff, just philosophically around the dividend, you guys are bumping up against an 80%-ish type of payout ratio on the free cash when it comes to the dividend. I mean, there is a pretty significant -- it's a big dividend relative to your free cash flow. Is that dividend viewed -- I mean, is there a fine line here? Given obviously the location of cash makes it a little bit complicated as far as moving things around and being able to pay that.

Would you -- is there a fine line as a percentage of free cash flow that you don't mind going over Industrial free cash flow and paying the dividend? I mean is it -- and as far as growth, do you view the dividend, it's a must-grow over time? I'm just trying to get my hands around how much you defend that dividend.

[Defendant Immelt]: You've got $16 billion of cash on the balance sheet right now. We are going to do Alstom this year. ***You're still sitting on top of substantial excess cash in GE Capital.*** Look, ***I view the dividend as being key***. We have capital allocation choices we make. ***We're going to continue to grow our free cash flow as time goes on, and we're comfortable with where we are right now***.

114.    On February 27, 2015, the Company filed with the SEC its 2014 Form 10-K, which was signed by defendants Bornstein, Immelt, Beattie, Brennan, Cash, D'Souza, Dekkers, Hockfield, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, Swieringa, Tisch, and Warner.  For the

full year 2014, the Company reported net income of $15.23 billion, or $1.50 per diluted share, on revenue of $147.81 billion, compared to net income of $13.05 billion, or $1.27 per diluted share, on revenue of $142.93 billion for 2013.  For 2014, GE Capital reported segment profit of $7.01 billion, on revenue of $42.72 billion.  The MD&A section of the 2014 Form 10-K discussed the restructuring of GE Capital and explained that the restructuring would "improve [] long-term performance" and "reduce liquidity risk."  The 2014 Form 10-K stated:

> We have communicated our goal of reducing GE Capital's [ending net investment ("ENI")], excluding liquidity, most recently targeting a balance of less than $300 billion. ENI is a metric used by us to measure the total capital we have invested in our financial services business. GE Capital's ENI (excluding liquidity) was $363 billion at December 31, 2014. To achieve this goal, we are more aggressively focusing our businesses on selective financial services products where we have deep domain experience, broad distribution, the ability to earn a consistent return on capital and are competitively advantaged, while managing our overall balance sheet size and risk. We have a strategy of exiting those businesses that are deemed to be non-strategic or that are underperforming. We have completed a number of dispositions in our businesses in the past and will continue to evaluate options going forward.

> Accordingly, in the short-term, as we reduce our ENI through exiting non-core businesses, the overall level of our net earnings may be reduced, which potentially could include impairments, restructurings and other non-cash charges. However, over the long-term, we believe that this strategy will improve our long-term performance through higher returns as we will have a larger concentration of assets in our core businesses, as opposed to the underperforming or non-strategic assets we will be exiting; reduce liquidity risk as we pay down outstanding debt and diversify our sources of funding (with less reliance on the global commercial paper markets and an increase in alternative sources of funding such as deposits); and reduce capital requirements while strengthening capital ratios.

115.   The 2014 Form 10-K reported the Company's total insurance liabilities at approximately $27.58 billion and commented on the Company's periodic testing of GE Capital's insurance portfolio for impairment.  The 2014 Form 10-K stated:

> We review identified intangible assets with defined useful lives and subject to amortization for impairment whenever events or changes in circumstances indicate that the related carrying amounts may not be recoverable.... *For our insurance activities remaining in continuing operations, we periodically test for impairment our deferred acquisition costs and present value of future profits*.

116.     Accompanying the 2014 Form 10-K were certifications pursuant to SOX signed by defendants Immelt and Bornstein attesting to its accuracy and the adequacy of internal controls over financial reporting.

117.     The statements set forth in ¶¶108-114 were improper for the reasons stated in ¶107 above. Further, the statements concerning excess cash at GE Capital, stable asset quality trends at GE Capital, and GE's periodic asset impairment testing were improper because they failed to disclose: (i) the serious risks and uncertainties associated with GE's legacy LTC reinsurance business; (ii) that the Company's statutory insurance reserves were woefully deficient in violation of GAAP and SEC regulations; (iii) that the Company failed to maintain sufficient internal controls over its financial reporting with respect to LTC reserves; and (iv) consequently, GE's earnings and cash flows were overstated.   In addition, defendant Immelt's statements concerning the dividends were improper because they failed to disclose that only by under-reserving for liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program.

**b.      GE Capital's April 10, 2015 Investor Meeting**

118.     On April 10, 2015, the Company held its Investor Meeting conference call for analysts and investors.   During the conference call, the Company announced a major restructuring strategy that included: (i) the sale of most of GE Capital's assets; and (ii) a plan to distribute more than $90 million to GE stockholders in 2018 via dividends, a buyback program, and a share exchange involving the split-off of Synchrony Financial.  Due to the importance of this restructuring to the Company, the Board must have approved of it and the communications concerning it.

119.     During GE's conference call, defendant Immelt further commented on the

Company's plan to sell off substantial GE Capital assets, stating:

> Today, we're announcing a definitive step on our evolution to create a focused
> infrastructure and technology company. We plan to sell most GE Capital assets
> over the next 18 months to 24 months and *remain primarily in core verticals and
> markets GE knows best*.

120.     In discussing the Company's decision to shrink GE Capital, defendant Sherin

emphasized that the restructuring was a way to decrease volatility and would make GE Capital

"much safer."  No mention was made of the Company's increased exposure to GE Capital's LTC

policies as a result of the restructuring.  Defendant Sherin stated:

> Thank you, Jeff. As you all know, we've done a lot over the last six years to
> shrink GE Capital while also *making it much safer*.

> \* \* \*

> [T]here's been more discussion around the SIFI de-designation process. De-
> designation guidance was published in February, and the recent Congressional
> hearings gave us additional input on regulatory thinking around the subject.

Defendant Immelt further commented:

> We've obviously been just watching what the [Financial Stability Oversight
> Council ("FSOC")] is saying. In February, there were some brief guidelines
> issued about the off-ramp and that's a start. Obviously no one's ever done it. And
> then obviously the hearings, the Congressional hearings, I think you look at some
> of the commentary around the hearings, one that SIFIs received higher capital
> charges to encourage them to shrink.

> Two, that if a SIFI actually changed its business model they should come in and
> talk to the FSOC about the change and what it meant for the designation. And
> those things, those three things, all line up with our strategy here around capital
> allocation. *So we're trying to achieve an objective that is good for the financial
> system that is also really good for our shareholders and I think we found that
> sweet spot here*.

Defendant Sherin further commented:

> I would say is the faster we go and the smaller we get, certainly in the U.S., as
> Jeff said earlier, we'll be able to address the characteristics that made us systemic
> and apply to de-designate.

121.    Defendant Sherin provided additional information on the future of GE Capital and

its anticipated earnings, stating:

> So next, I want to just give you a snapshot of GE Capital going forward. The left
> side shows the ending net investment forecast for the next several years. You can
> see that we plan to shrink rapidly. Our goal is to get down to $90 billion globally
> by the end of 2017. Our estimate is that we'll have about $50 billion of ENI
> outside the U.S. and about $40 billion in the U.S.  On the right side, you can see
> that the future GE Capital segment will have about $1.5 billion of net income and
> a 13% return on tangible equity, ***ex[cluding]-insurance. We plan on giving you
> the pro forma financial information for this future GE Capital every quarter as
> we go forward.***

122.    In order to reassure investors as to the safety of GE's all-important quarterly

stockholder dividend, defendant Bornstein reiterated the Company's plan to distribute more than

$90 billion to GE's stockholders.  Defendant Bornstein also explicitly represented that dividends

would continue to grow after 2016, stating:

> …In this construct, we believe that we'll be in a position to return up to $90
> billion or more of cash between 2015 and 2018 through dividends, buybacks and
> the Synchrony [Financial] exchange. The dividend remains a priority for the
> company.  We plan to maintain the current dividend through 2016 and expect it to
> grow ***thereafter***. The current dividend yield on the stock is an attractive 3.7%.

123.    Despite defendant Bornstein's explicit assurances, analysts expressed concern

about the future of GE's dividend.  During the conference call, Jeff T. Sprague ("Sprague"), an

analyst at Vertical Research, asked defendants Immelt and Bornstein to comment on the

Company's dividend going forward.  The following exchange took place:

> [Sprague]: All right. And then finally, what would you consider a normal payout
> ratio then as you think about the dividend going forward?
>
> [Defendant Bornstein]: Around 50%. I think in the context, Jeff, of the dividend,
> flat or growing. In other words ***I think the dividend is key for the stock*** and I
> think that's the way investors ought to be thinking about it. And again with all of
> this buyback, the cash outlay on dividends is -- reduces dramatically.

124.    Defendant Sherin's statements concerning SIFI de-designation were improper

because GE's exposure would be significantly more pronounced following the de-designation.

Further, defendants Immelt's and Bornstein's statements concerning GE Capital's dividends were improper because they failed to disclose that only by under-reserving for liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program.

### c.    First Quarter 2015

125.    On April 17, 2015, GE hosted a conference call with analysts and investors to discuss the Company's financial and operating results for the first quarter ended March 31, 2015. During the call, defendant Immelt reinforced the security of the dividend, calling it a "top priority," stating:

> Dispositions in CFOA are on track and *we expect GE Capital to dividend between $500 million and $7 billion in line with what we talked about last week and we will update this as we go through the year*.

> We will continue to drive investor-friendly capital allocation. *The dividend remains a top priority*.  ...*So between Synchrony [Financial], the buyback and dividends, we can return $90 billion to investors over the next few years*.

126.    On May 4, 2015, GE filed its Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the first quarter ended March 31, 2015 (the "Q1 2015 Form 10-Q").  For the quarter, GE reported a net loss of $13.57 billion, or -$1.35 per diluted share, on revenue of $26.21 billion, compared to net income of $2.99 billion, or $0.30 per diluted share, on revenue of $33.35 billion for the same period in the prior year.

127.    The Q1 2015 Form 10-Q further specifically discussed GE Capital's plan to reduce the size of its financial services businesses.  The Q1 2015 Form 10-Q stated:

**THE GE CAPITAL EXIT PLAN**

On April 10, 2015, the Company announced a plan (the GE Capital Exit Plan) to reduce the size of its financial services businesses through the sale of most of the assets of GECC over the next 24 months, and to focus on continued investment and growth in the Company's industrial businesses. Under the GE Capital Exit Plan, which was approved on April 2, 2015 and aspects of which were approved

on March 31, 2015, the Company will retain certain GECC businesses, principally its vertical financing businesses—GE Capital Aviation Services (GECAS), Energy Financial Services and Healthcare Equipment Finance—that directly relate to the Company's core industrial domain and other operations, including Working Capital Solutions and our run-off insurance activities. The assets planned for disposition include Real Estate, most of Commercial Lending and Leasing and all Consumer platforms (including all U.S. banking assets). The Company expects to execute this strategy using an efficient approach for exiting non-vertical assets that works for the Company's and GECC's debt holders and the Company's shareowners. An element of this approach involves a merger of GECC into the Company to assure compliance with debt covenants as GECC exits non-vertical assets, and the creation of a new intermediate holding company to hold GECC's businesses after the merger. The Company has discussed the GE Capital Exit Plan, aspects of which are subject to regulatory review and approval, with its regulators and staff of the Financial Stability Oversight Council (FSOC) and will work closely with these bodies to take the actions necessary over time to terminate the FSOC's designation of GECC (and the new intermediate holding company, as applicable) as a nonbank systemically important financial institution (nonbank SIFI).

128.    Accompanying the Q1 2015 Form 10-Q were certifications pursuant to SOX signed by defendants Immelt and Bornstein attesting to its accuracy and the adequacy of internal controls over financial reporting.

129.    The statements set forth in ¶¶123-126 were improper for the reasons stated in ¶107 above.  Further, defendant Immelt's statement regarding the dividends was improper because it failed to disclose that only by under-reserving for liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program.

### d.    April 22, 2015 Annual Meeting of Shareowners

130.    On April 22, 2015, GE held its Annual Meeting of Shareowners.  During the meeting defendant Bornstein continued to highlight the restructuring and de-designation of GE Capital and the significant cash flows the restructuring would generate stating:

And we have more clarity now regulatorily on the off-ramp from de-designated from being a systemically important financial institution. And we've got an approach that we think is shareholder-friendly, allows us to execute this with a

level of purchasing cost that we think is plausible for shareholders. ***And over time, as Keith Sherin and the team execute this plan, we see an opportunity to return about $35 billion of capital from GE Capital back to the company, and ultimately, back to you.***

***So between now and 2018, our view is, we can deliver $90 billion plus back to shareholder, and we'll do that a number of different ways***. One is through the dividend. ***We are very focused and supportive of the dividend. It's one of our single biggest priorities***. We plan for the dividend to remain where it is today, probably through 2016. We expect it from there to grow as earnings grow into the future.

\* \* \*

***And then in the plan that Keith and the team are executing, where we shrink GE Capital to just the core, return $35 billion of excess capital, and we use those proceeds to buy back the company stock,*** we'll lose $0.25 a share of earnings from GE Capital from those businesses we sold, but we'll get $0.25 back in accretion with a lower share count outstanding.

131.    To further assure investors that the Company's quarterly dividends were forthcoming, defendant Immelt echoed these remarks and reiterated the Company's prior dividend guidance, stating:

Two weeks ago, we announced a significant strategic change for GE Capital. In the future, we'll focus only on financing businesses connected to GE's industrial markets and sell the remainder of GE Capital. We've already achieved a large part of this goal through the Synchrony [Financial] split and the sale of our commercial real estate business. ***Executing this plan should allow us to deliver $90 billion in dividends and buyback over the next few years.***

132.    Defendants Immelt's and Bornstein's statements concerning the dividends were improper because they omitted or failed to disclose that only by under-reserving for liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly stockholder dividends and stock buyback program.

### e.    Electrical Products Group Conference on May 20, 2015

133.    On May 20, 2015, GE made a presentation at the Electrical Products Group Spring Conference.  During the Company's presentation, defendant Immelt emphasized the

significant amount of cash the GE Capital asset sale was expected to generate as well as the

Company's "[s]trong" and "[b]alanced portfolio," stating:

> So who gets the money? This is again just talking about – there's going to be a ton of cash generated and the answer is primarily you. Primarily, our investors are going to get dividend growth. You're going to get -- the Synchrony [Financial] split comes back in $20 billion to $35 billion coming from GE Capital.
>
> \* \* \*
>
> So that's GE. I think like the portfolio, like the moves we've made. **Strong portfolio. Balanced portfolio. Really in good shape**.

134.    Defendant Immelt's statements concerning GE Capital's portfolio were improper

because they omitted or failed to disclose that: (i) GE was failing to make meaningful

adjustments to its LTC reserves in violation of GAAP and SEC regulations; and (ii) only by

under-reserving for these liabilities was GE able to maintain sufficient cash flows for its

quarterly dividend payments and stock buyback program.

###            f.        Sanford C. Bernstein Strategic Decisions Conference on May 27, 2015

135.    On May 27, 2015, GE presented at the Sanford C. Bernstein Strategic Decisions

Conference.  During this presentation, defendant Sherin highlighted GE Capital's "very strong"

verticals business and reiterated GE's prior dividend guidance, to further assure investors that

their quarterly dividends were safe, stating:

> **The verticals as we go forward. These are really very strong businesses. They are connected to GE**. They provide synergy between the industrial and the financial business. We will have about $90 billion of investment. We will earn about $1.5 billion, have a tangible equity of 13% ex-insurance.
>
> \* \* \*
>
> …In terms of the Company priorities, **the dividend remains a priority. It's going to be flat in 2016 and then grow thereafter**....  The buyback of $35 billion from GE Capital, basically we need to shrink our risk-weighted assets, get the proceeds from those sales and then return that capital back to the parent over time and we have a small amount that we think we've will be working on for the fourth quarter

of 2015 and then our capital plan for 2016 will deliver a substantial amount of that back and there may be some that comes back in 2017.

136.    Defendant Sherin's statements regarding GE Capital's verticals business and anticipated stockholder dividend were improper.  Specifically, the Company omitted or failed to disclose that:  (i) GE was failing to make meaningful adjustments to its LTC reserves in violation of GAAP and SEC regulations; and (ii) only by under-reserving for these liabilities was GE able to maintain sufficient cash flows for its quarterly dividend payments and stock buyback program.

### g.    Second Quarter 2015

137.    On July 30, 2015, the Company filed its Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the second quarter ended June 30, 2015 (the "Q2 2015 Form 10-Q").  For the quarter, GE reported a net loss of $1.36 billion, or -$0.13 per diluted share, on revenue of $31.97 billion, compared to net income of $3.54 billion, or $0.35 per diluted share, on revenue of $31.92 billion for the same period in the prior year.  In the Q2 2015 Form 10-Q's MD&A section, the Company described its GE Capital Exit Plan in substantially the same language as in its Q1 2015 Form 10-Q.

138.    Accompanying the Q2 2015 Form 10-Q were certifications pursuant to SOX signed by defendants Immelt and Bornstein attesting to its accuracy and the adequacy of internal controls over financial reporting.

### h.    Third Quarter 2015

139.    On November 2, 2015, GE filed its Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the third quarter ended September 30, 2015 (the "Q3 2015 Form 10-Q").  For the quarter, GE reported net income of $2.50 billion, or $0.25 per diluted share, on revenue of $31.51 billion, compared to net income of $3.53 billion, or $0.35 per diluted share, on revenue of $31.84 billion for the same period in the prior year.  In the Q3

2015 Form 10-Q's MD&A section, GE described its GE Capital Exit Plan in substantially the same language as in its Q1 2015 Form 10-Q.

140.    Accompanying the Q3 2015 Form 10-Q were certifications pursuant to SOX signed by defendants Immelt and Bornstein attesting to its accuracy and the adequacy of internal controls over financial reporting.

141.    The statements set forth in ¶¶135-138 were improper for the reasons stated in ¶107 above.

### i.    December 16, 2015 Annual Outlook Investor Meeting

142.    During the Company's Annual Outlook Investor Meeting on December 16, 2015, defendant Immelt further discussed the restructuring of GE Capital and the substantial anticipated GE Capital dividend as a result thereof.   Defendant Immelt emphasized that the Company was going to be "returning a lot of cash to investors," stating:

> *…We're returning a lot of cash to investors*, $32 billion to investors from a standpoint of dividend and Synchrony [Financial] and buyback. And we continue to invest in growth, in organic growth.

> \* \* \*

> *Free cash flow plus dispositions will be towards the higher end of that range*. The way to think about that is we received a $2.5 billion dividend from GE Capital last Friday for a total of $3 billion for the year. We could get an additional dividend yet this year and so that's made up for the lack of having the Appliance transaction closed in 2015.

> \* \* \*

> Dividends in 2015 and 2016 what we are counting on and then the rest will come in in 2017 and 2018.

> Like I said earlier, we had a $500 million dividend in the first quarter this year. We received an additional $2.5 billion last week, so that is a total of $3 billion. And we still think there is a good chance we will get a good chance we will get an additional $1.5 billion this year and still do $18 billion next year.

143.    Defendant Immelt's statements concerning the highly anticipated stockholder dividends were improper because they omitted or failed to disclose that:  (i) GE was failing to make meaningful adjustments to its LTC reserves in violation of GAAP and SEC regulations; and (ii) only by under-reserving for these liabilities was GE able to maintain sufficient cash flows for its quarterly dividend payments and stock buyback program.

### j.    Fourth Quarter and Year-End 2015

144.    On January 22, 2016, GE issued a press release summarizing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2015. For the quarter, the Company reported net income of $6.28 billion, or $0.64 per diluted share, on revenue of $32.75 billion, compared to net income of $5.15 billion, or $0.51 per diluted share, on revenue of $33.42 billion for the same period in the prior year.

145.    On February 26, 2016, the Company filed with the SEC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2015 (the "2015 Form 10-K"), which was signed by defendants Bornstein, Immelt, Beattie, Brennan, Cash, D'Souza, Dekkers, Hockfield, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, Swieringa, Tisch, and Warner. For 2015, the Company reported a net loss of $6.12 billion, or $0.62 per diluted share, on revenue of $115.15 billion, compared to net income of $15.23 billion, or $1.50 per diluted share, on revenue of $116.40 billion for 2014.  For 2015, GE Capital reported a segment loss of $7.98 billion, on revenue of $10.8 billion.  The Company's 2015 Form 10-K described the GE Capital Exit Plan in substantially the same language as in its Q1 2015 Form 10-Q.

146.    The 2015 Form 10-K further stated that the Company periodically tested GE Capital's LTC portfolio for impairment and "continually reviewed and adjusted" its liabilities. The 2015 Form 10-K stated:

We review identified intangible assets with defined useful lives and subject to amortization for impairment whenever events or changes in circumstances indicate that the related carrying amounts may not be recoverable.  ...***For our insurance activities remaining in continuing operations, we periodically test for impairment our deferred acquisition costs and present value of future profits***.

\* \* \*

Our run-off insurance activities include providing insurance and reinsurance for life and health risks and providing certain annuity products. Two primary product types are provided: traditional insurance contracts and investment contracts. Insurance contracts are contracts with significant mortality and/or morbidity risks, while investment contracts are contracts without such risks.  ...For traditional long-duration insurance contracts, including long-term care, term, whole life and annuities payable for the life of the annuitant, we report premiums as earned income when due.

\* \* \*

***Liabilities for unpaid claims and estimated claim settlement expenses represent our best estimate of the ultimate obligations for reported and incurred-but-not-reported claims and the related claim settlement expenses***. *Liabilities for unpaid claims and estimated claim settlement expenses are continually reviewed and adjusted through current operations*.

147.     Accompanying the 2015 Form 10-K were certifications pursuant to SOX signed by defendants Immelt and Bornstein attesting to its accuracy and the adequacy of internal controls over financial reporting.

148.     The statements set forth in ¶¶142-145 were improper for the reasons stated in ¶107 above.  Further, the Company's statements concerning: (i) periodic testing for impairment; (ii) LTC reserves representing the best estimate of the Company's obligations; and (iii) LTC liabilities being "continually reviewed and adjusted" were improper.  Notably, the filings failed to disclose: (i) the serious risks and uncertainties associated with GE's retained LTC business; (ii) that GE failed to timely record increases to LTC reserves by billions of dollars in violation of GAAP; and (iii) that the Company failed to maintain sufficient internal controls over its financial reporting with respect to its LTC reserves.

**k.      Barclays Industrial Select Conference on February 17, 2016**

149.      On February 17, 2016, GE presented at the Barclays Industrial Select Conference, during which defendant Bornstein commented on the expected GE Capital dividend, further reinforcing the security of the stockholder dividend.  Defendant Bornstein stated:  "[W]e expect the business to dividend about $18 billion back to the company this year.  We plan on investing that $18 billion in reducing the share count of the company."

150.      Defendant Bornstein's statement was improper because it omitted or failed to disclose that only by under-reserving for liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program.

**l.      First Quarter 2016**

151.      On April 22, 2016 GE hosted an earnings conference call with analysts and investors in connection with its first quarter 2016 financial results.  During the conference call, defendant Immelt again emphasized GE Capital's significant cash and liquidity and defendant Bornstein highlighted GE Capital's "stable" portfolio.  Defendants Immelt and Bornstein stated:

> [Defendant Immelt]:  We continue to execute our GE Capital strategy. We have $166 billion of capital deals signed. GE Capital sent a $7.5 billion dividend to the parent in the quarter, and GE Capital filed for SIFI de-designation in March. …We returned $8.3 billion to investors in dividend and buyback, and our capital allocation framework remains on track.
>
> Importantly, we are reaffirming our 2016 framework goal of $1.45 to $1.55 EPS, 2% to 4% organic growth, CFOA of $29 billion to $32 billion, and $26 billion of cash to investors. Our performance in the quarter again validates the strength of the GE operating model.  …Diversity is a key strength during this period of volatility.
>
> *   *   *
>
> Cash was in line with expectations. As I said earlier, we received a $7.5 billion dividend from Capital.  …***Our balance sheet remains very strong, and we ended***

*the quarter with $106 billion of liquidity at GE Capital and $9 billion of cash on the balance sheet*.

Meanwhile, we returned $8.3 billion of cash to investors in buyback and dividend. *We expect to receive $18 billion from GE Capital for the year....*

\* \* \*

[Defendant Bornstein]: The last segment I'll cover is GE Capital. Our Verticals businesses earned $496 million this quarter. That's up 43% from prior year, driven by higher gains, better operations, partially offset by lower tax benefits and impairments. *Portfolio quality continues to remain stable*.

\* \* \*

The timing of dividends for the rest of the year is dependent on the timing of deal closures, but we expect to pay roughly half of the $18 billion we've targeted in the first half of the year and the remainder in the second half.

\* \* \*

Overall, Keith and the GE Capital team have executed ahead of schedule and on all aspects of the plan we shared with you one year ago. We expect to be largely completed with the asset sales by 2016.

On March 31 we filed the request to the FSOC for the rescission of GE Capital's designation as a SIFI. The filing demonstrates that GE Capital has substantially reduced its risk profile and is significantly less interconnected to the financial system, and therefore does not pose any threat to the U.S. financial system. We hope to complete the de-designation process as soon as possible.

152.    On May 4, 2016, GE filed its Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the first quarter ended March 31, 2016 (the "Q1 2016 Form 10-Q").  For the quarter, GE reported net loss of $98 million, or -$0.01 per diluted share, on revenue of $27.83 billion, compared to a net loss of $13.57 billion, or -$1.35 per diluted share, on revenue of $26.09 billion for the same period in the prior year.  The Q1 2016 Form 10-Q stated the progress of the GE Capital Exit Plan:

**THE GE CAPITAL EXIT PLAN**

On April 10, 2015, the Company announced a plan (the GE Capital Exit Plan) to create a simple, more valuable company by reducing the size of its financial services businesses through the sale of most of the assets of GE Capital and

- 75 -

aligning a smaller GE Capital with GE's industrial businesses. We expect GE Capital to release approximately $35 billion in dividends to GE (subject to regulatory approval) as a result of the sale of GE Capital assets. We received $4.3 billion in dividends from GE Capital in 2015 and $7.5 billion in the first quarter of 2016. As of March 31, 2016, we are ahead of our plan, having signed agreements with buyers for $166 billion of ending net investment (ENI), excluding liquidity (as originally reported at December 31, 2014), of which $146 billion has closed. In addition, as part of our initiative to reduce the size of our financial services businesses, we completed the split-off of our remaining interest in GE Capital's North American Retail Finance business, Synchrony Financial, to holders of GE common stock, which resulted in a $20.4 billion buyback of GE common stock (671.4 million shares) in 2015. In connection with the GE Capital Exit Plan, we completed a legal reorganization of GE Capital that included a merger of GE Capital into GE, a guarantee by GE of GE Capital debt, and an exchange of $36 billion of GE Capital debt for new GE notes. The result of all these actions reduced GE Capital's total assets by 44% from $501 billion at December 31, 2014 to $281 billion at March 31, 2016. As of March 31, 2016, we incurred charges of $22.6 billion related to these actions and remain on track versus our $23 billion estimate.

Given the progress of the GE Capital Exit Plan to date, we expect to largely complete that plan by the end of 2016. On March 31, 2016, GE filed its request to the Financial Stability Oversight Council (FSOC) for rescission of GE Capital's designation as a nonbank Systemically Important Financial Institution (SIFI).

153.    Accompanying the Q1 2016 Form 10-Q were certifications pursuant to SOX signed by defendants Immelt and Bornstein attesting to its accuracy and the adequacy of internal controls over financial reporting.

154.    The statements set forth in ¶¶149-151 were improper for the reasons stated in ¶107 above. Further, defendant Immelt's statements regarding dividends and buybacks were improper because they omitted or failed to disclose that:  (i) GE was failing to make meaningful adjustments to its LTC reserves in violation of GAAP and SEC regulations; and (ii) only by under-reserving for these liabilities was GE able to maintain sufficient cash flows for its quarterly dividend payments and stock buyback program.  In addition, defendant Bornstein's statement concerning the stability of GE Capital's portfolio was improper because it omitted or

failed to disclose that GE was failing to timely record increases to its LTC reserves by billions of dollars in violation of GAAP.

> **m.      Sanford C. Bernstein Strategic Decisions Conference on June 1, 2016**

155.    On June 1, 2016 GE made a presentation at the Sanford C. Bernstein Strategic Decisions Conference.   During the conference, defendant Sherin updated investors on the restructuring of GE Capital, emphasizing that the Company "exited whole pools of risk," stating:

> So, we are a lot smaller. Assets are down 50% when we filed and even within that a third of the assets that are remaining are in cash and liquidity. That's up substantially from where it was when we were designated. And we are not just smaller; *we exited whole pools of risk*.

> \*   \*   \*

> *In 2016 our plan is to return $18 billion of dividends. We are on track for that. We paid $7.5 billion in the first quarter. We do need a SIFI de-designation to realize the total objectives we have here, but we feel confident about our ability to finish the remaining sales and close the assets. That's the biggest driver here is lowering our risk-weighted assets by closing on these asset sales. That frees up the capital and the excess capital we're returning back to the parent*.

> \*   \*   \*

> Here's the earnings outlook for GE Capital. We've been giving the total net income forecast for GE Capital just to try to make it easier. With all the moving parts it's been tough to forecast. So, our verticals estimate for this year is $1.6 billion, as we said.

> \*   \*   \*

> So, to be able to basically dismantle GE Capital and take it to a place where we've got $80 billion of ending net investment and to get the excess interest cost out of here in that time frame has been a really -- *it's a great profile overall.*

> \*   \*   \*

> And then you look at capital continuing overall. We are going to lose a little over $1 billion this year. We had in April 10 we forecast to lose around $1 billion. We think we will make between zero and $0.5 billion in 2017 and we had a forecast for breakeven roughly. And then in 2018 a little under $1 billion is what we forecast on April 10, and we are somewhere between $0.5 billion and $1 billion on a consolidated basis.

156.     During the call, Steve Winoker ("Winoker"), an analyst from Sanford C. Bernstein, asked defendant Sherin to put GE Capital's transformation into context.  In response, defendant Sherin commented on the dramatic portfolio changes and explicitly stated that "all of the insurance business is gone."  The following exchange took place:

> [Winoker]: And I was going to say, Keith, you may not look it, but you've been at the Company for 35 years. And so, can you help portfolio managers in the audience from a long-term contexts put the current transformation over just the last year and a half into context from an investment perspective as they think about the business going forward?
>
> [Defendant Sherin]: Yes, I think the last year and a half has been dramatic, but it's really it's been many years of portfolio change. *If you look at what the portfolio is today versus take it when Jeff started, all of the insurance business is gone. That was a huge change in the portfolio*. All the materials businesses are now out of the portfolio, the plastics, the specialty materials, silicones.
>
> *   *   *
>
> We feel like this GE Capital plan just makes the Company so much simpler. One, for investors, I think it's been too complicated for investors; and two, to run. I think for GE leadership going forward it's just a simpler portfolio with a lot more common processes, a lot more common customers and a lot more common shared services inside the Company from, as I said, the R&D, the services and the globalization. It's a cleaner more synergistic portfolio.
>
> So we feel great about it.

157.     Defendant Sherin's remarks about GE Capital's insurance portfolio were improper because they omitted or failed to disclose:  (i) that the Company retained significant LTC business; (ii) the serious risks and uncertainties associated with GE's retained LTC business; and (iii) that the Company was failing to materially increase its LTC reserves despite elevated adverse claims experience in the LTC policies it was reinsuring and industry-wide negative trends in the LTC market.  In addition, defendant Sherin's statements concerning the dividends were improper because they omitted or failed to disclose that only by under-reserving for

liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program.

### n.  Second Quarter 2016

158.   On July 22, 2016, GE hosted an earnings conference call with analysts and investors in connection with its second quarter 2016 financial results.   During the conference call, defendant Bornstein commented on Company's share repurchase program and the stability of GE's LTC portfolio, stating:

> In addition, in the second quarter, GE borrowed $5 billion from GE Capital which will mature in the fourth quarter of this year. This makes a ton of sense for the Company as we already own the excess debt and the borrowing cost is lower than our dividend yield. The proceeds were used for an accelerated share repurchase program launched in June. This helps accelerate our buyback within the year.

> *   *   *

> Last, I will cover GE Capital. As mentioned earlier on June 28, GE Capital was de-designated as a systemically important financial institution marking a major step in our GE Capital exit plan.

> Our vertical businesses earned $452 million this quarter down 15% from prior year, including higher base earnings offset by lower gains and ***higher insurance reserve provisions resulting from updates to our models on our runoff long-term care book. Portfolio quality remains stable.***

159.   On August 1, 2016, the Company filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2016 (the "Q2 2016 Form 10-Q").   For the quarter, GE reported net income of $2.73 billion, or $0.30 per diluted share, on revenue of $30.34 billion, compared to a net loss of $1.36 billion, or -$0.13 per diluted share, on revenue of $28.44 billion for the same period in the prior year.   In addition, the Q2 2016 Form 10-Q discussed the GE Capital Exit Plan and the Company's anticipated dividend from GE Capital. The Q2 2016 Form 10-Q stated:

**THE GE CAPITAL EXIT PLAN**

\* \* \*

Under the GE Capital Exit Plan, which was approved on April 2, 2015 and aspects of which were approved on March 31, 2015, the Company will retain certain GE Capital businesses, principally its vertical financing businesses—GE Capital Aviation Services (GECAS), Energy Financial Services (EFS) and Industrial Finance (which includes Healthcare Equipment Finance, Working Capital Solutions and Industrial Financing Solutions)—that relate to the Company's core industrial domain and other operations, including our run-off insurance activities, and allocated corporate costs (together referred to as GE Capital Verticals or Verticals).

***We expect GE Capital to release approximately $35 billion in dividends to GE (subject to regulatory approval) as a result of the sale of GE Capital assets.*** We received $4.3 billion in dividends from GE Capital in 2015 and $11 billion in the first half of 2016. In July 2016, we received an additional $4 billion of common dividends from GE Capital bringing our year-to-date total to $15 billion.

\* \* \*

Given the progress of the GE Capital Exit Plan to date, we expect to largely complete that plan by the end of 2016. On March 31, 2016, GE filed its request to the Financial Stability Oversight Council (FSOC) for rescission of GE Capital's designation as a nonbank Systemically Important Financial Institution (SIFI). On June 28, 2016, we received approval of our request to the FSOC for rescission of GE Capital's designation as a nonbank SIFI.

160.     The Q2 2016 Form 10-Q also disclosed a $100 million increase in GE's insurance reserves.  Specifically, the Q2 2016 Form 10-Q stated:  "Within [GE] Capital, Verticals net earnings decreased by $0.1 billion due to higher insurance reserve provisions ($0.1 billion) and lower gains, partially offset by core increases."

161.     Accompanying the Q2 2016 Form 10-Q were certifications pursuant to SOX signed by defendants Immelt and Bornstein attesting to its accuracy and the adequacy of internal controls over financial reporting.

162.     The statements set forth in ¶¶156-159 were improper for the reasons stated in ¶107 above.  Further, statements concerning the Company's $100 million LTC reserve charge

were improper because the Company omitted or failed to disclose that: (i) the $100 million increase in LTC reserves was severely deficient given emerging LTC trends; and (ii) the Company failed to maintain sufficient controls over its financial reporting with respect to its LTC reserves.  In addition, the Company's statements concerning the dividends were improper because they failed to disclose that only by under-reserving for liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program.

### o.  Third Quarter 2016

163.    On October 21, 2016, GE hosted an earnings conference call with analysts and investors to discuss its third quarter 2016 financial results.  During the call, defendant Bornstein commented on GE Capital's anticipated dividend and defendant Immelt mentioned that the Company was increasing the buyback.  These comments assured investors that GE Capital would be able to generate the anticipated cash flows and dividends, and as a result the Company's quarterly stockholder dividends were safe.  Defendants Bornstein and Immelt stated:

[Defendant Bornstein:] ***GE Capital paid $5 billion of dividends during the third quarter. In October, they paid an additional $2 billion, and we expect an incremental $2 billion dividend before the end of the year for a total of $20 billion in 2016 versus the $18 billion target***.

Overall, the Capital team continued to execute ahead of schedule on all aspects of the plan that we shared with you 18 months ago. We expect to be largely complete by the end of 2016.

*   *   *

[Defendant Immelt:] [W]e're increasing the buyback from $18 billion to $22 billion.  This makes the total cash returned to investors $30 billion for the year, ahead of plan.  So in a time of volatility, the GE model is performing.

164.    On November 2, 2016, the Company filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q").  For the

quarter, GE reported net income of $1.99 billion, or $0.22 per diluted share, on revenue of $29.03 billion, compared to net income of $2.50 billion, or $0.25 per diluted share, on revenue of $27.85 billion for the same period in the prior year.  In addition, the Company's Q3 2016 Form 10-Q, further discussed the progress of the GE Capital Exit Plan.  The Q3 2016 Form 10-Q's MD&A section stated:

> We expect GE Capital to release approximately $35 billion in dividends to GE (subject to regulatory approval) as a result of the sale of GE Capital assets. We received $4.3 billion in dividends from GE Capital in 2015 and $16.1 billion in the first nine months of 2016. In October 2016, we received and additional $2.0 billion of common dividends from GE Capital bringing our year-to-date total to $18.1 billion. As of September 30, 2016, we are ahead of our plan, having signed agreements with buyers for $193 billion of ending net investment (ENI), excluding liquidity (as originally reported at December 31, 2014), of which $173 billion has closed. In addition, as part of our initiative to reduce the size of our financial services businesses, we completed the split-off of our remaining interest in GE Capital's North American Retail Finance business, Synchrony Financial, to holders of GE common stock, which resulted in a $20.4 billion buyback of GE common stock (671.4 million shares) in 2015. In connection with the GE Capital Exit Plan, we completed a legal reorganization of GE Capital that included a merger of GE Capital into GE, a guarantee by GE of GE Capital debt, and an exchange of $36 billion of GE Capital debt for new notes guaranteed by GE. The result of all these actions reduced GE Capital's total assets by 59% from $501 billion at December 31, 2014 to $203 billion at September 30, 2016. As of September 30, 2016, we incurred charges of $22.9 billion. Due to anticipated tax benefits and gains, we do not expect total after-tax charges through the completion of the GE Capital Exit Plan to exceed our initial $23 billion estimate.

> Given the progress of the GE Capital Exit Plan to date, we expect to largely complete that plan by the end of 2016. On March 31, 2016, GE filed its request to the Financial Stability Oversight Council (FSOC) for rescission of GE Capital's designation as a nonbank Systemically Important Financial Institution (SIFI). On June 28, 2016, we received approval of our request to the FSOC for rescission of GE Capital's designation as a nonbank SIFI.

165.    Accompanying the Q3 2016 Form10-Q were certifications pursuant to SOX signed by defendants Immelt and Bornstein attesting to its accuracy and the adequacy of internal controls over financial reporting.

166.    The statements set forth in ¶¶161-163 were improper for the reasons stated in ¶107 above.   Further, defendants Bernstein's and Immelt's statements regarding the dividends and stock buybacks were improper because they failed to disclose that only by under-reserving for liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program.

### p.    December 2016 Annual Outlook Investor Call

167.    During GE's Annual Outlook Investor Call on December 14, 2016, the Company represented that the stockholder dividend would be $8 billion, the stock buyback between $11 billion and $13 billion, and the GE Capital dividend between $6 billion and $7 billion.   In connection with these representations, defendant Immelt made the following comment:   "And then, we still have $10 billion on the sidelines, as it pertains to incremental leverage, and we'll think about that as time goes on in terms of the best usage of that capital."

168.    When a J.P. Morgan analyst mentioned that the "$6 billion to $7 billion in GE Capital dividends [to GE was] a little bit below what [GE] had initially laid out," and questioned whether GE Capital would be able to sustain the anticipated cash flows and dividends, defendant Bornstein assured investors that dividends were sustainable.   Defendant Bornstein stressed that GE Capital was performing well on cash flows, stating:   "We pulled dividends [from 2017] into 2016.   We are actually several billion dollars ahead of the plan that we gave you, we are not behind plan."

169.    The Company's statements regarding the dividends were improper because they omitted or failed to disclose that only by under-reserving for liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program.

### q.    Fourth Quarter and Year-End 2016

170.    On January 20, 2017, GE issued a press release summarizing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2016. For the fourth quarter, the Company reported net income of $3.48 billion, or $0.39 per diluted share, on revenue of $32.46 billion, compared to net income of $6.28 billion, or $0.64 per diluted share, on revenue of $32.75 billion for the same period in the prior year.

171.    The same day, the Company held an earnings conference call with analysts and investors in connection with fourth quarter and year-end 2016 results.  During the earnings call defendant Bornstein highlighted growth in GE Capital's verticals business and confirmed GE's prior dividend guidance, stating:

> Finally, I'll cover GE Capital. The verticals earned $478 million in this quarter, up 9% from prior year driven principally by lower impairments in EFS.  GECAS, EFS and Industrial Finance all had strong quarters and overall portfolio quality remains stable.
>
> *   *   *
>
> ***GE Capital paid $4 billion of dividends during the fourth quarter for a total of $20 billion in 2016*** versus the original $18 billion target for the year. Dividends of $5 billion ahead of the original plan announced in April of 2015. Overall the GE Capital team delivered ***a strong verticals performance*** while executing on all aspects of the exit plan.

172.    Following GE's opening remarks, the Company opened the line to analysts' questions.  Sanford C. Bernstein analyst, Winoker, asked whether GE Capital's cash flows were improving, to which defendants Bornstein and Immelt highlighted GE Capital's "very good underlying performance."  The following exchange took place:

> [Winoker]: Good morning. Since I only have one question I'd love to focus on cash here. And within that, Jeff, is there any factoring this quarter from GE Capital into GE industrial? And then also while it's the strongest cash flow quarter in a while, still a little bit below what we thought you guys implied when we talked about it before. Then as you think about it progressing through 2017 and

beyond maybe just talk a little more about the cash flow initiative comp that really can give investors confidence that the cash flow part of the story is improving.

[Defendant Bornstein]: Okay, there's a lot in that. So let me start with the fourth quarter, Steve. We improved working capital in fourth quarter about $5.2 billion which the best we can tell is the strongest working capital quarter the Company has ever had. And I want to just give you some of the pieces on that.

*   *   *

So within that accounts receivable performance you asked about factoring. For the total year, factoring with GE Capital was a $1.6 billion change for the year. It was $1.7 billion last year, so actually year-to-year it was $100 million less of a benefit in the year between what we did with GE Capital around factoring. And in the fourth quarter importantly, and you see it because our receivables improved $500 million, is from the third to fourth quarter of 2015, the benefit was $2.3 billion, the benefit going from this past third quarter to this quarter was $700 million. So it was actually down $1.6 billion year-to-year between third and fourth quarter each of those years. ***So there's very good underlying performance here. It's not just about, it's actually very little to do with GE Capital factoring***.

[Defendant Immelt]: Steve, I would add, the one piece that we're still not happy with in terms of Q4 is inventory. And I think we generated, we reduced working capital by $3 billion for the year and still didn't do what I think either Jeff or I want to see on inventory. We expect inventory to go down by $2 billion next year. ***And we think that's going to give us a ton of momentum as it pertains to CFOA and working capital in 2017***.

[Defendant Bornstein]: So let me just follow up and answer that part of your question. So we came in at $11.6 billion of industrial CFOA. ***We were shooting to be something closer to $12 billion of CFOA in the latest update we gave you.*** When you subtract CapEx you get industrial free cash flow we ended up at $8.9 billion. That was actually right in the middle of the range we gave you coming into the year on industrial free cash flow.

But the $400 million light is really all about inventory and it's essentially the $1 billion roughly, the $1 billion sales miss left more in inventory than we expected. Now not all of that would have converted to receivables and then from receivables would have converted to cash but a significant piece of it would have been. So I would say on an industrial free cash flow basis a couple hundred million lighter, on industrial CFOA closer to $400 million lighter and most of it is about that volume not going out the door and not being rev recced.

173.    On February 24, 2017, the Company filed with the SEC its 2016 Form 10-K,

which was signed by defendants Bornstein, Immelt, Bazin, Beattie, Brennan, D'Souza, Dekkers,

Henry, Hockfield, Jung, Lane, Lazarus, McAdam, Mollenkopf, Mulva, Rohr, Schapiro, and

Tisch.  For 2016, the Company reported net income of $8.83 billion, or $0.89 per diluted share,

on revenue of $119.68 billion, compared to a net loss of $6.12 billion, or $0.62 per diluted share,

on revenue of $115.15 billion for 2015.  For 2016, GE Capital reported a segment loss of $1.25

billion, on revenue of $10.90 billion.  The 2016 Form 10-K also updated investors on the

progress of the GE Capital Exit Plan and GE Capital's anticipated flow-through dividends.  The

2016 Form 10-K stated:

> As a result of the GE Capital Exit Plan dispositions, **_GE Capital has paid $24.4_**
> **_billion in dividends to GE in 2015 and 2016 ($4.3 billion and $20.1 billion,_**
> **_respectively). We expect GE Capital to release additional dividends of up to_**
> **_approximately $10 billion through the remainder of the plan._** In January 2017,
> GE received an additional $2.0 billion of common dividends from GE Capital. As
> of December 31, 2016, we are ahead of our plan, having signed agreements with
> buyers for $197 billion of ending net investment (ENI), excluding liquidity (as
> originally reported at December 31, 2014), of which $190 billion has closed. As
> of December 31, 2016, we have substantially completed the dispositions related to
> the GE Capital Exit Plan. In addition, as part of our initiative to reduce the size of
> our financial services businesses, we completed the split-off of our remaining
> interest in GE Capital's North American Retail Finance business, Synchrony
> Financial, to holders of GE common stock, which resulted in a $20.4 billion
> buyback of GE common stock (671.4 million shares) in 2015. In connection with
> the GE Capital Exit Plan, we completed a legal reorganization of GE Capital that
> included a merger of GE Capital into GE, a guarantee by GE of GE Capital debt,
> and an exchange of $36 billion of GE Capital debt for new notes guaranteed by
> GE. **_The result of all these actions reduced GE Capital's total assets by 63%_**
> **_from $500 billion at December 31, 2014 to $183 billion at December 31, 2016._**
> From inception of plan through December 31, 2016, we incurred charges of $22.0
> billion. Due to anticipated tax benefits and gains, we do not expect total after-tax
> charges through the completion of the GE Capital Exit Plan to exceed our initial
> $23 billion estimate.

174.    In addition, the 2016 Form 10-K repeated the Company's previous comments

about periodic asset impairment testing and accounting for insurance liabilities.  The 2016 Form

10-K stated:

> **_For our insurance activities remaining in continuing operations, we_**
> **_periodically test for impairment our deferred acquisition costs and present value_**
> **_of future profits_**.

* * *

Liabilities for unpaid claims and estimated claim settlement expenses represent our best estimate of the ultimate obligations for reported and incurred-but-not reported claims and the related estimated claim settlement expenses. ***Liabilities for unpaid claims and estimated claim settlement expenses are continually reviewed and adjusted through current operations***.

175.    Accompanying the 2016 Form 10-K were certifications pursuant to SOX signed by defendants Immelt and Bornstein attesting to its accuracy and the adequacy of internal controls over financial reporting.

176.    The statements set forth in ¶¶168-173 were improper for the reasons stated in ¶107 above.  Further the Company's statements concerning the dividends were improper because they omitted or failed to disclose that only by under-reserving for liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program.   In addition, the Company's statements concerning periodic testing of GE Capital's insurance portfolio for impairment were improper because they omitted or failed to disclose: (i) the serious risks and uncertainties associated with GE's retained LTC insurance business; (ii) that the Company failed to materially increase its LTC reserves despite escalating industry-wide negative trends in the LTC market; and (iii) that the Company failed to maintain adequate internal controls over financial reporting with respect to its LTC reserves.

**r.    Barclays Industrial Select Conference on February 22, 2017**

177.    On February 22, 2017, during Barclays Industrial Select Conference, defendant Bornstein summarized GE Capital's financial status and future prospects.   During the presentation, defendant Bornstein assured investors that the Company was "right on track" with its dividend projections, stating:

On the GE Capital restructuring, it's the largest corporate restructuring we think in the world that anybody has ever attempted. We have moved about $300 billion of assets in a year and a half. We're essentially done. We have one deal in France we're waiting for EU approval on, hopefully in the next week or two, and we'll be largely done with the M&A piece of what is the restructuring of GE Capital. From here, we'll have some assets that will run off with time, just because it makes more economic sense to do that.

*And so I think the Capital team has executed everything they committed that they would and more, and the dividends are slightly ahead of plan.* So we expect in 2017 the GE Capital dividend above $7 billion for the Company; keeps us right on track with what we committed to investors.

178.    Later during the presentation, in response to a participant's question about GE Capital and it's "longer-term capital structure," defendant Bornstein stated that the Company's anticipated returns were still in the ballpark of 10% or 11%:

*So, I think we're going -- by 2018, I think we'll be pretty close to steady-state in GE Capital in terms of what the capital structure is going to shake out*. We're not regulated anymore, so the capital structure is more a function of where we sit with the rating agencies in terms of their capital allocation models.

* * *

So I think that the GE Capital structure balance sheet, how we ought to think about the business going forward, is starting to play itself out. And I think when we get through 2018, we'll have a very clear picture of what the cap structure looks like and what we should expect. *We still think -- when we talked in April 2015, we talked about a business that we thought could return 10% or 11%. I think we're still in that ballpark.*

179.    Defendants' statements concerning the restructuring of GE Capital and the expected dividend from GE Capital were improper because they failed to disclose that only by under-reserving for liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program. Further, defendant Bornstein's statements concerning the "steady-state" in GE Capital were improper because they failed to disclose that: (i) there were serious risks and uncertainties associated with GE's retained LTC business; (ii) the Company's LTC insurance reserves were

woefully inadequate; (iii) the Company failed to maintain adequate internal controls over its financial reporting with respect to its LTC reserves; and (iv) consequently, GE's earnings and cash flows were overstated.

> **s.      J.P. Morgan Aviation, Transportation & Industrials Conference on March 13, 2017**

180.     On March 13, 2017, GE participated in the J.P. Morgan Aviation, Transportation & Industrials Conference.  During the conference, Richard A. Laxer ("Laxer"), then-CEO of GE Capital summarized GE Capital's overall financial condition, emphasizing its "good financial profile" and "very conservative and very strong" capital levels and liquidity, stating:

> Since we announced the exit plan *we paid $47 billion of dividends, $5 billion ahead of where we thought we'd be at this point. That includes the spinoff of Synchrony [Financial] and we've got good momentum coming into this year. We paid $2 billion already of a dividend out of the $6 billion to $7 billion that we project that we will pay in 2017.*

> *GE Capital now is aligned with the industrials*. Our businesses are in the business of supporting industrial growth, working with our industrial businesses and their customers to help drive orders for the company. I will talk more about that. *And the go-forward business has a good financial profile.*

> *    *    *

> From a dividend standpoint we paid $47 billion between the Synchrony [Financial] and cash dividends. We will have $51 billion paid out by the end of this year and as I said we've already paid $2 billion so far this year and our *capital levels and liquidity for the Company remain very conservative and very strong.*

181.     Laxer also answered questions from analysts concerning GE Capital's anticipated dividends to its parent.  The following exchange took place between J.P. Morgan analyst Tusa, and Laxer:

> [Tusa]:  Okay. And then just one other check-the-box item on getting an update on the trajectory. $10 billion in dividends leftover, $6 billion to $7 billion this year. Is that the right number for 2018, $3 billion to $3.5 billion depending on what you get done this year?

[Laxer]: Yes. So the way to think about it is we have paid up until this year $24.4 billion. If you add in the $2 billion that we've already paid this quarter puts you at $26.4 billion. By the end of this year we will be at $31 billion. ***Now what we talked about in 2015, we said that about $31 billion of dividends would come from the sale of the assets and that's roughly what you see there the rest will come from earnings from the assets that we kept, the release of capital, etc. So, $31 billion is on track by the end of this year. In terms of the $35 billion, as [Immelt] mentioned at the outlook meeting in December, we will probably be inside of that number because we sold a lot faster than we expected***.

182.    At the conference, Laxer also discussed the plan for GE Capital's LTC insurance business.  In response to Tusa asking whether the Company planned to sell off its retained insurance business, Laxer commented that "it's not an attractive exit," given the then-current interest rate environment.  The following dialogue took place:

[Tusa]:  And then just lastly from me on a disc-ops basis, the insurance liabilities, what's the plan, anything planned there, or you just want that down over an extended period of time; not something that's talked about a lot but it's relatively sizable....

[Laxer]: ***Those are long-dated assets. And given the interest rate environment we're in right now, it's not attractive to do something. We always look at it, but just given where rates are at this point, it's not an attractive exit.***

*   *   *

[Tusa]: Regarding the insurance liabilities, you mentioned it was because of the rate environment is not attractive to look at a solution now. What sort of bogey level would you think you'd have to see in terms of the rate environment to consider that transaction where the bid/ask comes...?

[Laxer]: ***I think there's a lot of factors there. So it's hard to give you a specific number, but we would like to see a few increases before that would be attractive.***

183.    Laxer's statements concerning GE Capital's dividends and the future of GE Capital were improper because they omitted or failed to disclose that only by under-reserving for liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program.  Further, Laxer's statements concerning GE Capital's run-off insurance business were improper because they

omitted or failed to disclose:  (i) the serious risks and uncertainties associated with GE's LTC

business; (ii) that the Company's LTC reserves were woefully inadequate; (iii) the Company

failed to maintain adequate internal controls over its financial reporting with respect to its LTC

reserves; and (iv) consequently, GE's earnings and cash flows were overstated.

### t.    First Quarter 2017

184.    On April 21, 2017, GE held an earnings conference call with analysts and

investors to discuss the Company's first quarter 2017 financial and operating results.  During the

call, defendant Bornstein commented on the state of GE Capital, emphasizing GE Capital's

"strong performance" from verticals and the accuracy of the Company's prior dividend

projections, stating:

> Finally, I'll cover GE Capital. The verticals earned $535 million in the quarter, up
> 8% from the prior year, driven principally by lower impairments, higher tax
> benefits, partially offset by lower gains. GECAS, Energy Finance and Industrial
> Finance all had strong quarters, and overall portfolio quality remains stable. In the
> first quarter, the verticals funded $1.8 billion of unbooked volume and enabled
> $2.2 billion of industrial orders.
>
> Other continuing operations generated a $582 million loss in the quarter, driven
> by excess interest expense, restructuring costs related to portfolio transformation
> and headquarters operating costs....  Discontinued operations generated $242
> million loss, driven by Exit Plan-related items and operating costs. Overall, GE
> capital reported a net loss of $290 million.
>
> We ended the quarter with $167 billion of assets, including $43 billion of
> liquidity. Assets were down $16 billion from year-end.
>
> *   *   *
>
> ***GE Capital paid $2 billion of dividends during the quarter and an additional $2
> billion this week. We remain on track for $6 billion to $7 billion of dividends for
> the total year. Overall, the GE Capital team delivered a strong performance
> from the verticals, while executing on all aspects of our Exit Plan.***

185.    On May 5, 2017, GE filed with the SEC its Quarterly Report on Form 10-Q

announcing GE's financial results for the first quarter ended March 31, 2017 (the "Q1 2017 Form

10-Q").  For the quarter, GE reported net income of $619 million, or $0.07 per diluted share, on revenue of $27.49 billion, compared to net loss of $61 million, or -$0.01 per diluted share, on revenue of $27.83 billion for the same period in the prior year.  With respect to GE Capital's financial results, the Q1 2017 Form 10-Q stated:

> Capital revenues decreased by $0.2 billion, or 7%, primarily due to organic revenue declines and lower gains, partially offset by lower impairments.
>
> Capital losses decreased $0.8 billion, or 95%, primarily due to lower treasury operation expenses, lower preferred dividend expenses and lower restructuring expenses associated with the GE Capital Exit Plan.
>
> ☐ Within Capital, Verticals net earnings increased due to lower impairments ($0.1 billion) and core increases ($0.1 billion), partially offset by lower gains ($0.1 billion).
>
> ☐ Other Capital losses decreased by $0.8 billion, or 58%, primarily associated with the GE Capital Exit Plan as follows:
>
> - Lower treasury operation expenses of $0.4 billion reflecting lower excess interest expense, including costs associated with the February 2016 hybrid tender and derivative activities that reduce or eliminate interest rate, currency or market risk between financial assets and liabilities.
>
> - Lower preferred dividend expenses of $0.3 billion associated with the January 2016 preferred equity exchange.
>
> - Lower restructuring expenses of $0.1 billion.

186.    Accompanying the Q1 2017 Form 10-Q were certifications pursuant to SOX signed by defendants Immelt and Bornstein attesting to its accuracy and the adequacy of internal controls over financial reporting.

187.    The statements set forth in ¶¶182-184 were improper for the reasons stated in ¶107 above.  Further, the Company's statements regarding the dividends were improper because they failed to disclose that only by under-reserving for liabilities related to GE Capital's LTC

reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program.

### u.   Electrical Products Group Conference on May 24, 2017

188.   On May 24, 2017, GE presented at the Electrical Products Group Conference, during which defendant Immelt spoke positively about the Company's overall financial condition and future prospects.  Defendant Immelt specifically highlighted GE's many sources of cash to assure investors that the Company's highly anticipated quarterly dividends were on track with its projections.  Defendant Immelt stated:

> And that just leads into a discussion on capital allocation really for the next 2 years. So let's say, 2017 and 2018, we have $72 billion or $74 billion of capital to allocate inside the company. If you add up, what I would call, just the bedrock of the company, keeping it safe and secure, the dividend, funding new products, kind of the first 4 things, the pension, that's roughly half of the cash we have available to allocate, right? So the company's incredibly strong from a balance sheet standpoint. You should look to capital allocation decisions around dividend and buyback and things like that. These are things that we're committed to. This shows what's remaining on the buyback, the announced M&A. This is kind of the Alstom, finishing out the Alstom JVs, finishing out Baker Hughes. And there's still probably $8 billion to $12 billion of cash out there to allocate in the future.
>
> The other thing I would say is that we tend sometimes to look at -- ***despite all the cash we've got on GE Capital, we're going to get ongoing dividends from GE Capital as time goes on. There's other sources of cash that aren't even on this page as you think going forward. So very strong, very committed to the capital allocation choices we've made, especially the dividend***. And this is the way to think about GE and the strength of the company going forward.

189.   Defendant Immelt's statements concerning the dividends, capital allocation, and strength of the Company were improper because the Company omitted or failed to disclose that only by under-reserving for liabilities related to GE Capital's LTC reinsurance portfolio was GE able to maintain sufficient cash flows to fund its quarterly dividends and stock buyback program.

### 2. Improper Statements Concerning GE Power and Its LTSAs

#### a. Fourth Quarter and Year-End 2014

190. On February 27, 2015, the Company filed with the SEC its 2014 Form 10-K, which was signed by defendants Bornstein, Immelt, Beattie, Brennan, Cash, D'Souza, Dekkers, Hockfield, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, Swieringa, Tisch, and Warner.  The Company's 2014 Form 10-K discussed GE's revenue recognition practices with respect to its LTSAs.  The 2014 Form 10-K emphasized that the Company "routinely review[ed]" its estimates of expected project revenues and costs on its LTSAs and "regularly revis[ed]" them to reflect existing conditions.  GE further explained that adjustments from 2012 through 2014 increased the Company's reported earnings on LTSAs substantially.  The 2014 Form 10-K stated:

> Revenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to perform the services; and future billing rate, cost changes and customers' utilization of assets. ***We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook***.

> We also regularly assess customer credit risk inherent in the carrying amounts of receivables and contract costs and estimated earnings, including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination. We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods. ***Revisions may affect a product services agreement's total estimated profitability resulting in an adjustment of earnings; such adjustments increased earnings by $1.0 billion, $0.3 billion and $0.4 billion in 2014, 2013 and 2012, respectively***. We provide for probable losses when they become evident.

191. The above statements were improper because they failed to disclose: (i) that the Company was using cumulative catch-up adjustments to improperly accelerate the recognition of revenue on its LTSAs in violation of GAAP; (ii) that as a result, the Company's contract assets were artificially inflated; (iii) that the Company failed to maintain adequate internal controls over

its     financial     reporting     with     respect     to     contract     assets;     and (iv) consequently, the Company's earnings and cash flows were overstated.

### b.     Fourth Quarter and Year-End 2015

192.     On February 26, 2016, the Company filed with the SEC its 2015 Form 10-K, which was signed by defendants Bornstein, Immelt, Beattie, Brennan, Cash, D'Souza, Dekkers, Hockfield, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, Swieringa, Tisch, and Warner.   The Company's 2015 Form 10-K discussed GE's revenue recognition practices with respect to its LTSAs.  The 2015 Form 10-K again stated that the Company "routinely review[ed]" its estimates of expected project revenues and costs on its LTSAs and "regularly revis[ed]" them to reflect existing conditions.   GE further explained that adjustments from 2013 through 2015 increased the Company's reported earnings on LTSAs substantially.  The 2015 Form 10-K stated:

> Revenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to perform the services; and future billing rate, cost changes and customers' utilization of assets. ***We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook***.

> We also regularly assess customer credit risk inherent in the carrying amounts of receivables and contract costs and estimated earnings, including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination. We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods.

> ***Revisions may affect a product services agreement's total estimated profitability resulting in an adjustment of earnings; such adjustments increased earnings by $1.4 billion, $1.0 billion and $0.3 billion in 2015, 2014 and 2013, respectively***. We provide for probable losses when they become evident.

193.     The foregoing statements were improper for the reasons stated in ¶189 above.

### c.     December 2016 Annual Outlook Investor Meeting

194.     On December 14, 2016, GE hosted its Annual Outlook Investor Meeting with investors and analysts.  During the conference call, the Company reported an industrial CFOA guidance of between $12 billion and $14 billion. In addition, defendant Immelt projected a strong year for the GE Power segment, stating:

> …Next year, when I look at backlogs and we look at run rates there is a fantastic opportunity to have a great year in services in 2017. And that is going to be driven by upgrades, ***we still see a very strong pipeline not just in the Power business but across the portfolio, but another good year in Power upgrades***.  ...So, between repower, upgrades, big installed basis in Power and in Aviation, we are going to see very strong organic growth in the service franchises in 2017. So that is service.

195.     Following the Company's opening remarks, J.P. Morgan analyst Tusa asked about the Company's accounting practices with respect to LTSAs cumulative catch-ups.  Specifically, Tusa stated: "Do you exclude those because they are non-cash or does that kind of play into that whole bucket of the $1.5 million service and productivity?"  In response, defendant Immelt stated that, "it all goes into the service, Steve. But I think we always look at these as kind of like net beneficial to both the customers and us."

196.     The foregoing statements concerning the Company's industrial CFOA, the "very strong pipeline" in GE Power, revenue recognition on LTSAs and contract assets, and the impact of cumulative catch-up adjustments were improper for the reasons set forth in ¶189 above.

### d.    Fourth Quarter and Year-End 2016

197.    During the Company's earnings conference call with analysts and investors held on January 20, 2017, to discuss its fourth quarter and year-end 2016 financial results, defendant Bornstein assured investors that earnings in the GE Power segment would continue to be strong in 2017.  Specifically, defendant Bornstein stated, "As we said in December, we expect double-digit earnings growth in Power in 2017."

198.    On February 24, 2017, the Company filed with the SEC its 2016 Form 10-K, which was signed by defendants Bornstein, Immelt, Bazin, Beattie, Brennan, D'Souza, Dekkers, Henry, Hockfield, Jung, Lane, Lazarus, McAdam, Mollenkopf, Mulva, Rohr, Schapiro, and Tisch.  The Company's 2016 Form 10-K reported substantial increases in contract assets as a result of adjustments to the Company's LTSAs.  The 2016 Form 10-K stated:

> *Contract assets increased $4,006 million in 2016, which was primarily driven by a change in estimated profitability within our long-term product service agreements resulting in an adjustment of $2,216 million, as well as an increase in deferred inventory costs.*

199.    In addition, the 2016 Form 10-K reported a balance of $12.75 billion on LTSAs. The 2016 Form 10-K explained: "Long-term product service agreement balances are presented net of related billings in excess of revenues of $3,750 million and $2,602 million at December 31, 2016 and 2015, respectively."  Further, the 2016 Form 10-K stated that the Company "routinely review[ed]" its estimates of expected project revenues and costs on its LTSAs and "regularly revis[ed]" them to reflect existing conditions.  GE explained that adjustments from 2014 through 2016 increased the Company's reported earnings on LTSAs substantially.  The 2016 Form 10-K stated:

> Revenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to

perform the services; and future billing rate, cost changes and customers' utilization of assets. ***We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook***.

We also regularly assess customer credit risk inherent in the carrying amounts of receivables and contract costs and estimated earnings, including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination. We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods. ***Revisions may affect a product services agreement's total estimated profitability resulting in an adjustment of earnings; such adjustments increased earnings by $2.2 billion, $1.4 billion and $1.0 billion in 2016, 2015 and 2014, respectively.*** We provide for probable losses when they become evident.

200.    The foregoing statements concerning GE's industrial CFOA, the financial outlook for GE Power, revenue recognition on LTSAs and contract assets, and the impact of cumulative catch-up adjustments were improper for the reasons set forth in ¶189 above.

> **e.    March 2017 GE Power and Renewable Energy Investor Meeting**

201.    On March 8, 2017, during the Company's Power and Renewable Energy Investor Meeting, defendant Bornstein reiterated GE's industrial CFOA guidance of $12 billion to $14 billion and stated that there was no change in "what's going to get returned to investors." Defendant Bornstein emphasized that GE feels "really good about the Power business."  GE Power executive, Stephen R. Bolze ("Bolze"), further explained that the Company felt "very strong about double-digit earnings growth in 2017" within the GE Power segment.  Bolze also discussed the Company's priorities going forward, including delivering organic growth and improving cash conversion, stating:

> Now as we have gone through this transition now and transformation, as I said earlier, ***it has opened our eyes to how much we can run this place with better cost efficiency and cash flow***. ***We are now, and I am turning more of my attention on two key incremental areas for value generation, cost and cash***. ***You will hear a big focus on cash generation action; all of our incentives are aligned as a leadership team around Power***. We are going to be leveraging the

- 98 -

same awesome playbook that you saw in the integration for all the costs across the Power business. And then as far as working capital, another $1 billion to be released in working capital from the business and part of our increasing our free cash flow from operations.

\* \* \*

***Now let's talk about the game plan going forward. This is it. It is three key strategic priorities: deliver organic growth; aggressive cost out for a flat market; and improving cash conversion. And with that our plan in 2017 calls for 5% organic growth, operating profit double-digit, with a 150 plus point greater than expansion in our margins***. We are going to walk – I'm going to walk through each of these three things in more detail and show you the clarity we have on this path.

202.    The Company's statements concerning industrial CFOA and GE Power were improper for the reasons set forth in ¶189 above.

### f.    First Quarter 2017

203.    On April 21, 2017, during an earnings conference call with investors and analysts, defendant Bornstein disclosed GE's poor industrial CFOA results for the quarter.  However, defendant Immelt reassured investors that dispositions were on track and that GE's industrial CFOA would improve.  Defendants Bornstein and Immelt stated:

[Defendant Bornstein]: …[O]ur industrial CFOA was at $1.6 billion usage of cash, about $1 billion below our expectations. ***We expect to see most of this come back over the remainder of the year***, and ***we see no change for our outlook for the year of $12 billion to $14 billion of industrial CFOA***.

\* \* \*

[Defendant Immelt]: …***Despite a slow start, we plan to hit $12 billion to $14 billion of industrial CFOA for the year***. We believe that capital dividend should be $6 billion to $7 billion for the year. Dispositions are on track. We're on track to return $19 billion to $21 billion to investors through dividend and buyback.

To recap, we had 10% orders growth, 7% organic growth, 130 basis points of margin expansion and 20% organic industrial operating profit growth, and a commitment to hit CFOA for the year. So this is a good start.

204.     During the conference call, defendant Bornstein explained the impact that contract assets had on the Company's weak industrial CFOA for the quarter.   Defendant Bornstein assured investors that the Company would "recover the vast majority [of it] over the second to the fourth quarter," stating:

> Contract assets were a use of $1.9 billion. This was $300 million worse than expected. Of the $1.9 billion, $500 million was from our long-term equipment contracts, where the timing of our billion revenue recognition milestones differ. ***This will catch up throughout the year as we execute against the contracts***. The remaining $1.4 billion is our long-term service agreements. There were 2 pieces to this. $600 million is related to service contracts where we've incurred cost and booked the revenue, but haven't yet billed the customer. ***We expect this to partly come back over the year*** as we see higher asset utilization in Power and Aviation. ***And we've seen these similar trends in the prior years***.
>
> The other $800 million are contract adjustments driven by better cost performance and part life, primarily driven by Power and Aviation. ***Versus expectations, the $300 million of lower cash on contract assets is driven by $200 million of long-term equipment contracts that we expect to come back throughout the year, and the $100 million is from services contract adjustments I just walked through, which will come back over the remaining life of those contracts as we build the utilization. In total, we're about $1 billion off our first quarter plan, but we'll recover the vast majority over the second to the fourth quarter***.

205.     Defendant Bornstein further assured investors that "the contract drag on cash flow" for 2017 would be the same as in 2016, and that GE was "not pulling future profit forward" on the contracts, stating:

> ***…[W]e expect the contract drag on cash flow for the year to be roughly the same***, 2016 versus 2017....  I think you got a number of phenomena that's going on. We're investing like crazy in productivity and cost-out.  …When we get lower cost, the cost to execute against our contracts improves. And when they improve, the accounting has to account for that and where it changes our view on the ultimate profitability of these contracts. That's one mechanism, and we're hugely focused on that. ***And I think you want us focused on that, that's all future cash, future economics, et cetera, on a go-forward basis. We're not pulling future profit forward. That is not what we're doing***. We're just restating what – where we are in the contract from inception to date.
>
> The second part is where the long-term service agreements that protect our installed base, ***our penetration continues to improve***....

206.    When J.P. Morgan analyst Tusa pressed GE for more clarity on the Company's "noncash earnings from contract assets," defendant Bornstein explained that contract assets for the quarter increased primarily due to GE updating part costs when the Company changed standards, stating:

> …CSA contracts in the quarter were up $1.4 billion year-over-year. $800 million of that increase was associated with contract updates, okay? And that's versus $500 million a year ago. So it's higher by $266 million year-over-year. ***Of the about $300 million, it's up year-over-year, a little more than half of that is in Power***. ***And most of that is associated with updates of part costs when we change standards every year. So for the contracts that were under review in the first quarter, if we change the standard on the part cost and deliver against that contract in the future, we did that update.***
>
> And then there's a small update for escalation that's mostly around our Aviation business. We update it once a year on escalation within the service contract. That part of long-term contracts that are revenues versus billing, so outside of contract updates was $600 million in the first quarter. And that's really where we've incurred shop visits, outages. We've incurred cost against those service contracts ahead of actually billing the hours or the events associated with it. So that's mostly timing. ***And some of that will come back over the course of the year, as we actually bill against the utilization or bill against an outage or a shop visit. So I would say that's mostly timing***. That's the $1.4 billion increase that you see in contracts year-over-year.

207.    On May 5, 2017, the Company filed its Q1 2017 Form 10-Q with the SEC, reporting significant increases in contract assets.  The Q1 2017 Form 10-Q stated:

> ☐   ***Contract assets increased $2.2 billion***, primarily due to adjustments driven by lower forecasted cost to complete the contracts and timing of billings relative to revenue recognition on our long-term equipment and service contracts.

208.    In addition, the Q1 2017 Form 10-Q reported a balance of $14.19 billion on LTSAs.  The Q1 2017 Form 10-Q explained: "Long-term product service agreement balances are presented net of related billings in excess of revenues of $3,171 million and $3,750 million at March 31, 2017 and December 31, 2016, respectively."  The Q1 2017 Form 10-Q also explained

that cash from operating activities decreased $7.5 billion, as a result of adjustments driven by lower estimated expenses.  The Q1 2017 Form 10-Q stated:

☐ Cash used for industrial operating activities of $1.6 billion in the three months ended March 31, 2017, compared to cash generated of $0.4 billion in the three months ended March 31, 2016, primarily due to [among other things]: ...***An increase in contract assets of $1.9 billion and $0.7 billion in the three months ended March 31, 2017 and 2016, respectively, primarily due to adjustments driven by lower forecasted cost to complete the contracts and timing of billings relative to revenue recognition on our long-term equipment and service contracts***.

209.  The statements set forth in ¶¶201-206 were improper for the reasons stated in ¶189 above.

**D.    The Individual Defendants Negligently Make Misleading Statements in GE's Proxy Statements**

**1.    The 2016 Proxy**

210.  On March 14, 2016, GE issued its Proxy Statement for the 2016 Annual Meeting of Shareowners, held on April 27, 2016 (the "2016 Proxy").  In the 2016 Proxy, defendants Beattie, Brennan, Cash, D'Souza, Dekkers, Hockfield, Immelt, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, Swieringa, Tisch, and Warner solicited stockholder votes to, among other things: (i) reelect defendants Beattie, Brennan, D'Souza, Dekkers, Hockfield, Immelt, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, and Tisch to the Board; (ii) reject the stockholder proposal to adopt cumulative voting in the election of directors; and (iii) reject the stockholder proposal to adopt a policy to require an independent Board Chairman.  Defendants Beattie, Brennan, Cash, D'Souza, Dekkers, Hockfield, Immelt, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, Swieringa, Tisch, and Warner negligently issued misleading statements with respect to each of these solicited votes.

211.  Plaintiffs' allegations with respect to the misleading statements in the 2016 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing

conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

> a.   **Misstatements in Support of Reelecting Defendants Beattie, Brennan, D'Souza, Dekkers, Hockfield, Immelt, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, and Tisch**

212.   In the 2016 Proxy, defendants Beattie, Brennan, Cash, D'Souza, Dekkers, Hockfield, Immelt, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, Swieringa, Tisch, and Warner solicited votes to reelect Beattie, Brennan, D'Souza, Dekkers, Hockfield, Immelt, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, and Tisch.  In support of their bid to reelect defendants Beattie, Brennan, D'Souza, Dekkers, Hockfield, Immelt, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, and Tisch, these defendants, along with defendants Cash, Swieringa, and Warner, highlighted their supposed successful oversight of the Company.  In particular, the 2016 Proxy described their responsibilities and the duties of each Board committee.   Additionally, the 2016 Proxy incorrectly claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in GE Capital's operations; (ii) the Audit Committee exercised oversight of the Company's financial statements; and (iii) GE's financial statements were accurate, and therefore the Board's approval of their inclusion in the Company's 2015 Form 10-K was appropriate.  The 2016 Proxy states:

> **Finance Experience**
>
> GE uses a broad set of financial metrics to measure its performance, and accurate financial reporting and robust auditing are critical to our success.  We have added a number of directors who qualify as audit committee financial experts, and we expect all of our directors to have an understanding of financial and financial reporting processes.

*   *   *

**Risk Management Experience**

In light of the Board's role in overseeing risk management and understanding the most significant risks facing the company, we have added directors with experience in risk management and oversight.

213.    With respect to the key oversight responsibilities of the Board's Audit Committee

and GE Capital Committee, the 2016 Proxy stated:

**Audit**

* * *

- Independent auditor engagement

- Financial reporting & accounting standards

- Internal audit functions (Corporate Audit Staff & GE Capital Audit)

- Disclosure and internal controls

- Compliance and integrity programs

* * *

**GE Capital**

* * *

- Risk management framework & related policies/processes

- Risk governance framework & risk assessment

- Risk appetite & key risk policies

- Metrics used to manage risks

- Financial services regulatory examinations & reviews

- Internal risk management function

214.    Through these statements, defendants Beattie, Brennan, Cash, D'Souza, Dekkers,

Hockfield, Immelt, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, Swieringa, Tisch, and Warner

misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control,

disclosure review, and reporting programs to mitigate wrongdoing and apprise the Board of significant risks; (ii) was well informed of the Company's exposure to risk through myriad information channels; and (iii) promoted prudent risk management practices.  The 2016 Proxy omitted any disclosures concerning: (i) the risks and uncertainties associated with the Company's LTC portfolio; (ii) GE's failure to periodically test GE Capital's insurance portfolio for impairment; (iii) GE's failure to timely record increases to LTC reserves by billions of dollars in violation of GAAP and statutory insurance regulations; (iv) the Company's improper revenue recognition practices; (v) GE's artificially inflated stock price as a result of the foregoing; and (vi) GE facing significant reputational harm when the truth would inevitably unfold.

215.    The 2016 Proxy harmed GE by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the misleading statements in the 2016 Proxy, GE's stockholders voted via an uninformed stockholder vote to reelect defendants Beattie, Brennan, D'Souza, Dekkers, Hockfield, Immelt, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, and Tisch to GE's Board.

**b.    Misstatements in Opposition to Adopting a Policy to Require an Independent Board Chairman**

216.    The 2016 Proxy also contained a stockholder proposal to adopt a policy to require an independent Board Chairman.  The Board recommended voting against this proposal citing the supposedly "strong, independent leadership" of defendant Brennan and the Board's belief that the "current leadership structure is the most effective for GE."  The Board recommended voting against this proposal for the following reasons:

THE BOARD REGULARLY REVIEWS AND ASSESSES OUR BOARD LEADERSHIP STRUCTURE.  Based on its most recent review, the Board believes that our current structure, in which our CEO also serves as the chairman of the Board and an independent lead director is appointed by the independent directors on the Board, remains appropriate for the company, as it allows one person to speak for and lead the company and Board while also providing for

effective oversight and governance by an independent board through the independent lead director.

217.    The above statements misleadingly stated that the Company's corporate governance structure was effective and provided adequate oversight and Board accountability. In fact, however, as detailed herein, the Company's corporate governance structure was ineffective at providing adequate oversight, especially relating to the Company's financial reporting and risk management practices.    The Board, Audit Committee, and GE Capital Committee completely failed to exercise active and appropriate oversight over the Company's corporate governance, risk management, and financial statements.    Neither the Board, nor any of its committees, took any action to address the Company's severely understated LTC reserves and improper revenue recognition practices.

218.    Furthermore, the 2016 Proxy misleadingly suggested that the Company's strong financial performance was attributable to a purportedly effective governance structure and wrongfully omitted that such financial performance stemmed, in part, from GE's failure to materially increase its LTC reserves and the Company's improper accounting practices with respect to its LTSAs.    As a result of these practices, the Company was reporting inflated revenues and earnings, and therefore its financial statements were not appropriate to include in the Company's SEC filings.    Defendants Beattie, Brennan, Cash, D'Souza, Dekkers, Hockfield, Immelt, Jung, Lane, Lazarus, Mulva, Rohr, Schapiro, Swieringa, Tisch, and Warner were negligent in including these misleading statements in the 2016 Proxy.

219.    As a result of these misleading statements, the Company's stockholders voted against adopting a policy to require an independent Board Chairman without adequate information necessary to make a reasonably informed decision.

### c.     Misstatements in Opposition of Adopting a Policy to Require Cumulative Voting in the Election of Directors

220.     The 2016 Proxy also contained a stockholder proposal to adopt a policy to require cumulative voting in the election of directors.  The Board recommended voting against this proposal stating that the Company's existing voting policy "ensures the broadest and fairest shareowner representation" and is "most likely to produce an effective board of directors."  In addition, the Board claimed that "GE is a leader in Board accountability."

221.     The 2016 Proxy omitted any disclosures that: (i) the Board failed to maintain sufficient compliance, internal control, disclosure review, and reporting programs to apprise the Board of significant risks; (ii) the Company lacked effective internal control over its financial reporting; and (iii) the Company's financial statements contained errors relating to revenues on its LTSAs.  For these reasons, the above statements in the 2016 Proxy were materially misleading and caused stockholders to vote against adopting a policy to require cumulative voting on directors without adequate information necessary to make a reasonably informed decision.

### 2.     The 2017 Proxy

222.     On March 8, 2017, GE issued its Proxy Statement for the 2017 Annual Meeting of Stockowners, held on April, 26, 2017 (the "2017 Proxy").  In the 2017 Proxy, defendants Bazin, Beattie, Brennan, D'Souza, Dekkers, Henry, Hockfield, Immelt, Jung, Lane, Lazarus, McAdam, Mollenkopf, Mulva, Rohr, Schapiro, and Tisch solicited stockholder votes to, among other things: (i) reelect themselves to the Board; (ii) approve an amendment to the 2007 Long-Term Incentive Plan; (iii) decide whether to adopt cumulative voting in the election of directors; and (iv) decide whether to adopt a policy to require an independent Board Chairman.  Defendants Bazin, Beattie, Brennan, D'Souza, Dekkers, Henry, Hockfield, Immelt, Jung, Lane, Lazarus,

McAdam, Mollenkopf, Mulva, Rohr, Schapiro, and Tisch negligently issued misleading statements with respect to each of these solicited votes.

223.    Plaintiffs' allegations with respect to the misleading statements in the 2017 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

> **a.    Misstatements in Support of Reelecting Defendants Bazin, Beattie, Brennan, D'Souza, Dekkers, Henry, Hockfield, Immelt, Jung, Lane, Lazarus, McAdam, Mollenkopf, Mulva, Rohr, Schapiro, and Tisch**

224.    In the 2017 Proxy, defendants Bazin, Beattie, Brennan, D'Souza, Dekkers, Henry, Hockfield, Immelt, Jung, Lane, Lazarus, McAdam, Mollenkopf, Mulva, Rohr, Schapiro, and Tisch solicited votes to reelect themselves.  In support of their bid to reelect themselves, these defendants highlighted their supposed successful oversight of the Company.  In particular, the 2017 Proxy described their responsibilities and the duties of each committee.  Additionally, the 2017 Proxy incorrectly claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in GE Capital's operations; (ii) the Audit Committee exercised oversight of the Company's financial statements; and (iii) GE's financial statements were accurate, and therefore the Board's approval of their inclusion in the Company's 2016 Form 10-K was appropriate.  The 2017 Proxy repeated substantially the same statements as the 2016 Proxy.

225.    Through these statements, defendants Bazin, Beattie, Brennan, D'Souza, Dekkers, Henry, Hockfield, Immelt, Jung, Lane, Lazarus, McAdam, Mollenkopf, Mulva, Rohr, Schapiro,

and Tisch misleadingly suggested that the Board: (i) maintained sufficient compliance, internal control, disclosure review, and reporting programs to mitigate wrongdoing and apprise the Board of significant risks; (ii) was well informed of the Company's exposure to risk through myriad information channels; and (iii) promoted prudent risk management practices.  In reality, the Board and Audit Committee did not exercise active and appropriate oversight over the Company's corporate governance, risk management, and financial statements.  Rather, the Board continually failed to address the Company's severely understated LTC reserves and improper revenue recognition practices with respect to its LTSAs.  As a result of these practices, the Company was reporting inflated revenues and earnings, and therefore its financial statements were not appropriate to include in the Company's SEC filings.  Defendants Bazin, Beattie, Brennan, D'Souza, Dekkers, Henry, Hockfield, Immelt, Jung, Lane, Lazarus, McAdam, Mollenkopf, Mulva, Rohr, Schapiro, and Tisch were negligent in including these misleading statements in the 2017 Proxy.

226.    The 2017 Proxy harmed GE by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the misleading statements in the 2017 Proxy, GE's stockholders voted via an uninformed stockholder vote to reelect defendants Bazin, Beattie, Brennan, D'Souza, Dekkers, Henry, Hockfield, Immelt, Jung, Lane, Lazarus, McAdam, Mollenkopf, Mulva, Rohr, Schapiro, and Tisch to GE's Board.

   **b.    Misstatements in Support of Vote to Approve an Amendment of the 2007 Long-Term Incentive Plan to Extend the Plan and Increase the Number of Shares Available Under the Plan**

227.    Defendants Bazin, Beattie, Brennan, D'Souza, Dekkers, Henry, Hockfield, Immelt, Jung, Lane, Lazarus, McAdam, Mollenkopf, Mulva, Rohr, Schapiro, and Tisch also made misrepresentations in the 2017 Proxy in support of a stockholder vote for approval of an

amendment of the 2007 Long-Term Incentive Plan (the "Incentive Plan") to extend the plan and increase the number of shares available under the plan, among other things.  The amendment sought to extend the term of the Incentive Plan by ten years and increase the total number of shares that can be issued under the plan from 925 million shares to 1.075 billion, with dilutive effects.  In support of the requested approval, the 2017 Proxy stated:

> **Why the Board recommends a vote FOR the amended plan.**  The purposes of the plan are to:
>
> – **Encourage** selected salaried employees to acquire a proprietary interest in the growth and performance of GE;
>
> – **Generate** an increased incentive to contribute to GE's future success and prosperity, thus enhancing the value of the company; and
>
> – **Enhance** the ability of the company to attract and retain exceptionally qualified individuals upon whom the sustained progress, growth and profitability of GE depend.
>
> The amended plan would further these objectives by allowing GE to continue to grant awards under the Plan for another four to five years.

228.     The annual and long-term compensation awards were subject to performance goals.  The material terms of the performance goals in GE's Incentive Plan did not encourage proper risk oversight, nor advance long-term stockholder value.  In reality, the material terms of the performance goals in the Incentive Plan actually encouraged—and consistently rewarded—extreme risk-taking, which furthered only short-term growth fueled by artificially inflated sales numbers due to the Company's failure to materially increase reserves while rewarding executives overseeing such endeavors.

229.     Particularly, the Incentive Plan incentivized Company fiduciaries to conceal the Company's failure to increase LTC reserves to keep the stock price artificially inflated.  The Individual Defendants were negligent in not knowing that executives had breached their

fiduciary duties to the Company and exposed the Company to significant and material risks and liability through their conduct related to GE's LTC business.

230.    As a result of the misleading statements in the 2017 Proxy, GE's stockholders voted for the increase in shares for distribution under the Incentive Plan.  This vote was made without the benefit of material information regarding the defendants' continued and ongoing failure to address GE's under-reserving for LTC policies and their failure to reform the Company's incentive compensation structures to ensure they did not promote improper accounting practices.

**c.**      **Misstatements in Opposition to Adopting Policies Requiring an Independent Board Chairman and Cumulative Voting**

231.    The 2017 Proxy also contained stockholder proposals to adopt policies requiring an independent Board Chairman and cumulative voting.  The Board recommended voting against these proposals for substantially the same reasons set forth in the 2016 Proxy.

232.    For the reasons detailed *supra* with respect to the 2016 Proxy, the Individual Defendants' statements in the 2017 Proxy were materially misleading and caused stockholders to vote in accord with the Board's respective recommendations.

**E.      The Truth Slowly Emerges**

**1.      Second Quarter 2017**

233.    The truth about GE's LTC insurance business and other underperforming segments began to emerge on July 21, 2017, when GE issued a press release summarizing the Company's financial and operating results for the quarter ended June 30, 2017.  For the second quarter of 2017, the Company reported industrial operating and verticals EPS of $0.28 and CFOA of $3.5 billion ($1.5 billion industrial CFOA), including a $2 billion dividend from GE

Capital.   In the press release, defendant Immelt stated that "[w]e expect cash flow to continue to improve throughout the year."

234.    That same day, before the market opened, GE held an earnings conference call with investors and analysts to discuss the Company's second quarter 2017 financial results. During the conference call, the Company hinted for the first time of an impending issue at GE Capital, but failed to provide context or disclose the magnitude of the problem.   Defendant Bornstein stated:  "We recently have had adverse claims experience in a portion of our long-term care portfolio and we will assess the adequacy of our premium reserves."  Despite these vague remarks about adverse claims experience, defendant Bornstein, commenting on GE Capital's verticals business, assured investors that "[o]verall, portfolio quality remains stable."

235.    Defendant Immelt also spoke positively about the Company's industrial businesses, explaining that cash flow would improve in the second half of the year and projecting a "solid" industrial CFOA range of $12 billion to $14 billion.  Defendant Immelt stated:

> For cash, CFOA was $3.5 billion in the quarter: $2 billion from capital and $1.5 billion from Industrial CFOA, in line with expectations....  Contract assets were a drag, but better than a year ago.
>
> ***The second-half CFOA profile will be a lot like last year****....  **Contract assets will grow at about the same level, and we will benefit from timing of other items***. We ended the quarter with $14 billion of cash on the balance sheet, in line with expectations. ***And we should be within the $12 billion to $14 billion goal for Industrial CFOA***.

236.    Defendant Bornstein reiterated the $12 billion to $14 billion range for industrial cash flow, however, disclosed that industrial CFOA was expected to come in at the lower end of that range.   Defendant Bornstein attributed lower-trending cash flows to weakness in the Company's GE Power segment, stating:

> We had a better cash quarter. CFOA was $3.5 billion, including a $2 billion dividend from GE Capital. Industrial CFOA was $1.5 billion in the quarter. It was

up $3.1 billion from the first quarter and up substantially from the second quarter of last year. At the half, Industrial CFOA is a $200 million usage.

> ***We expect substantial improvement in cash in the second half, driven by higher earnings, continued working capital improvement on higher shipments, partly offset by contract assets.*** For the year, we are trending to the bottom end of the $12 billion to $14 billion range on CFOA, driven by pressure, principally in Power and Oil & Gas....  Dividend remains our priority. We are relooking the $11 billion to $13 billion range of cash used for buyback based on the timing of dispositions. Year to date, we bought back $3.6 billion of shares.

237.   Later during the conference call, defendant Bornstein clarified his statements about CFOA in the second quarter.  Specifically, defendant Bornstein stated that "we expected that CFOA in the second quarter would be substantially better sequentially from the first and substantially better than the second quarter of last year.  I didn't mean to say that we would be flat year over year."  Defendant Bornstein also reassured investors that CFOA in the GE Power segment would be up in the second half of 2017, stating:

> Then when you think about total year, ***we still think about the Power business being up mid-single digits on revenue and up roughly high to low double-digits on earnings***. I just think that in the backdrop of everything we've got in front of us here that it does feel softer.

238.   Defendant Immelt also emphasized the Company's "very strong position in Power."  With respect to GE's industrial businesses, defendant Immelt explained that "We don't like the current oil and gas cycle, but our business is significantly improved and will prosper as the cycle recovers."  Defendant Immelt stressed that even with these headwinds, the Company would meet its "target of $17.2 billion for Industrial [earnings before interest and taxes]."

239.   Following the Company's prepared remarks, analysts were provided an opportunity to ask questions.  Not surprisingly, analysts were most concerned about GE's announcement that industrial CFOA was expected to come in at the lower end of the $12 billion to $14 billion range.  One analyst asked for more "transparency" into the expected cash conversion within the Power segment, to which defendant Bornstein assured investors that the

Power business would "deliver positive CFOA."  Specifically, defendant Bornstein responded:

"*So we expect the Power business to deliver positive CFOA in the year for sure.... So the Power business is going to be something like a 50% to 60% conversion in the year*."

240.   Defendant Bornstein further discussed the impact that contract assets had on industrial CFOA, explaining that contract assets would "be a little bit of a drag in the second half," but "all other elements of cash flow will be better in the second half than the first half." However, defendant Bornstein failed to disclose that only through GE's improper accounting for its contract assets was the Company able to manufacture positive industrial CFOA.  Defendant Bornstein stated:

> *...[O]n contract assets , we still expect contract assets to be a cash usage in the second half, but not nearly the rate that we saw in the first half. And we expect it to look very similar to the change in contract assets in the second half of last year, which was about $1.4 billion, $1.5 billion*.

> So, if you look at second-half cash flow versus 2016, we delivered $11 billion of CFOA in the second half of last year. We need to do about $1 billion more this year, which is primarily a function of earnings. And we expect working capital to be about $3.9 billion better in the second half. So the total improvement for the year of about $3.3 billion, and that's less than the $5.1 billion of working capital improvement we had in the second half of last year.

> *As I said, contract assets will be a little bit of a drag in the second half, but in line with where we were in the second half of last year*. And I'd say lastly, other operating – *all the other elements of cash flow will be better in the second half than the first half and will be better substantially versus 2016. So that is kind of how we think about going from first half to second half*.

241.   On this news, GE's market capitalization dropped nearly 3%, erasing approximately $6.8 billion in market capitalization.

242.   Despite the Company's repeated assurances about the security of the dividend, a July 24, 2017 report by J.P. Morgan, indicated that the Company's cash flows would likely be insufficient to cover the proposed $8.5 billion stockholder dividend.   The report titled "Framework Reaffirmed," stated:

…[C]ontract assets are now a ~$4.7B difference this year (prior guide had been $3.9B), another step higher set to reverse on earnings in the years ahead. ***Receivables sales to GECS and extended payables terms are ways to temporarily drive working capital, though progress payments ($2B positive last year), and what promises to be heavy cash restructuring means there are still negative cash calls here.***

\* \* \*

Two items of note we will be watching are receivables sales to GECS, and payables for which there is some evidence from the WSJ article of extended terms, despite an already stretched payables days ~90. ***In any event, the absolute FCF levels at the low end of guidance ($9B), and when considering an additional $1.8B in pension funding and $1+B of outflows for "other investing activities", equates to ~$6B, not enough to cover the dividend ($8.5B).***

\* \* \*

The key TBD here is the magnitude of LTSA gains and y/y uptick particularly after a ~$200mm y/y increase in 1H, and while there could be upside pressure to our/street's Q3 estimates driven by these gains, it will all come down to rolling 4-qtr cash flow, which we think will be the ultimate indicator of quality of earnings.

\* \* \*

Management said that LTSA gains were $0.5B in Q2 vs $0.6B prior year, showing what happens to segment profits when this lever becomes less of a y/y contributor (Q2 segment profits of $3.9B were down $0.2B y/y, and missed our estimate by $0.1B). This is contrary to the Q1 segment profit results which beat our estimates by $0.3B, when LTSA gains were $0.8B, up $0.3B y/y. Looking to 2H17, contract assets (of which LTSA gains are a portion) are expected to be flat y/y, showing this source of non-cash earnings growth is slowing. In Q217, contract assets were $1.3B. For the full year contract assets are now expected to grow by ~$4.7B vs $3.9B prior.

243.    On July 28, 2017, the Company filed with the SEC its Q2 2017 Form 10-Q.  The

Q2 2017 Form 10-Q revealed that the Company was experiencing "elevated claim experience" in

its LTC portfolio which could potentially result in deficient reserves.  With respect to the

Company's LTC reserves, the Q2 2017 Form 10-Q stated:

> ***We test future policy benefit reserves associated with our run-off insurance activities for premium deficiencies annually***. *We have recently experienced elevated claim experience for a portion of our long-term care insurance products, which may result in a deficiency in reserves plus future premiums*

***compared to future benefit payments***. Should such a deficiency exist, we would record a charge to earnings in the second half of 2017 upon completion of this review.

\*  \*  \*

The future policy benefit reserve is subject to an annual review to determine its adequacy. Should the liability for future policy benefits plus the present value of expected future gross premiums be insufficient to provide for the present value of expected future policy benefits and expenses, a premium deficiency would be recorded.

244.   In addition, the Q2 2017 Form 10-Q reported that industrial CFOA was performing worse than initially anticipated, purportedly due to increases in contract assets as a result of adjustments to estimated profitability on LTSAs.  For the second quarter, the Company reported an LTSA balance of $14.76 billion.  With respect to the Company's LTSAs, the Q2 2017 Form 10-Q stated:  "Long-term product service agreement balances are presented net of related billings in excess of revenues of $2,679 million and $3,750 million at June 30, 2017 and December 31, 2016, respectively."  The Q2 2017 Form 10-Q also disclosed that CFOA decreased $7.2 billion.  The Company attributed this primarily to an increase in contract assets. The Q2 2017 Form 10-Q explained that contract assets increased as a result of accounting adjustments that supposedly reflected variations in GE's profitably on its LTSAs.  The Q2 2017 Form 10-Q stated:

- Cash used for industrial operating activities amounted to $0.4 billion and $0.2 billion in 2017 and 2016, respectively, primarily due to [among other things]: ...***An increase in contract assets of $3.2 billion and $2.4 billion in 2017 and 2016, respectively, primarily due to adjustments driven by lower forecasted cost to complete the contracts and timing of billings relative to revenue recognition on our long-term equipment and service contracts***.

## 2.    Third Quarter 2017

245.   On October 20, 2017, the Company issued a press release summarizing the Company's financial and operating results for the third quarter ended September 30, 2017.  As

the press release revealed, GE's earnings fell significantly short of the Company's projections as well as analysts' expectations.  In addition, the press release disclosed that the Company's LTC claims experience was sufficiently high to necessitate a comprehensive review of GE Capital's premium deficiency assumptions.  The press release further announced that GE Capital was "…deferring decision on additional dividends until Insurance reserve review is completed."

246.    That same day, the Company hosted an earnings conference call with analysts and investors in connection with its third quarter 2017 financial results.  The Company shocked the market when defendant Bornstein revealed that GE "did not receive a dividend in the quarter [from GE Capital]" and the Company had "deferred the decision to pay approximately $3 billion of additional GE Capital dividends."  During the conference call, defendants Bornstein and Miller addressed the ongoing LTC reserve review and the delayed dividend as a result thereof. Defendants Bornstein and Miller stated:

> [Defendant Bornstein]: …*[W]e've recently observed elevated claims experience for a portion of the long term care book at GE Capital's legacy insurance business,* which represents $12 billion or roughly 50% of our insurance reserves. As a result, we began a comprehensive review in the third quarter of premium deficiency assumptions that are used in the annual claims reserve adequacy test. This is a very complex exercise, and the team is making good progress. We expect to complete this process by the end of the year. Until the review has been completed we've deferred the decision to pay approximately $3 billion of additional GE Capital dividends. Year to date, GE Capital has paid $4 billion of dividends to GE.
>
> *   *   *
>
> [Defendant Miller]: At GE Capital, Jeff mentioned that we expect our insurance actuarial review to be concluded in the fourth quarter. As many of you may know, this book of business includes long-term care reinsurance, which can be quite difficult to analyze and reset the reserves. Jeff mentioned the decision to hold off on the GE Capital additional dividends for the third and fourth quarters until that analysis is finalized.

247.    Unfortunately, the surprises to the market did not end there.  On this same date, October 20, 2017, details began to emerge indicating that GE's cash flow issues were far worse

than the Company had let on.  After continually reiterating a "solid" industrial CFOA range of $12 billion to $14 billion, the Company announced that GE was slashing its guidance for 2017 industrial CFOA down to $7 billion.   In addition, defendant Flannery announced that the Company's 2017 EPS guidance was being revised downward from $1.60 to $1.70 per share from $1.05 to $1.10 per share.  Analysts called the EPS reductions "drastic" and found the CFOA miss to be "enormous."  Defendant Flannery admitted that these results were "unacceptable, to say the least" and that the Company needed to "make some major changes with urgency and a depth of purpose."

248.    During the call, the Company explained that GE was forced to slash its industrial CFOA guidance in large part due to weak cash flow performance in the GE Power segment and the accounting used for contract assets within that segment.  In particular, defendant Bornstein stated: "Versus our expectations, our CFOA in the quarter was negatively impacted by two things: lower-than-expected Power earnings, and underperformance in working capital."

249.    Speaking to lower-than-expected power earnings, defendant Bornstein explained that GE Power had "emerged as a real challenge in terms of volume, profitability, and cash flow."  Defendant Bornstein further detailed the poor performance of the GE Power segment and the impact of cumulative catch-up adjustments for the quarter.  Defendant Bornstein stated:

> …We are severely disappointed in the results of Power, and are taking action to position the business going forward. This includes a refocus on the basics, significant additional cost-out plans, and changes to management, including announcing a new head of power services this week.
>
> The business has been undergoing market changes and we haven't changed fast enough with it.  …The structure of the service market has also changed, as we discussed on the second-quarter conference call, driven by renewables, fleet penetration for AGPs, lower capacity payments, utilization, and outages.
>
> However, the decline we saw in our service business in the third quarter was much sharper than the decrease in the first half. We expect these issues to persist through the fourth quarter and into 2018.

* * *

Service revenues of $4.3 billion were down 4%, with Energy Connections up 6%, and Power down 5%. Power services were down on lower AGPs, down 54%, at 13 versus 28 units last year, and outages were down 18%. *Our CSA [cumulative catch] adjustments in the quarter were $323 million, down from last year's $366 million*.

250.    In addition, defendant Bornstein explained the negative impact contract assets had

on the Company's weak industrial CFOA, stating:

Contract assets were a use of $800 million in the quarter. Of the $800 million, $300 million was from our equipment contracts, given the timing of our revenue recognition milestones which will catch up as we execute against these contracts. The remaining $500 million is from our long-term service agreements due to better cost performance and parts life, primarily in Power and Transportation.

251.    During the question and answer portion of the earnings call, analysts focused on

GE's contract assets and the impact they had on the Company's cash flow.  Vertical Research

Partners analyst Sprague, commented on the lack of transparency in GE's accounting for contract

assets and called GE out for its "aggressive forecasts" and "unrealistic assumptions," stating:

There's been a couple elephants in the room leading up to today, and another one has been the contract asset account, which is also built upon numerous assumptions. As we sit here and listen to aggressive forecasts, unrealistic assumptions, et cetera, particularly in Power, how do we get comfortable with what's gone on in that account? And have you guys actually been able to scrub through that yet?

252.    In response, defendant Bornstein assured investors that the Company's revenue

recognition practices with respect to its LTSAs and contract assets was sound.  Defendant

Bornstein further assured investors that the asset balance would convert to cash in the near

future, stating:

…[W]e have been digging through that, I would say, over the last six months. *I think we are very comfortable with where we are. And I think you've got to think about it, in Power's case, in a number of buckets. The first is long-term service agreements. And I want to be clear here: in the third quarter with this performance, our productivity or CSA cumulative catch was actually down $45 million year-over-year. So it's a small contributor to where we are year-over-*

- 119 -

*year in the quarter*. But it's not that reason that we were way off where we thought we would be in the third quarter.

The second is we have really grown long-term equipment agreements. Now, this is 81-1 accounting. These are long-term contracts. They're generally anywhere from 12 to 24 months, where we build projects out, and along – as we go along the way we incur cost, we rev rec on milestones.

And then there's also cash billing milestones. And they don't always line up on top of one another. That has grown over the last two years really as a function of two things. One is we added Alstom to the portfolio, which had a much higher content of long-term projects. And as we built out the H units, we've done a lot more full scope, much larger scope projects, even if it was just contained to the turbine island, all the way through HRSGs and the steam tail that we got with Alstom. So the amount of this activity in the portfolio has grown. And as a result of that, our 81-1 balances, particularly in Power, have grown.

And so that cost, if you will, generally liquidates over 12 to 18 months. *So we're higher this year by about $800 million than we originally forecast, almost all of that in Power. But that will liquidate and turn to cash as we hit billing milestones over the next 12 to 18 months*.

253.     Defendant Miller echoed defendant Bornstein's assurances about the sound methods used to account for the Company's contract assets, stating that she was "deeply familiar with that model." In addition, defendant Miller commented on GE's cumulative catch-up adjustments, explaining that the adjustments were in the range of previous estimates, stating:

On contract assets, look, I'm *deeply familiar with that model*. I've only been here in Boston for a couple of weeks, *but I have gone through and sat through a number of the reviews with businesses, and I know GE balance sheet very well. Look, there's nothing I've seen that gives me any indication of an accounting issue here. I think Jeff explained it pretty well in terms of the long-term contract equipment build we're seeing*.

\* \* \*

So look, we'll take you through this on November 13. Obviously this is a big fourth-quarter focus area. The one thing I'd add to what Jeff said is the cumulative catch is still in the range of what we've been estimating before. And as we go through it, we'll lay out both how we think you should think about margins on long-term equipment, margins on services, and just how best to sort of gauge the 2018 to 2017 run rate views.

254.    On this news, GE's market capitalization decreased more than 6%, or $1.51 per share, on October 23, 2017, to close at $22.32 per share compared to the previous trading day's closing of $23.83 per share, erasing approximately $13.1 billion in market capitalization.

255.    In the days following the Company's disclosures, analysts questioned whether the Company's revelations told the whole story.  For example, on October 23, 2017, Deutsche Bank issued an analyst report titled "Back to the Future," stating:

> We find it extraordinary that investors and analysts appear to have jumped so quickly to adopt GE's narrative that cash flow is heading for a substantial rebound – driven by cost cutting (significantly already in the numbers) and the absence of black box one-time items such as Alstom taxes. Moreover, Aviation and other business "strength" (commercial spares +21%) will eventually soften – possibly blunting the future benefit from Power one day turning higher. We calculate a paltry FCF yield even if GE were able to realize a sizeable cash bounce next year.

256.    Deutsche Bank analysts questioned how the Company's Power business apparently fell apart "[i]n only a matter of weeks."  The report stated:

> GE's Power Q317 segment profit collapse was astounding with revenues down 4% and profits down 51% y/y. In only a matter of weeks, the company's service, aeroderivative and power conversion businesses seemingly fell apart.

257.    Likewise, analysts also questioned how deep the problems at GE Power went.  In an October 23, 2017 J.P. Morgan analyst report titled "General Electric Co., Not Much Left For Bears To Say… The Numbers Now Speak For Themselves," analysts stated:

> …We also wonder how, immediately following the departure of Power head Steve Bolze, a segment that is supposed to be driven by services can unravel so quickly.

> We are not saying there are accounting issues here, but given the legendary earning management prowess of historical GE, there would appear to be something perhaps more systemic, a challenge for anyone to cleanse, especially a 30 year insider.

J.P. Morgan analysts also questioned how "great" a business that has to "build billions in contract assets to drive market share actually be?"

258.    On October 30, 2017, GE filed with the SEC its Q3 2017 Form 10-Q.  The Q3 2017 Form 10-Q discussed the Company's legacy LTC insurance business and its ongoing reserve testing.  The Company reiterated that it was delaying the GE Capital dividend until the deficiency testing was complete, which it expected to be in the fourth quarter of 2017.  The Q3 2017 Form 10-Q stated:

- Our run-off insurance activities include future policy benefit reserves of $19.2 billion and claim reserves of $4.9 billion at September 30, 2017 of which approximately $9.0 billion and $3.4 billion, respectively, relates to long-term care insurance contracts. We test future policy benefit reserves associated with our run-off insurance activities for premium deficiencies annually. *We have recently experienced elevated claim experience for a portion of our long-term care insurance contracts* that requires the completion of a comprehensive review of premium deficiency assumptions across all insurance products. This review will be completed in the fourth quarter of 2017. Based upon the work performed to date and complexity of the review as further described within our Critical Accounting Estimates and Note 11 to the consolidated financial statements, a charge related to a probable deficiency is not reasonably estimable at September 30, 2017.

* * *

*We have recently experienced elevated claim experience for a portion of our long-term care insurance contracts,* which is most pronounced for policyholders with higher attained ages. As a result, and as described below, we are conducting a comprehensive review of premium deficiency assumptions across all insurance products, including a reassessment of future claim projections for long-term care contracts that will be incorporated within our annual test of future policy benefit reserves for premium deficiencies, which is expected to be completed in the fourth quarter of 2017.

* * *

Should the net liability for future policy benefits plus the present value of expected future gross premiums be insufficient to provide for the present value of expected future policy benefits and expenses, we would be required to reduce any remaining capitalized acquisition costs and, to the extent a shortfall still exists, increase our existing future policy benefit reserves. We would record a charge to earnings for any premium deficiencies in the fourth quarter of 2017 upon completion of this review. Based upon the work performed to date and complexity of the review described above, a charge related to a probable deficiency is not reasonably estimable at September 30, 2017. Until the above

described review has been completed we have deferred the decision whether GE Capital will pay additional dividends to GE.

259.    The Q3 2017 Form 10-Q also discussed significant increases in contract assets, as a result of adjustments to projected revenues from LTSAs.  According to the Company, contract assets increased primarily due to the timing of revenue recognition relative to the timing of collections as well as lower estimated costs to complete the contracts.  The Q3 2017 Form 10-Q stated:

- *Contract assets increased $4.6 billion. Revenues in excess of billings increased $2.6 billion and $1.3 billion for our long-term service and equipment agreements, respectively. The remaining increase in contract assets of $0.7 billion is primarily due an increase in deferred inventory costs and non-recurring engineering costs.*

\*   \*   \*

Revenues in excess of billings increased $2,606 million and $1,328 million for our long-term service agreements and long-term equipment contracts, respectively. *The increase in our long-term service agreements is due to a $1,930 million cumulative catch up adjustment driven by lower forecasted costs to complete these contracts as well as increased forecasted revenue and $676 million due to the timing of revenue recognized for work performed relative to billings and collections. Revenue in excess of billings for our longterm equipment contracts increased $1,328 million primarily due to the timing of revenue recognized for work performed relative to the timing of billings and collections. The remaining increase in contract assets of $712 million is primarily due an increase in deferred inventory costs and non-recurring engineering costs*.

The change in estimated profitability within our long-term product service agreements in our Power, Aviation, Transportation, and Oil & Gas segments resulted in an adjustment of $649 million and $588 million for the three months ended September 30, 2017 and 2016, respectively, and $1,930 million and $1,714 million for the nine months ended September 30, 2017 and 2016, respectively, driven primarily by cost execution and increased productivity.

260.    Additionally, the Q3 2017 Form 10-Q commented on the $14.3 billion decrease in CFOA, attributing it to the increase in contract assets as a result of cumulative catch-up adjustments.  The Q3 2017 Form 10-Q stated:

- Cash generated from Industrial CFOA[] amounted to an insignificant amount and $2.3 billion in 2017 and 2016, respectively, primarily due to [among other things]: …***An increase in contract assets of $4.0 billion in 2017 compared with $3.0 billion in 2016, primarily due to cumulative catch up adjustments driven by lower forecasted cost to complete the contracts as well as increased forecasted revenue on our long-term service agreements and the timing of revenue recognized relative to the timing of billings and collections on both our long-term service agreements and long-term equipment contracts***.

### 3. November Investor Update and Goldman Sachs Conference

261.    On November 13, 2017, GE again shocked the market when it announced the Company was slashing its annual dividend in half, from $0.96 to $0.48 per share, which was only GE's second dividend cut since the Great Depression.  During the Company's Investor Meeting later that day, defendant Flannery explained that GE had been paying out a dividend above its industrial free cash flow for a number of years, and that GE Capital would not be paying a dividend to GE in 2018.  Defendant Flannery stated:

> [T]he reduction of this dividend to $0.48 is a product, really, of where we are as a company right now.  So we had a $0.96 dividend established.  We had a path where we thought the industrial cash flow generation would grow, that would grow into the dividend....  The reality is that hasn't unfolded that way.  ...[W]e've been paying a dividend in excess of our free cash flow for a number of years now.

262.    Market analysts found these admissions to be not only surprising, but also "particularly damaging."  During the question and answer portion of the conference call, one participant questioned defendant Flannery's assertions that the dividend was safe only three months prior. In response, defendant Flannery explained that the dividend was actually "predicated on [GE] growing to a certain level … in the next couple of years."  The following exchange took place:

> [Analyst]: …[S]hortly after you were named CEO, it was widely quoted in the Journal and elsewhere that the dividend was safe.  I'm surprised that you would make such a strong statement early on, which … has hurt your credibility right out of the gate.  ...[W]hen did you make the decision?

[Defendant Flannery]: So I think there's been major change in our cash flow forecast. So the time we went out with that first statement, we were having a $12 billion to $14 billion CFOA. And the day I started, there was a guide to the low end of that range.... So we're now at a $7 billion number.... [F]undamentally, that dividend was predicated on us growing to a certain level that we just did not see happening in terms of industrial cash flow in the next couple of years.... So the single biggest delta, I think is obvious, which is what happened in the Power business.

263.     In addition, the Company updated analysts and investors on GE's ongoing LTC

insurance review.  Defendant Miller explained that the review would conclude in December and

likely result in a charge of at least $3 billion.  Defendant Miller stated:

One area, I'll just pause and talk about for a minute, is GE Capital. And as many of you know we're in the middle of an ongoing reserves review at our insurance businesses there. This process is ongoing. It involves multiple third parties and it's not done at this point. And I don't have a number for you today. We're on track to conclude that in December. And we mentioned to you before, that we're not taking a second half GE Capital dividend of about $3 billion. And as we go through this process at this point, I do expect the charge to be more than that. But we do have capital plans in place and we don't expect to have to put GE parent cash into GE Capital.

264.     During its November Investor Meeting, the Company also announced it was

slashing its 2018 profit outlook by 50%, from adjusted earnings of $2 per share to $1.07 per

share.  In addition, the Company announced a series of steps to save cash and refine operations,

including reducing the Board to twelve members, revising executive compensation plans, and

reducing its corporate workforce.

265.     In the wake of these disclosures, analysts were quick to downgrade GE stock.  As

one Citibank analyst observed, "[p]ower is a mess right now, GE Capital will likely take a big

insurance charge, and Cash/EPS could flat-line close to $1."

266.     Then, on November 14, 2017, representatives from GE attended the Goldman

Sachs Industrials Conference during which defendant Miller reiterated that the Company would

be deferring its dividend as a result of the ongoing insurance reserves review.  Defendant Miller stated:

> …[W]e're in the middle of a review of our insurance reserves.  This is a book of largely reinsured long-term care businesses back from more than a decade ago.... It's on track for completion in December....  We had announced earlier that we had deferred the decision on a GE Capital dividend of about $3 billion in the second half of the year.  At this point in the process, I'd tell you that I expect that charge to be more than that, but we also have capital plans in place and I don't expect to have to put parent cash into GE Capital at this point.

267.    In the wake of these shocking announcements, GE's market capitalization plunged more than 7%, or $1.47 per share, on November 13, 2017, to close at $19.02 per share compared to the previous trading day's closing of $20.49 per share, erasing approximately $12.7 billion in market capitalization.  The Company's market capitalization fell an additional 5.8%, or $1.12 per share, to close at $17.90 per share on November 14, 2017.  This marked a market capitalization loss of $22.4 billion, approximately 12.64%, in just two days.

**4.       January 16, 2018 Insurance Update**

268.    On January 16, 2018, the Company issued a press release titled "GE Provides Update on Insurance Review; $6.2B after-tax GAAP charge in 4Q'17," confirming a multibillion-dollar loss in GE's legacy reinsurance business.  GE stated that it would be taking an after-tax GAAP charge of $6.2 billion for the fourth quarter of 2017, and GE Capital would be required to contribute approximately $15 million to its reserves.  The press release stated:

- *$9.5B pre-tax, $6.2B after-tax GAAP charge in 4Q'17; $7.5B after-tax impact at 21% tax rate (post U.S. tax reform)*

- *~$3 billion statutory contribution in Q1'18 and ~$2 billion annually from 2019 to 2024 for an estimated statutory contribution of ~$15 billion over 7 years*

- *GE Capital to fund contributions and suspend dividend to GE for foreseeable future*

- *Ongoing actions over the next two years to make GE Capital smaller, more focused and restore its capital ratios to appropriate levels*

- *Goodwill and other non-cash impairments of $1.8 billion after-tax related to GE Capital actions*

- *No impact to Industrial business and 2018 capital allocation plan*

GE (NYSE: GE) announced today that the comprehensive review and reserve testing for GE Capital's run-off insurance portfolio, North American Life & Health (NALH), will result in an ***after-tax GAAP charge of $6.2 billion for the fourth quarter of 2017, and GE Capital expects to make statutory reserve contributions of ~$15 billion over seven years.*** The Kansas Insurance Department, NALH's primary regulator, approved a phased contribution of ~$3 billion in Q1'18 and ~$2 billion annually from 2019 through 2024.

"As we disclosed during the company's second- and third-quarter earnings calls and further discussed during our November 13, 2017, investor presentation, earlier this year GE Capital initiated a comprehensive review of our insurance reserves with the assistance of leading outside experts," said John Flannery, chairman and CEO of GE. "This was a rigorous process involving complex factors and estimates relating primarily to long-term care policies written by primary insurance companies and reinsured by NALH."

Flannery added, "The required contributions to the statutory reserve will be made by GE Capital, which has sufficient liquidity to do so. We have been taking ongoing actions to make GE Capital smaller and more focused while maintaining its key capabilities to support financing for GE Industrial products. These actions will also help restore GE Capital ratios to appropriate levels. At a time when we are moving forward as a company, ***a charge of this magnitude from a legacy insurance portfolio in run-off for more than a decade is deeply disappointing.***"

The required statutory contributions will be a higher number than the GAAP charge, due primarily to modifications of certain assumptions to reflect various potential adverse conditions, as is required for statutory accounting purposes.

269.    During a conference call later that day, defendant Flannery repeated the results of

GE's comprehensive review and admitted that the Company "underappreciated the risk in [GE's

insurance business] book."  Defendant Flannery stated:

…[W]e've been performing a comprehensive review of our insurance portfolio. We finished that work late last week and reviewed it with our regulator, and we're going to share those results of that review with you today.

We've taken an after-tax GAAP charge of $6.2 billion, which is $7.5 billion at a 21% tax rate. And you will see that reflected in our fourth quarter financials. GE Capital will make a $3 billion statutory cash contribution to its insurance subsidiary in the first quarter of 2018 and approximately $2 billion annually from 2019 to 2024, for a total of approximately $15 billion. Needless to say, at a time when we are moving forward as a company, *I'm deeply disappointed at the magnitude of the charge in this legacy portfolio*.

\* \* \*

*Clearly, in hindsight, we underappreciated the risk in this book*. Similar to the rest of the industry, the assumptions we made at that time have played out differently. In 2015, as part of the GE Capital exit process, we again reviewed our insurance exposure and determined that we'd looked at exit options when the interest rate environment was more favorable.

270.    On the conference call, defendant Miller expanded on the Company's LTC reserve charge and explained the difference in the GAAP charge and the required statutory contribution, stating:

…*In the quarter, we recorded a pretax charge of $9.5 billion*….    The components of the pretax charge are the following: *an $8.9 billion increase in policy benefit reserves; and a $600 million write-down of the remaining deferred acquisition cost*. This GAAP charge represents our best estimate of the future cost based on what we know today.

*The related statutory capital contributions will be approximately $15 billion, which will be funded over the next 7 years*. We estimate that our 2018 funding requirement will be approximately $3 billion, and we'll make that contribution in late February using GE Capital's excess cash. At this point, we estimate the annual contributions from 2019 to 2024 to be approximately $2 billion.

\* \* \*

The capital contribution is not based on GAAP numbers. It's actually based on regulatory or statutory accounting. And there is very prescribed rules not only around the accounting, but also around the required capital of insurance entities. So for statutory, you use more adverse assumptions. There is -- examples of that might be for morbidity. You use more adverse morbidity improvement assumptions. The discount rates tend to be prescribed as opposed to something where you estimate. And then a lot of these assumptions are set as of the end of the year as well. So it's just a different process than GAAP.

And then when you get to actually looking at required capital, the insurance regulators have a regulatory calculation around risk-based capital. So that's really

what determined the $15 billion contribution. This funding will be spread over 7 years, as we talked about before, so $3 billion next year, roughly $2 billion thereafter each year. And really, the statutory process, we've worked very closely with the Kansas Insurance Department. However, that process really runs for another month or so. The $15 billion is what we think it will be.

271.    During the conference call, GE Capital's Chief Risk Officer, Ryan A. Zanin ("Zanin"), also commented on the Company's LTC business as well as the broader LTC industry. Zanin's comments acknowledged the widespread negative trends in the LTC industry and elevated adverse claims experience throughout "[v]irtually, the entire industry."  Despite this acknowledgement, Zanin failed to admit that virtually the entire industry had made adjustments to their assumptions and increased reserves years before GE.  Zanin stated:

Turning to long-term care portfolio. This business was primarily underwritten in the late 1980s to early 2000s. Our book has been in run-off since 2006 with no new business written in over a decade. Across our books, we reinsure approximately 300,000 policies.   ...In general, long-term care policies have proven challenging for the industry. Decades can pass between when policies are underwritten and when policyholders begin to claim benefits. As the insured population ages and actual claims arise, those claims are compared with the projected claims, and the adequacy of reserves is assessed.

Virtually, the entire industry has experienced greater claims than originally anticipated where more people go on claim and for longer than expected.

*  *  *

Each year, we perform an annual premium deficiency test, which, under GAAP, test to ensure the sufficiency of our current reserves plus future premiums to pay future claims across all insurance books. In all prior years, these tests resulted in a positive margin, which, under GAAP, requires that original assumptions above the book remain locked.

In 2017, based on new claims experience studies, we undertook a deeper dive to better understand developing trends in claims. This led to a comprehensive actuarial review of all policy assumptions and a bottoms-up rebuilding of claims cost curves.

We engaged 2 independent third-parties with actuarial experts to help us with that work in addition to KPMG's audit review. The actuarial analysis included a fundamental shift in estimating future claims costs, from one that involved making incremental adjustments to existing projections in response to observed

levels of claims experienced, to one that rebuilds the projections utilizing the additional credible data for older retained ages that has become available.

The revised and reconstructed long-term care claims cost projections, combined with the fact that claims costs stand out over 40 years, results in a very significant premium deficiency and is a primary driver of today's aggregate after-tax GAAP reserve charge of $6.2 billion. On a statutory basis, reserves are calculated assuming moderately adverse conditions rather than our best estimate under GAAP. On a statutory basis, we estimate today that we may contribute approximately $15 billion over 7 years to build reserves at North America Life & Health.

272.    Not surprisingly, in the days after GE published the disappointing and unexpected financial results, the Company's stock price fell approximately 3%, from a close of $18.76 per share on January 12, 2018, to close at $18.21 per share on January 16, 2018, the next trading day. The following day, January 17, 2018, GE's stock fell another $0.85, or 4.7%, for a total two-day drop of 7.52%, erasing another $12.2 billion in market capitalization.

273.    Given the magnitude of the losses, analysts covering GE were quick to conclude that the Company was aware of problems in GE Capital's LTC insurance business for some time. For example, after the conference call on January 16, 2018, Deutsche Bank issued an analyst report titled "Insurance Woes Hit GE Hard."  The report noted that not only were the "charges and scope of the problem … significantly worse than [Deutsche Bank] had anticipated," but also, "[t]he charges come well after Genworth first flagged [LTC] issues in late 2014."  Similarly, *The Economist* published an article on January 18, 2018, commenting on GE's failure to increase reserves in the face of mounting industry-wide negative trends.  The article stated:

That in the 12 years since then the firm appears to have done little about this residual portfolio seems an odd omission. The risk, after all, was well known. Other firms had problems with policyholders living longer and incurring higher medical costs than insurers had built into their initial assumptions; the long-term care market as a whole in America has run into trouble.

Further, Melius Research analyst, Scott Davis reported that it is "very hard to believe that mysteriously overnight GE found problems they didn't know existed."   Likewise, Vertical Research analyst Sprague commented that it's "hard to imagine a $15 billion problem materialized in the course of the year."

274.    Then, on January 24, 2018, before the market opened, the Company announced its fourth quarter and year-end 2017 financial results, disclosing a net loss of $9.8 billion for the quarter and steep declines in profits in the GE Power segment.  The press release stated:

> GE Chairman and CEO John Flannery said, "In the fourth quarter, EPS was at the low-end of guidance, excluding insurance-related items, U.S. tax reform, and industrial portfolio actions....   Power was down significantly and we expect market challenges to continue.
>
> *   *   *
>
> GE Capital ended the quarter with $157 billion of assets, including $31 billion of liquidity. On a reported basis, the Verticals generated a loss of $(7.6) billion, which is down from last year driven by the effects of the charges in the Insurance business, and the associated Energy Financial Services impairments. Other continuing operations generated $1 billion in earnings in the quarter driven by tax benefits.

275.    Later that day, during an earnings conference call with investors and analysts, the Company announced that it was being investigated by the SEC in connection with the insurance reserve increase and GE's accounting for contract assets.   Defendant Miller announced the following:

> I also want to note that we have been notified by the SEC that they are investigating the process leading to the insurance reserve increase and the fourth quarter charge as well as GE's revenue recognition and controls for long-term service agreements. We are cooperating fully with the investigation, which is in very early stages.

276.    Additionally, during the conference call, GE Power's CEO Stokes disclosed deficiencies in GE's internal controls over financial reporting, specifically in the GE Power segment.   In particular, Stokes disclosed that the Company was "implementing much more

disciplined underwriting practices."   The following dialogue took place between Melius Research analyst Stott Davis and Stokes:

> [Davis]: If I was to look at one part of our model that we're probably a little bit insecure of, I should say, it's just around price in Power … maybe just [Stokes] could fill us in on where we stand there?

> [Stokes]: …There is an element of price that we have acknowledged that we felt up to now, just given that we did not have the level of attention that we should have had on that portion of the business. We also acknowledged in the past cost overruns around some of the execution that had taken place as well.

*   *   *

> [Davis]: So … I mean, one of the things that – your competitors have always said that GE is a little bit tough on price. And maybe you guys had made some decisions in the past that weren't economic. Is that something that has materially changed under your watch?...

> [Stokes]: So across the board, we are implementing much more disciplined underwriting practices.  …The process is definitely tighter than I would say than it was in the past….

277.    In addition, defendant Miller confirmed that GE would be adopting stronger controls to address its accounting for contract assets:   "Some of the controls that we're implementing are things like just really making sure that we are much tighter on our underwriting, not only how we think about the strike zone around returns, but importantly how the cash profile really looks on these contracts going out several years."

278.    In the days following these disclosures, GE's stock price fell 4.5%, from a close of $16.89 per share on January 23, 2018, to a close of $16.13 per share on January 26, 2018, erasing another $6.59 billion in market capitalization.

**5.      The Company's Stock Price Continues to Decline**

279.    Since these disclosures, GE's stock price has continued to decline.  On March 13, 2018, analysts at J.P. Morgan slashed the stock price target, citing increased concerns over the outlook for free cash flow and earnings.  Casting doubt on the already lower forecasts made by

- 132 -

GE, J.P. Morgan analysts stated that management's earnings guidance "is not a credible number." While the Company has projected earnings would be around $1 per share in 2018, down from its earlier projection of $2, J.P. Morgan analysts expect profits of $0.88 per share, and have stated that there's a "plausible case" that it could be even lower.  After J.P. Morgan's announcement of lowered expectations, the Company's stock price fell another 2.5%, from a close of $15.10 per share on March 12, 2018, to a close of $14.43 per share on March 13, 2018.

280.    On March 26, 2018, GE's stock price dropped to $12.86, the lowest level since July 2009.  In an article published that day, CNBC reported: "Pressure on GE has not let up this year, with the stock sliding more than 25 percent.  A dismal 2017 saw company shares slide 42 percent."

281.    Roughly two weeks later, on April 13, 2018, the Company filed a Current Report on Form 8-K reporting a $4.24 billion equity charge and restating its earnings for fiscal years 2016 and 2017.  The Company reduced its 2016 EPS by $0.13 and its 2017 EPS by $0.17.  In addition, GE reduced its revenue by $220 million for 2016 and $2.2 billion for 2017.  The restatement stems from the need to adjust for new revenue recognition rules issued by the FASB. For GE, this especially applies to its LTSAs.  GE's Form 8-K explained the new revenue standard:  "Under the new revenue standard, contract modifications will generally be accounted for as if we entered into a new contract, resulting in prospective recognition of changes to our estimates of contract billings and costs.  That is, cumulative effect adjustments will generally no longer be recognized in the period that modifications occur."

282.    On April 20, 2018, the Company announced its financial results for the first quarter of 2018.  The Company reported a net loss of $1.18 billion for the quarter.  During the quarter, revenue in the Power unit fell 9% and the segment's profit fell 38%.  During GE's April

20, 2017 earnings call, the Company disclosed that the power segment was looking even worse than GE had anticipated.  The Company reported that it had closed 17 sites in the Power division over the past six months and would be "exiting other noncore assets" in the division.  Defendant Flannery explained that:   "Power continues to be our biggest challenge. … [T]he market is challenging and, as we've said before, this will be a multiyear fix."

283.   Finally, on June 19, 2018, media outlets reported GE was being ousted from the Dow Jones Industrial Average.  GE was an original member of the Dow in 1896 and has been in it continuously since November 7, 1907.  The *New York Times* explained why GE was dropped from the Dow and being replaced by Walgreens Boots Alliance:

> Over the last year, G.E.'s shares have fallen 55 percent, compared with a 15 percent gain for the Dow.  G.E., which closed Tuesday at $12.95, has the lowest share price of any of the index's 30 components.

> S. & P. Dow Jones Indices — which owns the Dow — suggested that the slide in G.E.'s stock price contributed to the decision to remove the company from the index, where it had been a member continuously since 1907. The Dow is a price-weighted index, which means higher priced stocks have a greater influence on its direction.

> "The low price of G.E. shares means the company has a weight in the index of less than one-half of one percentage point," said David Blitzer, chairman of the index committee at S. & P. Dow Jones Indices. "Walgreens Boots Alliance's share price is higher, and it will contribute more meaningfully to the index."

284.   In total, between July 2016, when the truth about GE began to emerge, and June 2018, GE's stock price fell over 60% and eliminated over $183 billion in market capitalization.

**F.    There Exists Facts Giving Rise to a Reasonable Inference that the Board Was Aware of GE's Concealment of the True Condition of GE's LTC Portfolio and has Failed to Take Meaningful Action against Those Responsible**

285.   Between 2004 and 2006, GE divested much of its legacy LTC policies through the spin-off of Genworth.  However, the Company retained $28 billion in insurance policies, including reinsurance on LTC policies.

286.    By the early 2000's, the lion's share of companies in the LTC insurance business, including GE, stopped writing or reinsuring new LTC policies since the policies created huge exposure (due to expanding life expectancies and medical costs) and was inherently unprofitable. Analysts estimate that of those companies still holding and liable for LTC policies written under the incorrect assumptions of the late 1980's and early 2000's, the industry-wide gap between LTC insurance claims and reserves could soon surpass $300 billion.

287.    It was only because no party was willing to accept GE's huge LTC insurance liabilities that billions of dollars in GE LTC insurance policies and reinsurance contracts were carved out of the deal spinning off the profitable portions of its insurance segment over a decade ago.

288.    GE has not sold new LTC insurance policies or reinsured the same for over a decade and its insurance sector primarily handles closed books of long-duration business, i.e. collecting premiums and paying liabilities of long existing policies.

289.    In light of the above, the GE insurance sector has long been, in essence, the custodian of toxic assets which the Company was unable to sell to another party.

290.    GE was well aware that it shared this industry wide exposure in its LTC business in addition to the known toxicity of its remaining LTC portfolio, but misreported its known true exposure so as to understate its required LTC reserves by billions of dollars.

291.    Due to the magnitude of the Genworth spinoff, there exists a reasonable inference that the Board was aware of the transaction and the major terms of the transaction including the retention of the toxic LTC contracts.

292.    During the past decade, the Company's insurance sectors, including its LTC insurance portfolio, have been left essentially unaudited, permitting the Company to wildly

misstate insurance assumptions, and to grossly understate by billions of dollars, GE's corresponding required LTC insurance reserves.

293. Indeed, while the Individual Defendants caused GE to issue opaque periodic financial reports, the public was unaware of the massive exposure the LTC policies presented to GE. For instance, as stated above, during the November 19, 2003 Investor Meeting, defendant Immelt assured investors that other than ERC, it was only retaining "a piece of low return, very stable run off block from the [GEFA] portfolio." Defendant Immelt even assured the market that its run-off business was "pric[ed] very diligently" and that it "maintain[ed] strong reserving practices" for its reinsurance business

294. Throughout the Revant Period, the Individual Defendants made almost no specific disclosures with regard to its exposure from GE Capital's LTC policies. In fact, until the recent corrective disclosures, rather than separately reporting reserves for LTC, the Company reported them under the "Life Insurance Benefits" section, obscuring the importance of LTC reserves. As a result, investors and the broader market could not meaningfully assess the true risk these policies presented.

295. There exists a reasonable inference that the Board was aware, and new Board members becamse aware of the nonreporting of the retention of the above described garbage loans and the failure of the Company to report the same.

296. The January 16, 2018 $6.2 billion charge (resulting from the suddenly announced $15 billion set aside for reserves) did not mysteriously or suddenly materialize overnight or in a year. Rather, it resulted from over a decade's worth of the Company's intentional underreporting of potential LTC liabilities. Concerning the news, CEO Defendant Flannery stated "At a time

when we are moving forward as a company, a charge of this magnitude from a legacy insurance portfolio in runoff for more than a decade is deeply disappointing."

297.     The only fashion in which GE was able to for over a decade underreport its required LTC reserves by billions of dollars, was by not updating assumptions of life expectancy and health care costs as these assumptions dramatically changed and correspondingly dramatically altered the landscape of the LTC business.  Working with stale assumptions, the Company for years made improper projection model changes so as to falsely understate the amount the Company was required to set aside as reserves for likely future liabilities from its LTC insurance business, all in violation of GAAP and statutory insurance regulations.

298.     The huge unreported liabilities associated with GE's retention of unprofitable LTC insurance policies had been long known to the many dozens of GE executives, accountants, actuaries and other employees, who actively participated in altering of LTC actuarial projections and other financial data so as to conceal the extent of the Company's LTC liability from investors.

299.     In light of the nature of the above described misstatements in terms of size (billions of dollars of misstatements), time duration (the Company is restating its 2016 and 2017 earnings), flagrancy (with the Board being informed that the insurance sector was not even conducting audits), and obviousness of fraudulent intent (alterations of fundamental actuarial projections is required in order to understate reserves by billions of dollars), it was apparent to the Director Defendants that the execution of such a massive ongoing massive misstatement of the finances of GE's insurance sector required the knowing involvement of a large number of GE employees ("the GE financial misreporting conspiracy").  The Board became aware that there existed a corporate-wide culture of corruption in the area of financial reporting at GE.

300.    It was clear to the Board that the execution of the GE financial reporting conspiracy over the course of the past decade required the knowing involvement of the following persons (along with many others): Dan Janki, GE's Treasurer, Kevin McCord, GE Capital's Director of Internal Audit, Joseph Pizzuto, GE Capital's former Chief Audit Executive, Ryan Zanin, GE Capital's Chief Risk Officer, Ronald Peters, ERAC's CEO, Clark Ramsey, ERAC's Chief Actuary, David Benz, LTC Managing Actuary, David Benz, and, importantly, KPMP, GM's auditor.

301.    In addition, upon information and belief, the Board forced the resignation or retirement of a number of high level executives who led the GE financial misreporting conspiracy, including  former CEO Defendant Immelt, "resignation" July 31, 2017; former CFO Defendant Bornstein, "resignation" November 1, 2017; Vice Chairman, President and CEO, GE Global Growth Organization, John Rice, "retirement," December 31, 2017; and, Vice Chairman Business Innovations, Elizabeth Comstock, "retirement," December 31, 2017.

302.    Despite having taken action against several executives for leading the GE financial misreporting conspiracy, the Board has failed to initiate any investigatory, disciplinary, or corrective action against the GE financial reporting personnel who actually executed the massive misreporting in various sectors of the Company.

303.    Despite the Board's awareness that GE's massive financial misreporting was indicative of a corporate-wide culture of corruption in the area of financial reporting, the Board has taken no meaningful steps to: (1) identify offending parties who knowingly participated in the misreporting; (2) create and institute specific policies (to prevent such misconduct in the future) to be enforced by specific persons (or positions) with specific delineated responsibilities and reporting obligations, to oversee risk prevention in the area of financial reporting; and, (3)

create a committee to investigate the causes of the massive financial misreporting of 2016 and 2017.

By its above described failure to take reasonable action to identify the offending employees who participated and executed GE's massive financial misreporting conspiracy, and by its above described failure to take reasonable corrective action in response to GE's massive financial misreporting conspiracy, the Director Defendants have in effect ratified that conduct and indicated their willingness to knowingly tolerate it in the future.

## VIII.  DAMAGES TO GE

304.   As a result of the Individual Defendants' improprieties, GE disseminated improper, public statements concerning the Company's allowance for insurance claims, accounting for contract assets, and the adequacy of the Company's internal controls over its financial reporting.  These improper statements have devastated GE's credibility as reflected by the Company's staggering multibillion-dollar market capitalization loss as the truth was gradually revealed to the public.

305.   The Individual Defendants' improper course of conduct has also subjected the Company to potentially billions of dollars in damages in connection with the Securities Class Action filed in the U.S. District Court for the Southern District of New York.  The Securities Class Action alleges that the Company and certain Individual Defendants violated securities laws by repeatedly misrepresenting that the Company had effective internal control over its financial reporting and disclosure procedures, when in fact the Company's financial statements could not be relied upon.  In addition, at least one class action complaint has been filed under ERISA alleging that GE breached its fiduciary duty to retirement plan participants by improperly and imprudently retaining or acquiring GE stock that was artificially inflated as a result of the

widespread and well-known improper accounting practices at the Company.  Furthermore, the Company remains subject to an investigation by the SEC in connection with GE's recent insurance reserve increase and GE's accounting for contract assets.

306.    GE's improper accounting practices and gross failures to timely address, remedy, or even disclose such practices also severely damaged its reputation within the business community and in the capital markets.  In addition to price, GE's customers and current and potential investors consider a company's trustworthiness, stability, and ability to evaluate known risks.  Businesses are less likely to award contracts to companies that knowingly permit unscrupulous behavior, and investors are less likely to invest in companies that disseminate improper statements, fail to comply with their own internal protocols and external regulations, and are uncertain about their own financial conditions.  Accordingly, GE's ability to attract customers and investors is now impaired.  In addition, GE's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

307.    Further, as a direct and proximate result of the Individual Defendants' actions, GE has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred in defending and paying any settlements in the Securities Class Action for violations of federal securities laws;

(b)    costs incurred in defending and paying any settlements in the ERISA Class Action;

(c)      costs incurred from the Company's internal investigation and review of the accounting violations;

(d)      costs incurred from restating and revising past financial statements;

(e)      costs incurred in complying with the investigation by the SEC;

(f)      costs incurred to investigate wrongdoing; and

(g)      costs incurred from the substantial compensation and benefits paid to the defendants who have breached their duties to GE.

## IX.      DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

308.      Plaintiffs bring this action derivatively in the right and for the benefit of GE to redress injuries suffered, and to be suffered, by GE as a direct result of violations of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  GE is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

309.      Plaintiffs will adequately and fairly represent the interests of GE and its stockholders in enforcing and prosecuting GE's rights.

310.      Plaintiffs are GE stockholders, were stockholders of GE at the time of the wrongdoing complained, and have continuously been stockholders of GE.

311.      The current Board of GE consists of the following twelve individuals: defendants Bazin, Beattie, Brennan, D'Souza, Flannery, Garden, Lavizzo-Mourey, Mulva, and Tisch, and nondefendants H. Lawrence Culp, Jr. ("Culp"), Thomas W. Horton ("Horton"), and Leslie F. Seidman ("Seidman").

312.    Plaintiffs have not made any demand on the Board to bring the allegations herein because such a demand would be a futile, wasteful, and useless act, as set forth below.

### A.    Demand Is Excused Because Defendants Bazin, Beattie, Brennan, D'Souza, Flannery, Garden, Lavizzo-Mourey, Mulva, and Tisch Face a Substantial Likelihood of Liability for Their Misconduct

313.    As alleged above, six of the twelve current Board members, including Director Defendants Bazin, Beattie, Brennan, D'Souza, Mulva, and Tisch, violated section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the 2016 Proxy and/or 2017 Proxy (collectively, the "Proxies").  Defendants Bazin, Beattie, Brennan, D'Souza, Mulva, and Tisch are responsible for the negligently made statements in the materially misleading Proxies.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act.  Accordingly, an indemnification provided by the Company to defendants Bazin, Beattie, Brennan, D'Souza, Mulva, and Tisch does not protect them for violations of section 14(a) in the Proxies.  As a result, defendants Bazin, Beattie, Brennan, D'Souza, Mulva, and Tisch face a substantial likelihood of liability, excusing a demand.

314.    In addition, nine out of twelve of the current Board members, including Director Defendants Bazin, Beattie, Brennan, D'Souza, Flannery, Garden, Lavizzo-Mourey, Mulva, and Tisch breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding:  (i) the risks associated with GE Capital's reinsurance business; (ii) the sufficiency of the Company's allowances for insurance claims; (iii) periodic testing of GE Capital's insurance portfolio for impairment; (iv) the Company's improper revenue recognition practices with respect to its LTSAs; and (v) the adequacy of the Company's internal controls over financial reporting.  In making these improper and misleading statements, defendants Bazin, Beattie, Brennan, D'Souza, Flannery, Garden, Lavizzo-Mourey, Mulva, and

Tisch breached their fiduciary duties.  Accordingly, a majority of the Board faces a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

315.    In light of the nature of the above described misstatements in terms of size (billions of dollars of misstatements), scope (misstatements relating to two major business sectors), and time duration (the Company is restating its 2016 and 2017 earnings, and the failure to disclose the LTC liabilities dates back to over a decade), it was readily apparent to the Director Defendants that the execution of such a massive ongoing misstatement of earnings and prospects required the knowing cooperation and involvement of a large number of GE employees ("the GE financial misreporting conspiracy").  As the misstatements became public, the Board reasonably became aware that there existed a corporate-wide culture of corruption in the area of financial reporting at GE.

316.    Upon information and belief, the Board forced the resignation or retirement of a number of high level executives who led the GE financial misreporting conspiracy, including former CEO Defendant Immelt ("resignation" July 31, 2017); former CFO Defendant Bornstein ("resignation" November 1, 2017); Vice Chairman, President and CEO, GE Global Growth Organization, John Rice ("retirement," December 31, 2017); and, Vice Chairman Business Innovations, Elizabeth Comstock ("retirement," December 31, 2017).

317.    Despite having taken action against executives who led the GE financial misreporting conspiracy, upon information and belief, the Board has failed to initiate any meaningful investigatory, disciplinary, or corrective action against the lower level GE financial reporting personnel who executed the massive misreporting conspiracy in various sectors of the Company.

318.    Despite the Board's awareness that GE's massive financial misreporting was indicative of a corporate-wide culture of corruption in the area of financial reporting, the Board has taken no meaningful steps to: (1) identify offending parties who knowingly participated in the misreporting, (2) delegate the responsibility to investigate the causes of the massive misreporting of 2016 and 2017 earnings; or, (3) create and institute specific policies to be enforced by specific persons (or positions) with specific delineated responsibilities and reporting obligations, to oversee the risk of corrupt employee practices in the area of financial reporting.

319.    Director Defendants Bazin, Beattie, D'Souza, and Mulva, as members of the Audit Committee during relevant times, reviewed and approved the improper statements detailed herein.  The Audit Committee's Charter provides that the members must oversee "the Company's financial reporting activities, including [the Company's] annual report, and accounting standards and principles, significant changes in such standards or principles … and the key accounting decisions affecting the Company's financial statements…."  Thus, defendants Bazin, Beattie, D'Souza, and Mulva were responsible for knowingly or recklessly allowing the improper statements concerning the Company's allowances for insurance claims and periodic testing for impairment.  These defendants further failed to assist the Board in overseeing "the Company's and GECC's risk policies and processes relating to financial statements … and allowance for loan and lease losses," and failed to ensure internal controls were sufficient for "monitoring and mitigating such risks."  By failing to implement a reasonable information and reporting system to ensure information concerning widespread accounting improprieties were timely shared with upper management and the Board, defendants Bazin, Beattie, D'Souza, and Mulva breached their duties.  Accordingly, defendants Bazin, Beattie, D'Souza, and Mulva face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

320.     Director Defendants Beattie and Brennan sat on the GE Capital Committee during relevant times.  These defendants failed to assist the Board in overseeing "the Company's risk-management framework, including key strategic and operations risks, as it relates to the Company's financial services businesses."  Furthermore, defendants Beattie and Brennan were responsible for reviewing and approving "GE Capital's risk governance framework, risk assessment and risk management practices."  These defendants therefore approved of GE Capital's abysmal risk-management framework.

321.     As members of the Risk Committee during relevant times, Director Defendants Beattie, Brennan, and Tisch utterly failed to provide effective oversight of the Company's strategies, policies, procedures, and systems, established by management to identify, assess, measure and manage major risks facing the Company.  These defendants tacitly approved widespread illegal and unethical conduct throughout GE.  As detailed herein, when the truth about GE's practices was revealed, the Company faced devastating and highly material declines, including, among other things, substantial losses in customer and investor trust and more than a hundred billion dollars of decline in market capitalization.

322.     The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations.  Defendants Bazin, Beattie, Brennan, D'Souza, Flannery, Garden, Lavizzo-Mourey, Mulva, and Tisch face a substantial likelihood of liability for repeatedly failing to comply with this duty.

**B.     Demand Is Excused as to Defendant Flannery Because He Lacks Independence**

323.     Defendant Flannery has been GE's Chairman since October 2017 and CEO and a director since August 2017.  Prior to becoming GE's Chairman and CEO, Flannery served as Senior Vice President, and as President and CEO of GE Healthcare.  Defendant Flannery is not

an independent director because defendant Flannery's principal professional occupation is his employment with GE, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.  In addition, defendant Flannery's reputation is inextricably linked to his role at GE. Accordingly, defendant Flannery lacks independence from defendants Bazin, Beattie, Brennan, D'Souza, Garden, Lavizzo-Mourey, Mulva, and Tisch and nondefendants Culp, Horton, and Seidman due to his interest in maintaining his executive position at GE.   GE paid defendant Flannery the following compensation:

| Year | Salary | Stock Options | Change in Pension Value & Nonqualified Deferred Comp. Earnings | All Other Compensation | SEC Total | Adjusted SEC Total |
|------|--------|---------------|-----------------|------------------------|-----------|--------------------|
| 2017 | $1,737,500 | $2,076,000 | $3,255,222 | $1,931,881 | $9,000,603 | $5,800,715 |

Accordingly, defendant Flannery is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Flannery.

324.   GE has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein.   Moreover, despite the Individual Defendants having knowledge of the claims raised by plaintiffs, the current Board has failed and refused to seek to recover for GE for any of the wrongdoing alleged by plaintiffs herein.

325.   Plaintiffs have not made any demand on the other stockholders of GE to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)   GE is a publicly held company with over 8.6  billion shares outstanding and thousands of stockholders;

(b)      making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)      making demand on all stockholders would force plaintiffs to incur excessive expenses, assuming all stockholders could be individually identified.

## X.   COUNT I—AGAINST DEFENDANTS BAZIN, BEATTIE, BRENNAN, CASH, DEKKERS, D'SOUZA, HENRY, HOCKFIELD, IMMELT, JUNG, LANE, LAZARUS, MOLLENKOPF, MULVA, ROHR, SCHAPIRO, SWIERINGA, TISCH, AND WARNER FOR VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT

326.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

327.   The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of Director Defendants Bazin, Beattie, Brennan, Cash, Dekkers, D'Souza, Henry, Hockfield, Immelt, Jung, Lane, Lazarus, Mollenkopf, Mulva, Rohr, Schapiro, Swieringa, Tisch, and Warner.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiffs specifically disclaim any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

328.   Director Defendants Bazin, Beattie, Brennan, Cash, Dekkers, D'Souza, Henry, Hockfield, Immelt, Jung, Lane, Lazarus, Mollenkopf, Mulva, Rohr, Schapiro, Swieringa, Tisch, and Warner negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxies.  In Proxies, the Board solicited stockholder votes to reelect themselves to the Board, approve the amendment to the Incentive Plan, reject the stockholder proposals to adopt cumulative voting in the election

of directors, and reject the stockholder proposals to adopt a policy to require an independent Board Chairman.

329.    The Proxies, however, misrepresented and failed to disclose: (i) GE's failure to periodically test GE Capital's insurance portfolio for impairment; (ii) GE violated GAAP and SEC regulations by, among other things, under-reserving for LTC exposure and failing to disclose the true risks and uncertainties associated with the LTC book; (iii) the Company's improper accounting on LTSAs which artificially inflated the revenue reported in GE's financial statements; (iv) the Company's woefully inadequate internal controls; and (v) GE faced significant reputational harm when the truth would inevitably unfold.  By reasons of the conduct alleged herein, Director Defendants Bazin, Beattie, Brennan, Cash, Dekkers, D'Souza, Henry, Hockfield, Immelt, Jung, Lane, Lazarus, Mollenkopf, Mulva, Rohr, Schapiro, Swieringa, Tisch, and Warner violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, GE misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding GE's recommendation to reelect certain Board members, approve the amendment to the Incentive Plan, and reject stockholder proposals for the Company to adopt policies to require an independent Board Chairman and cumulative voting.

330.    The misleading information contained in the Proxies was material to GE's stockholders in determining whether or not to elect these defendants, adopt policies to require an independent Board Chairman and cumulative voting on directors, and approve the amendment to the Incentive Plan.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy solicitation process in connection with the Proxies were essential links in the reelection of nominees to the Board, approval of the Incentive Plan,

the decision not to require an independent Board Chairman, and the decision not to adopt cumulative voting on directors.

331.   Plaintiffs, on behalf of GE, thereby seek relief for damages inflicted upon the Company based upon the misleading Proxies in connection with the improper reelection of the members of the Board, approval of the amendment to the Incentive Plan, and vote against stockholder proposals for the Company to adopt a policies to require an independent Board Chairman and cumulative voting on directors.

## XI.   COUNT II—AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

332.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

333.   As alleged in detail herein, Individual Defendants by reason of their positions as officers and directors of GE and because of their ability to control the business and corporate affairs of GE, owed the Company fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage GE in a fair, just, honest, and equitable manner.

334.   Each of the Individual Defendants violated their fiduciary duties by consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.  The Individual Defendants repeatedly encouraged and/or acquiesced to unlawful and unethical behavior throughout the Company's business operations.

335.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company was failing to make meaningful adjustments to its insurance actuarial assumptions;

(ii) the Company was failing to maintain adequate insurance reserves for premium deficiencies in accordance with GAAP; (iii) GE was improperly recognizing revenue on its LTSAs; and (iv) the value of GE was overstated and additional undisclosed impairments were necessary. As a result, the Officer Defendants' public statements about GE's business were misleading. Accordingly, the Officer Defendants breached their duties of care and loyalty to the Company.

336. The Director Defendants, as directors of the Company, owed GE the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein. The Director Defendants knew or were reckless in not knowing that: (i) the Company was failing to make meaningful adjustments to its insurance actuarial assumptions; (ii) the Company was failing to maintain adequate insurance reserves for premium deficiencies in accordance with GAAP; (iii) GE was improperly recognizing revenue on its LTSAs; and (iv) the value of GE was overstated and additional undisclosed impairments were necessary. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

337. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

338. The Risk Committee Defendants and the GE Capital Committee Defendants breached their fiduciaries duties by approving of GE Capital's risk governance framework, risk assessment and risk management practices. The Risk Committee Defendants and the GE Capital Committee Defendants utterly failed to provide effective oversight of the Company's strategies,

policies, procedures, and systems to identify, assess, measure, and manage the major risks facing the Company.

339.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GE has sustained significant damages, as alleged herein.

340.     Plaintiffs, on behalf of GE, have no adequate remedy at law.

## XII.    COUNT III—AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

341.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

342.     As a result of the Individual Defendants' failure to materially increase its insurance reserves, the Individual Defendants have caused GE to incur substantial costs.  In particular, as a direct result of this failure, GE was forced to report a $6.2 billion after-tax GAAP charge and contribute $15 million to its reserves.

343.     In addition, as a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, GE is subject to the Securities Class Action.  The Individual Defendants have caused GE to waste its assets by forcing it to defend itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

344.     Further, the Individual Defendants have caused GE to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

345.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

346.     Plaintiffs, on behalf of GE, have no adequate remedy at law.

## XIII.  COUNT IV—AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

347.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

348.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of GE.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to GE.

349.    Plaintiffs, as stockholders and representatives of GE, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

350.    Plaintiffs, on behalf of GE, have no adequate remedy at law.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of GE, demand judgment as follows:

A.      Against the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Individual Defendants' violations of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing GE to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect GE and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

       1.     a proposal to strengthen Board oversight and supervision of GE's business practices;

       2.     a proposal to strengthen the Company's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and public;

       3.     a proposal to strengthen the Company's controls over financial reporting;

       4.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

       5.     a provision to permit the stockholders of GE to nominate at least three candidates for election to the Board;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of GE have an effective remedy;

D.     Awarding to GE restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## XV.   JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: July 19, 2018               **ROBBINS ARROYO LLP**
                                 BRIAN J. ROBBINS
                                 CRAIG W. SMITH (admitted *pro hac vice*)
                                 JENNY L. DIXON (admitted *pro hac vice*)

_/s/ Jenny L. Dixon_
JENNY L. DIXON

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
     csmith@robbinsarroyo.com
     jdixon@robbinsarroyo.com

**LIFSHITZ & MILLER LLP**
JOSHUA M. LIFSHITZ
EDWARD M. MILLER
821 Franklin Avenue, Suite 209
Garden City, NY 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
E-mail: jml@jlclasslaw.com
     edmilleresq@aol.com

_Co-Lead Counsel for Plaintiffs_

**LAW OFFICES OF THOMAS G. AMON**
THOMAS G. AMON
733 3rd Avenue, 15th Floor
New York, NY 10017
Telephone: (212) 810-2430
E-mail: tamon@amonlaw.com

_Liaison Counsel for Plaintiffs_

1278775

## VERIFICATION

I, Edward Tansey, hereby declare as follows:

I am one of the plaintiffs in the within entitled consolidated action. I have read the Verified Consolidated Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _July 13, '18_

_Edward Tansey_
EDWARD TANSEY

VERIFICATION

I, Henry Zwang, hereby declare as follows:

I am one of the plaintiffs in the within entitled consolidated action. I have read the Verified Consolidated Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 2-15-18

_____

HENRY ZWANG

**VERIFICATION**

I, Malka Raul hereby declare as follows:

     I am a shareholder of General Electric and have continuously so owned the Company's common stock during the relevant period. I declare that I am the plaintiff named in the foregoing Consolidated Shareholder Derivative Complaint, and know the content thereof; that the pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe to be true.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on 07/15/2018

                                        Signature